# EXHIBIT AA-1

# PULLMAN ®

## THE PULLMAN GROUP,® LLC
*1370 Avenue of the Americas*
*New York, NY 10019*
*212.750.0210 tel.*
*212.750.0464 fax*
*info@pullmanco.com*
*www.pullmanco.com*
Securitizing the Future℠

*STRUCTURED ASSET SALES GROUP*

July 20, 1999

VIA FEDERAL EXPRESS

O'Kelly Isley Estate
C/o Ron and Rudolph Isley
Isley Brothers Management
10866 Wilshire Blvd., Suite 560
Los Angeles, CA 90024

Re:     Engagement as Exclusive Securitizing
        Agent and Advisor

Dear Mr. Ron and Rudolph Isley,

This engagement letter (the "Engagement Letter") confirms the engagement (the "Engagement") by O'Kelly Isley Estate, ("Owner") of The Pullman Group. ("Pullman") to act as Owner's agent and advisor on an exclusive basis with respect to the financial transactions described in paragraph 3(a) through (f) hereof ("Transactions"), on the following terms and conditions:

1.     **Engagement Period.** The term of the Engagement (the "Engagement Period") shall commence on the date Owner executes this letter (as entered by Owner below its authorized signatory's signature) (the "Commencement Date") and shall expire unless extended by mutual agreement of the parties hereto, upon the expiration of Ron Isley's Federal bankruptcy proceeding.

2.     **Exclusive Authority.** During the Engagement Period, neither Owner nor anyone acting on its behalf shall, other than with or through Pullman, undertake any activities with regard to Transactions. Notwithstanding the foregoing, Owner may obtain interim financing without doing so with or through Pullman, on condition that Owner provide notice and the particulars thereof to Pullman and that the interim financing is pre-payable and shall be refinanced in a transaction contemplated under this Engagement Letter to be the subject of Services by Pullman. Owner will refer to Pullman any expressions of interest and offers which Owner receives during the Engagement Period with respect to any Transactions. Pullman may perform the same or similar services for others, as well as engage in other business activities.

3.     **Pullman's Services.** Subject in the case of each particular Transaction to Pullman's due-diligence review and the approval of Pullman's Commitment Committee and Credit Committee

HIGHLY CONFIDENTIAL:
ATTORNEYS EYES ONLY
® Copyright 1998-1999, The Pullman Group, LLC. All rights expressly reserved.
PULLMAN® 2120

Engagement between Pullman and O'Kelly Isley Estate
Page 2

approval, Pullman or an affiliate, as appropriate, will, using reasonable best efforts, perform or cause to be performed under its supervision the following services (collectively the "Services"):

(a) Structuring a securitization program for the issuance of securities (the "Securities") or asset sale(s) backed by Record Masters, Music Publishing and Writers' share (the "Assets").

(b) Additionally subject to (i) the Securities' receiving an investment-grade rating by at least two nationally recognized rating agencies and (ii) no material, adverse changes in Owner, Owner's financial condition, or the Assets, and subject to the governing securities laws and regulations, marketing the Securities.

(c) Structuring and obtaining a secured line of credit or similar lending facility ("Warehouse Loan") on commercially reasonable terms.

(d) Compiling information, research and supporting data with respect to the Transactions and Owner (the "Due Diligence Package"), qualifying investors to review the Due Diligence Package and overseeing investors' due diligence review.

(e) Performing such due diligence with respect to the proposed parties to Transactions and other matters as Pullman shall reasonably deem necessary.

4. **Obligations of Owner.** Owner undertakes that, using its reasonable best efforts, Owner will:

(a) Make available or cause to be made available to Pullman, at Owner's expense, all documents, agreements and other information, in hard copy and database form, which in Pullman's reasonable judgment are necessary or appropriate for the performance of due diligence, marketing or sales in any of the Transactions.

(b) Provide Pullman with access to Owner's officers, directors, employees and other agents, as well as obligors under any loans, encumbrances or obligations of Owner.

(c) Ensure that all information provided by Owner and its officers, directors, employees or agents is accurate and complete in all material respects, on the express understanding that Pullman shall be entitled to rely thereon without verification and to include all or any portions thereof in any marketing, issuance or offering documents with respect to the Transactions.

(d) Negotiate in good faith and, subject to said negotiations, enter into all documentation reasonably necessary to obtain the required ratings relating to the Securities and to complete the Transactions with the third parties proposed by Pullman.

(e) Approve and retain, at Owner's expense, third-party contractors of Pullman's choosing, including but not limited to accountants, rating agencies, auditors, and attorneys to serve as Transaction counsel or Issuer's, Pullman's and/or investor's counsel on any Transaction, which Pullman determines in the reasonable exercise of its discretion are necessary and appropriate to perform due diligence or other Services.

(f) Reimburse Pullman on a current basis for the out-of-pocket expenses incurred by Pullman in the performance of the Services.

HIGHLY CONFIDENTIAL:
ATTORNEYS EYES ONLY

© Copyright 1998-1999, The Pullman Group, LLC. All rights expressly reserved.

PULLMAN® 3181

Engagement between Pullman and O'Kelly Isley Estate
Page 3

(g) Ensure that Pullman receives, promptly on execution thereof, a fully executed copy of every agreement entered into by Owner in any Transaction, and all amendments and modifications thereto.

5.    Compensation to Pullman.

(a) As compensation for Pullman's performance of the Services, Owner shall pay to Pullman:

(i) A non-refundable retainer of $25,000, payable at execution of this Engagement Letter and credited toward fees. **Pullman will waive the retainer specifically for this transaction.**

(ii) A fee equal to ten percent (10%) of the aggregate commitment amount of a Warehouse Loan or asset sale, including any increase in the commitment amount, payable at the closing of the Warehouse Loan or, in the event of an increase, at the time the commitment to the increase is issued, or

(iii) A fee equal to ten percent (10%) of the aggregate principal amount of investment-grade Securities or proceeds from asset sale(s), payable at the time the Securities or assets are sold.

(b) Pullman shall give written notice in the event it declines to undertake to provide the Services as to any particular Transaction, in which event Owner shall be free to engage a third party to perform Services as to that Transaction and will have no obligation to pay Pullman a fee therefor.

(c) Owner acknowledges that Pullman shall be entitled to its fee in full, pursuant to paragraph 5(a), in the event that:

(i) An investor from whom Owner accepts an offer to purchase the Securities requires Pullman to cease its marketing and sales efforts or Owner otherwise fails to permit Pullman to carry out its undertaking herein with regard to the transaction.

(ii) A Transaction as to which Pullman commences providing Services during the Engagement Period does not close prior to the Termination Date for any reason other than the willful breach of this Engagement Letter by Pullman, so long as Pullman remains ready, willing and able to perform the Services through the closing of the Transaction (whether or not Owner chooses to permit Pullman to do so).

(iii) A Transaction does not occur because of Owner's failure or refusal to perform its obligations under this Engagement Letter, in which event, since Owner acknowledges that

© Copyright 1998-1999, The Pullman Group, LLC.  All rights expressly reserved.

HIGHLY CONFIDENTIAL:
ATTORNEYS EYES ONLY
PULLMAN® 3182

Engagement between Pullman and O'Kelly Isley Estate
Page 4

Pullman will incur consequential damages by reason of the injury to its relations to third parties involved in the Transaction which are not susceptible to quantifiable proof, Owner shall be additionally liable to Pullman for liquidated damages for such injury in the amount of $250,000.

(iv)  With respect to 5(c)(i) and 5(c)(ii) above, Owner agrees that Pullman can file an attachment or lien for the full extent of any fees or structuring fees of Pullman or out-of-pocket expenses, interest, Interest Rate and/or Interest Rate Buydown and/or any other fees contemplated herein and third-party expenses incurred by Pullman related to performance of the Services.

6.    Interest Rate.  Subject to Paragraph 5(d), Pullman is granted the exclusive option, at its sole discretion, to buy down the Interest rate on the securities from the securitization transaction which are "A" rated or above by at least one national rating agency from an interest rate equal to the yield of 450 basis points over the corresponding treasury of the average life of the securities.  For example, if the average life is 10 years and the U.S. ten (10) year treasury is trading at 5.0%, Pullman may buy down the securities from a yield of 9.50% at its sole discretion. Purchase price is to be set below par to reflect above yield.

7.    Refinancing or Asset Sale(s).  Pullman is granted the exclusive right, at its sole discretion, to refinance any future transaction(s) or asset sale(s) for owner upon future recoupment of the Securities.  Such financing or asset sale shall be at a minimum transaction size of the initial transaction contemplated by this agreement.  Such refinancing will be on the same terms and conditions outlined herein.  This clause shall be interpreted to include all future financings during the greater of owner's life or two future financing periods in addition to the initial financing contemplated by this agreement.

8.    Breach.  In order to make specific and definite and to eliminate, if possible, any controversy which may arise between the parties, if at any time Owner believes that the terms of this Engagement Letter are being breached by Pullman, it will give notice thereof to Pullman, setting forth with specificity the alleged breach, and shall allow Pullman a period of thirty (30) days after receipt thereof within which to cure the alleged breach.  No breach of this Engagement Letter, unless intentionally dishonest, will be construed as incurable.

9.    Indemnification.  Owner will indemnify and hold harmless Pullman, its parent and affiliates, and their respective directors, officers, controlling persons, agents and employees past and present (each being an "Indemnified Party") from and against all claims, liabilities, losses, damages, proceedings or actions (collectively "claims") related to or arising out of this Engagement or Pullman's role in connection therewith, and will reimburse each Indemnified Party for all reasonable costs and expenses, including counsel fees, as they are incurred in connection with investigating, preparing for and defending any such claim, whether pending or threatened.  Owner will not, however, be responsible for any claims which are judicially determined by final order, without any further right to appeal, to have resulted primarily from Pullman's gross negligence or willful misconduct.  The foregoing right to indemnification shall be in addition to any other rights which an Indemnified Party may have and shall apply whether or not an Indemnified Party is named or threatened to be named as a party in any action, suit or proceeding, brought or to be brought.

10.   Non-circumvention.  From the Commencement Date until three years after the Termination Date, Owner will not attempt to contact any of the investors or lenders introduced by Pullman to Owner without Pullman's prior written approval.  If such contact is made and any

© Copyright 1998-1999, The Pullman Group, LLC.  All rights expressly

HIGHLY CONFIDENTIAL:
ATTORNEYS EYES ONLY
PULLMAN® 3188

Engagement between Pullman and O'Kelly Isley Estate
Page 5

Transaction is consummated between Owner and/or its affiliates and the lender or investor introduced by Pullman, Owner will be liable to Pullman for fees on the Transaction pursuant to paragraph 5 hereof.

11. **Assignability**. Pullman may not assign its rights and/or obligations under this Engagement Letter without the consent of Owner, except to one or more affiliates of Pullman. Owner may not assign its rights and/or obligations under this Engagement Letter without the consent of Pullman, except to any one or more single-purpose corporations or partnerships formed to hold the Assets and approved by counsel for the company issuing the Securities, if such assignment is necessary and prudent in connection with the securitization, and provided that such assignment shall not relieve Owner of its obligations hereunder.

12. **Law and venue**. This Engagement Letter shall be interpreted under and governed by the laws of the State of New York. In the event that any legal proceeding shall be instituted under or in connection with this Engagement Letter, the federal and state courts located in New York, New York, shall have full jurisdiction over both parties with regard thereto, and litigation shall be commenced solely in said courts. The losing party shall reimburse the prevailing party for its reasonable attorney's fees and costs incurred with respect to such legal proceeding.

13. **Authority**. Owner represents and warrants to Pullman that all requisite approval action required under Owner's by-laws relating to Owner's entering into and performing in full under this Engagement Letter has been duly taken.

14. **Confidentiality**. Each of Owner and Pullman, on its own behalf and on behalf of its partners, shareholders, officers, employees and agents, hereby acknowledges that the contents of this Engagement Letter, the form and contents of all documents, instruments and other materials relating to the other party and to the Transactions which may become available to it during the course of performance under this Engagement Letter, and all information pertaining to the Securities, including the structure, the credit spread, and the other terms (collectively, the "Materials"), are confidential. No such Materials, nor any portion of the contents or substance thereof or of this Engagement Letter may be communicated or made available to any person other than Owner and Pullman without the express prior written approval of the other party, except that each party may distribute Materials to its lawyers, accountants, lenders and advisors acting on its behalf as necessary for the party's performance hereunder and except that Pullman may publish information regarding the Transactions on the Bridge/Knight Ridder electronic screen and/or cause rating agencies to publish reports on the Transactions. Each of Owner and Pullman acknowledges that a breach of this provision shall cause irreparable harm to the other party that remedies at law will be inadequate to redress and that Pullman and Owner, as the case may be, will be entitled to injunctive or similar equitable relief against the other party in the event of breach of this provision.

15. **Modifications**. This Engagement Letter contains the entire agreement between the parties hereto and may be modified only in a writing signed by both Owner and Pullman.

16. **Notices**. All notices under this Engagement Letter must be in writing and will be considered given when delivered by hand (including by courier service), or on the fifth day after being mailed by prepaid certified or registered mail, return receipt requested, to the parties at the respective addresses stated at the beginning of this Engagement Letter (or at such other address as a party may specify by notice given to the other).

HIGHLY CONFIDENTIAL:
ATTORNEYS EYES ONLY
© Copyright 1998-1999, The Pullman Group, LLC. All rights expressly reserved   PULLMAN® 3124

Engagement between Pullman and O'Kelly Isley Estate
Page 6

Please execute this Engagement Letter in the space provided below and return the original to us to acknowledge your understanding and acceptance of the terms hereof.

Very truly yours,
The Pullman Group, LLC

By: _____

Its: CEO

ACCEPTED AND AGREED:

O'KELLY ISLEY ESTATE

By: _____
Ronald Isley, as executor for the O'Kelly Isley Estate

Title: _____

Date: 7/23/99
(Commencement Date)

O'KELLY ISLEY ESTATE

By: _____
Rudolph Isley, as executor for the O'Kelly Isley Estate

Title: _____

Date: 7/23/99
(Commencement Date)

HIGHLY CONFIDENTIAL:
ATTORNEYS EYES ONLY

® Copyright 1998-1999, The Pullman Group, LLC. All rights expressly reserved.
PULLMAN® 3185

# EXHIBIT A-1

JUN-15-2000  12:37     MWE                                              P.12



# PULLMAN®

**THE PULLMAN GROUP,® LLC**     V3476 D692
*1370 Avenue of the Americas*
*New York, NY 10019*
*212.750.0210 tel.*
*212.750.0464 fax*
*info@pullmanco.com*
*www.pullmanco.com*
Securitizing the Future™

PM 16 2002

*STRUCTURED ASSET SALES GROUP*

July 20, 1999

VIA FEDERAL EXPRESS

O'Kelly Isley Estate
C/o Ron and Rudolph Isley
Isley Brothers Management
10866 Wilshire Blvd., Suite 560
Los Angeles, CA 90024

Re:   Engagement as Exclusive Securitizing
      Agent and Advisor

Dear Mr. Ron and Rudolph Isley,

This engagement letter (the "Engagement Letter") confirms the engagement (the "Engagement") by O'Kelly Isley Estate, ("Owner") of The Pullman Group. ("Pullman") to act as Owner's agent and advisor on an exclusive basis with respect to the financial transactions described in paragraph 3(a) through (f) hereof ("Transactions"), on the following terms and conditions:

1.    <u>Engagement Period</u>.  The term of the Engagement (the "Engagement Period") shall commence on the date Owner executes this letter (as entered by Owner below its authorized signatory's signature) (the "Commencement Date") and shall expire unless extended by mutual agreement of the parties hereto, upon the expiration of Ron Isley's Federal bankruptcy proceeding.

2.    <u>Exclusive Authority</u>.  During the Engagement Period, neither Owner nor anyone acting on its behalf shall, other than with or through Pullman, undertake any activities with regard to Transactions.  Notwithstanding the foregoing, Owner may obtain interim financing without doing so with or through Pullman, on condition that Owner provide notice and the particulars thereof to Pullman and that the interim financing is pre-payable and shall be refinanced in a transaction contemplated under this Engagement Letter to be the subject of Services by Pullman.  Owner will refer to Pullman any expressions of interest and offers which Owner receives during the Engagement Period with respect to any Transactions.  Pullman may perform the same or similar services for others, as well as engage in other business activities.

3.    <u>Pullman's Services</u>.  Subject in the case of each particular Transaction to Pullman's due-diligence review and the approval of Pullman's Commitment Committee and Credit Committee

® Copyright 1998-1999, The Pullman Group. LLC.  All rights expressly reserved.

approval, Pullman or an affiliate, as appropriate, will, using reasonable best efforts, perform or cause to be performed under its supervision the following services (collectively the "Services"):

(a) Structuring a securitization program for the issuance of securities (the "Securities") or asset sale(s) backed by Record Masters, Music Publishing and Writers' share (the "Assets").

(b) Additionally subject to (i) the Securities' receiving an investment-grade rating by at least two nationally recognized rating agencies and (ii) no material, adverse changes in Owner, Owner's financial condition, or the Assets, and subject to the governing securities laws and regulations, marketing the Securities.

(c) Structuring and obtaining a secured line of credit or similar lending facility ("Warehouse Loan") on commercially reasonable terms.

(d) Compiling information, research and supporting data with respect to the Transactions and Owner (the "Due Diligence Package"), qualifying investors to review the Due Diligence Package and overseeing investors' due diligence review.

(e) Performing such due diligence with respect to the proposed parties to Transactions and other matters as Pullman shall reasonably deem necessary.

4.    Obligations of Owner.  Owner undertakes that, using its reasonable best efforts, Owner will:

(a) Make available or cause to be made available to Pullman, at Owner's expense, all documents, agreements and other information, in hard copy and database form, which in Pullman's reasonable judgment are necessary or appropriate for the performance of due diligence, marketing or sales in any of the Transactions.

(b) Provide Pullman with access to Owner's officers, directors, employees and other agents, as well as obligors under any loans, encumbrances or obligations of Owner.

(c) Ensure that all information provided by Owner and its officers, directors, employees or agents is accurate and complete in all material respects, on the express understanding that Pullman shall be entitled to rely thereon without verification and to include all or any portions thereof in any marketing, issuance or offering documents with respect to the Transactions.

(d) Negotiate in good faith and, subject to said negotiations, enter into all documentation reasonably necessary to obtain the required ratings relating to the Securities and to complete the Transactions with the third parties proposed by Pullman.

(e) Approve and retain, at Owner's expense, third-party contractors of Pullman's choosing, including but not limited to accountants, rating agencies, auditors, and attorneys to serve as Transaction counsel or Issuer's, Pullman's and/or investor's counsel, on any Transaction, which Pullman determines in the reasonable exercise of its discretion are necessary and appropriate to perform due diligence or other Services.

(f) Reimburse Pullman on a current basis for the out-of-pocket expenses incurred by Pullman in the performance of the Services.

© Copyright 1998-1999, The Pullman Group, LLC.  All rights expressly reserved.

Engagement between Pullman and O'Kelly Isley Estate          V3476 D692   Page 3
Page 3

(g) Ensure that Pullman receives, promptly on execution thereof, a fully executed copy of every agreement entered into by Owner in any Transaction, and all amendments and modifications thereto.

5.     Compensation to Pullman.

(a) As compensation for Pullman's performance of the Services, Owner shall pay to Pullman:

(i) A non-refundable retainer of ~~$25,000~~, payable at execution of this Engagement Letter and credited toward fees.  **Pullman will waive the retainer specifically for this transaction.**

(ii) A fee equal to ten percent (10%) of the aggregate commitment amount of a Warehouse Loan or asset sale, including any increase in the commitment amount, payable at the closing of the Warehouse Loan or, in the event of an increase, at the time the commitment to the increase is issued, or

(iii) A fee equal to ten percent (10%) of the aggregate principal amount of investment-grade Securities or proceeds from asset sale(s), payable at the time the Securities or assets are sold,

(b) Pullman shall give written notice in the event it declines to undertake to provide the Services as to any particular Transaction, in which event Owner shall be free to engage a third party to perform Services as to that Transaction and will have no obligation to pay Pullman a fee therefor.

(c) Owner acknowledges that Pullman shall be entitled to its fee in full, pursuant to paragraph 5(a), in the event that:

(i) An investor from whom Owner accepts an offer to purchase the Securities requires Pullman to cease its marketing and sales efforts or Owner otherwise fails to permit Pullman to carry out its undertaking herein with regard to the transaction.

(ii) A Transaction as to which Pullman commences providing Services during the Engagement Period does not close prior to the Termination Date for any reason other than the willful breach of this Engagement Letter by Pullman, so long as Pullman remains ready, willing and able to perform the Services through the closing of the Transaction (whether or not Owner chooses to permit Pullman to do so).

(iii) A Transaction does not occur because of Owner's failure or refusal to perform its obligations under this Engagement Letter, in which event, since Owner acknowledges that

© Copyright 1998-1999, The Pullman Group, LLC.  All rights expressly reserved.

Engagement between Pullman and O'Kelly Isley Estate                V3476 D692   Page 4
Page 4

Pullman will incur consequential damages by reason of the injury to its relations to third parties involved in the Transaction which are not susceptible to quantifiable proof, Owner shall be additionally liable to Pullman for liquidated damages for such injury in the amount of $250,000.

        (iv)  With respect to 5(c)(i) and 5(c)(ii) above, Owner agrees that Pullman can file an attachment or lien for the full extent of any fees or structuring fees of Pullman or out-of-pocket expenses, interest, Interest Rate and/or Interest Rate Buydown and/or any other fees contemplated herein and third-party expenses incurred by Pullman related to performance of the Services.

    6.    <u>Interest Rate.</u>  Subject to Paragraph 5(d), Pullman is granted the exclusive option, at its sole discretion, to buy down the Interest rate on the securities from the securitization transaction which are "A" rated or above by at least one national rating agency from an interest rate equal to the yield of 450 basis points over the corresponding treasury of the average life of the securities.  For example, if the average life is 10 years and the U.S. ten (10) year treasury is trading at 5.0%, Pullman may buy down the securities from ·a yield of 9.50% at its sole discretion. Purchase price is to be set below par to reflect above yield.

    7.    <u>Refinancing or Asset Sale(s).</u>  Pullman is granted the exclusive right, at its sole discretion, to refinance any future transaction(s) or asset sale(s) for owner upon future recoupment of the Securities.  Such financing or asset sale shall be at a minimum transaction size of the initial transaction contemplated by this agreement.  Such refinancing will be on the same terms and conditions outlined herein.  This clause shall be interpreted to include all future financings during the greater of owner's life or two future financing periods in addition to the initial financing contemplated by this agreement.

    8.    <u>Breach</u>.  In order to make specific and definite and to eliminate, if possible, any controversy which may arise between the parties, if at any time Owner believes that the terms of this Engagement Letter are being breached by Pullman, it will give notice thereof to Pullman, setting forth with specificity the alleged breach, and shall allow Pullman a period of thirty (30) days after receipt thereof within which to cure the alleged breach.  No breach of this Engagement Letter, unless intentionally dishonest, will be construed as incurable.

    9.    <u>Indemnification</u>.  Owner will indemnify and hold harmless Pullman, its parent and affiliates, and their respective directors, officers, controlling persons, agents and employees past and present (each being an "Indemnified Party") from and against all claims, liabilities, losses, damages, proceedings or actions (collectively "claims") related to or arising out of this Engagement or Pullman's role in connection therewith, and will reimburse each Indemnified Party for all reasonable costs and expenses, including counsel fees, as they are incurred in connection with investigating, preparing for and defending any such claim, whether pending or threatened.  Owner will not, however, be responsible for any claims which are judicially determined by final order, without any further right to appeal, to have resulted primarily from Pullman's gross negligence or willful misconduct. The foregoing right to indemnification shall be in addition to any other rights which an Indemnified Party may have and shall apply whether or not an Indemnified Party is named or threatened to be named as a party in any action, suit or proceeding, brought or to be brought. ·

    10.  <u>Non-circumvention</u>.  From the Commencement Date until three years after the Termination Date, Owner will not attempt to contact any of the investors or lenders introduced by Pullman to Owner without Pullman's prior written approval.  If such contact is made and any

© Copyright 1998-1999, The Pullman Group, LLC.  All rights expressly reserved.

Engagement between Pullman and O'Kelly Isley Estate        V3476 D692    Page 5
Page 5

Transaction is consummated between Owner and/or its affiliates and the lender or investor introduced by Pullman, Owner will be liable to Pullman for fees on the Transaction pursuant to paragraph 5 hereof.

11.   <u>Assignability</u>. Pullman may not assign its rights and/or obligations under this Engagement Letter without the consent of Owner, except to one or more affiliates of Pullman. Owner may not assign its rights and/or obligations under this Engagement Letter without the consent of Pullman, except to any one or more single-purpose corporations or partnerships formed to hold the Assets and approved by counsel for the company issuing the Securities, if such assignment is necessary and prudent in connection with the securitization, and provided that such assignment shall not relieve Owner of its obligations hereunder.

12.   <u>Law and venue</u>. This Engagement Letter shall be interpreted under and governed by the laws of the State of New York. In the event that any legal proceeding shall be instituted under or in connection with this Engagement Letter, the federal and state courts located in New York, New York, shall have full jurisdiction over both parties with regard thereto, and litigation shall be commenced solely in said courts. The losing party shall reimburse the prevailing party for its reasonable attorney's fees and costs incurred with respect to such legal proceeding.

13.   <u>Authority</u>. Owner represents and warrants to Pullman that all requisite approval action required under Owner's by-laws relating to Owner's entering into and performing in full under this Engagement Letter has been duly taken.

14.   <u>Confidentiality</u>. Each of Owner and Pullman, on its own behalf and on behalf of its partners, shareholders, officers, employees and agents, hereby acknowledges that the contents of this Engagement Letter, the form and contents of all documents, instruments and other materials relating to the other party and to the Transactions which may become available to it during the course of performance under this Engagement Letter, and all information pertaining to the Securities, including the structure, the credit spread, and the other terms (collectively, the "Materials"), are confidential. No such Materials, nor any portion of the contents or substance thereof or of this Engagement Letter may be communicated or made available to any person other than Owner and Pullman without the express prior written approval of the other party, except that each party may distribute Materials to its lawyers, accountants, lenders and advisors acting on its behalf as necessary for the party's performance hereunder and except that Pullman may publish information regarding the Transactions on the Bridge/Knight Ridder electronic screen and/or cause rating agencies to publish reports on the Transactions. Each of Owner and Pullman acknowledges that a breach of this provision shall cause irreparable harm to the other party that remedies at law will be inadequate to redress and that Pullman and Owner, as the case may be, will be entitled to injunctive or similar equitable relief against the other party in the event of breach of this provision.

15.   <u>Modifications</u>. This Engagement Letter contains the entire agreement between the parties hereto and may be modified only in a writing signed by both Owner and Pullman.

16.   <u>Notices</u>. All notices under this Engagement Letter must be in writing and will be considered given when delivered by hand (including by courier service), or on the fifth day after being mailed by prepaid certified or registered mail, return receipt requested, to the parties at the respective addresses stated at the beginning of this Engagement Letter (or at such other address as a party may specify by notice given to the other).

© Copyright 1998-1999, The Pullman Group, LLC. All rights expressly reserved.

Engagement between Pullman and O'Kelly Isley Estate
Page 6

V3476 D692 Page 6

Please execute this Engagement Letter in the space provided below and return the original to us to acknowledge your understanding and acceptance of the terms hereof.

Very truly yours,
The Pullman Group, LLC

By: _____

Its: _____

ACCEPTED AND AGREED:

O'KELLY ISLEY ESTATE

By: _____
Ronald Isley, as executor for the O'Kelly Isley Estate

Title: _____

Date: 7/23/99 _____
(Commencement Date)

O'KELLY ISLEY ESTATE

By: _____
Rudolph Isley, as executor for the O'Kelly Isley Estate

Title: _____

Date: 7/23/99 _____
(Commencement Date)

© Copyright 1998-1999, The Pullman Group, LLC. All rights expressly reserved.

# EXHIBIT A-2

# PULLMAN®

**THE PULLMAN GROUP,<sup>e</sup> LLC**
*1370 Avenue of the Americas*
*New York, NY 10019*
*212.750.0210 tel.*
*212.750.0464 fax*
*info@pullmanco.com*
*www.pullmanco.com*
Securitizing the Future™



V3476 D689

JAN 16 2002

*STRUCTURED ASSET SALES GROUP*

July 20, 1999

VIA FEDERAL EXPRESS

Ron and Rudolph Isley
Bovina Music Inc.
C/o Isley Brothers Management
10866 Wilshire Blvd., Suite 560
Los Angeles, CA  90024

Re:   Engagement as Exclusive Securitizing
      Agent and Advisor

Dear Mr. Ron and Rudolph Isley,

This engagement letter (the "Engagement Letter") confirms the engagement (the "Engagement") by Bovina Music Inc., ("Owner") of The Pullman Group. ("Pullman") to act as Owner's agent and advisor on an exclusive basis with respect to the financial transactions described in paragraph 3(a) through (f) hereof ("Transactions"), on the following terms and conditions:

1.    <u>Engagement Period</u>.  The term of the Engagement (the "Engagement Period") shall commence on the date Owner executes this letter (as entered by Owner below its authorized signatory's signature) (the "Commencement Date") and shall expire unless extended by mutual agreement of the parties hereto, upon the expiration of Ron Isley's Federal bankruptcy proceeding.

2.    <u>Exclusive Authority</u>.  During the Engagement Period, neither Owner nor anyone acting on its behalf shall, other than with or through Pullman, undertake any activities with regard to Transactions.  Notwithstanding the foregoing, Owner may obtain interim financing without doing so with or through Pullman, on condition that Owner provide notice and the particulars thereof to Pullman and that the interim financing is pre-payable and shall be refinanced in a transaction contemplated under this Engagement Letter to be the subject of Services by Pullman.  Owner will refer to Pullman any expressions of interest and offers which Owner receives during the Engagement Period with respect to any Transactions.  Pullman may perform the same or similar services for others, as well as engage in other business activities.

© Copyright 1992-1999. The Pullman Group, LLC.  All rights expressly reserved.

V3476 D689  Page 2

Engagement between Pullman and Bovina Music, Inc.
Page 2

     3.  <u>Pullman's Services</u>.  Subject in the case of each particular Transaction to Pullman's due-diligence review and the approval of Pullman's Commitment Committee and Credit Committee approval, Pullman or an affiliate, as appropriate, will, using reasonable best efforts, perform or cause to be performed under its supervision the following services (collectively the "Services"):

     (a) Structuring a securitization program for the issuance of securities (the "Securities") or asset sale(s) backed by Record Masters, Music Publishing and Writers' share (the "Assets").

     (b) Additionally subject to (i) the Securities' receiving an investment-grade rating by at least two nationally recognized rating agencies and (ii) no material, adverse changes in Owner, Owner's financial condition, or the Assets, and subject to the governing securities laws and regulations, marketing the Securities.

     (c) Structuring and obtaining a secured line of credit or similar lending facility ("Warehouse Loan") on commercially reasonable terms.

     (d) Compiling information, research and supporting data with respect to the Transactions and Owner (the "Due Diligence Package"), qualifying investors to review the Due Diligence Package and overseeing investors' due diligence review.

     (c) Performing such due diligence with respect to the proposed parties to Transactions and other matters as Pullman shall reasonably deem necessary.

     4.  <u>Obligations of Owner</u>.  Owner undertakes that, using its reasonable best efforts, Owner will:

     (a) Make available or cause to be made available to Pullman, at Owner's expense, all documents, agreements and other information, in hard copy and database form, which in Pullman's reasonable judgment are necessary or appropriate for the performance of due diligence, marketing or sales in any of the Transactions.

     (b) Provide Pullman with access to Owner's officers, directors, employees and other agents, as well as obligors under any loans, encumbrances or obligations of Owner.

     (c) Ensure that all information provided by Owner and its officers, directors, employees or agents is accurate and complete in all material respects, on the express understanding that Pullman shall be entitled to rely thereon without verification and to include all or any portions thereof in any marketing, issuance or offering documents with respect to the Transactions.

     (d) Negotiate in good faith and, subject to said negotiations, enter into all documentation reasonably necessary to obtain the required ratings relating to the Securities and to complete the Transactions with the third parties proposed by Pullman.

     (e) Approve and retain, at Owner's expense, third-party contractors of Pullman's choosing, including but not limited to accountants, rating agencies, auditors, and attorneys to serve as Transaction counsel or Issuer's, Pullman's and/or investor's counsel, on any Transaction, which Pullman determines in the reasonable exercise of its discretion are necessary and appropriate to perform due diligence or other Services.

© Copyright 1998-1999, The Pullman Group, LLC.  All rights expressly reserved.

Case 1:20-cv-07293-GHW   Document 1-2   Filed 09/08/20   Page 18 of 54

V3476 D689   Page 3

Engagement between Pullman and Bovina Music, Inc.
Page 3

(f) Reimburse Pullman on a current basis for the out-of-pocket expenses incurred by Pullman in the performance of the Services.

(g) Ensure that Pullman receives, promptly on execution thereof, a fully executed copy of every agreement entered into by Owner in any Transaction, and all amendments and modifications thereto.

5.    Compensation to Pullman.

(a) As compensation for Pullman's performance of the Services, Owner shall pay to Pullman:

(i) A non-refundable retainer of $25,000, payable at execution of this Engagement Letter and credited toward fees.  Pullman will waive the retainer specifically for this transaction.

(ii) A fee equal to ten percent (10%) of the aggregate commitment amount of a Warehouse Loan or asset sale, including any increase in the commitment amount, payable at the closing of the Warehouse Loan or, in the event of an increase, at the time the commitment to the increase is issued, or

(iii) A fee equal to ten percent (10%) of the aggregate principal amount of investment-grade Securities or proceeds from asset sale(s), payable at the time the Securities or assets are sold,

(b) Pullman shall give written notice in the event it declines to undertake to provide the Services as to any particular Transaction, in which event Owner shall be free to engage a third party to perform Services as to that Transaction and will have no obligation to pay Pullman a fee therefor.

(c) Owner acknowledges that Pullman shall be entitled to its fee in full, pursuant to paragraph 5(a), in the event that:

(i) An investor from whom Owner accepts an offer to purchase the Securities requires Pullman to cease its marketing and sales efforts or Owner otherwise fails to permit Pullman to carry out its undertaking herein with regard to the transaction.

(ii) A Transaction as to which Pullman commences providing Services during the Engagement Period does not close prior to the Termination Date for any reason other than the willful breach of this Engagement Letter by Pullman, so long as Pullman remains ready, willing and able to perform the Services through the closing of the Transaction (whether or not Owner chooses to permit Pullman to do so).

(iii) A Transaction does not occur because of Owner's failure or refusal to perform its obligations under this Engagement Letter, in which event, since Owner acknowledges that Pullman will incur consequential damages by reason of the injury to its relations to third parties involved in the Transaction which are not susceptible to quantifiable proof, Owner shall be additionally liable to Pullman for liquidated damages for such injury in the amount of $250,000.

© Copyright 1998-1999, The Pullman Group, LLC.. All rights expressly reserved.

V3476 D689   Page 4

Engagement between Pullman and Bovina Music, Inc.
Page 4

        (iv)  With respect to 5(c)(i) and 5(c)(ii) above, Owner agrees that Pullman can file an attachment or lien for the full extent of any fees of Pullman or out-of-pocket expenses, interest, and third-party expenses incurred by Pullman related to performance of the Services.

    6.   <u>Interest Rate.</u>  Subject to Paragraph 5(d), Pullman is granted the exclusive option, at its sole discretion, to buy down the Interest rate on the securities from the securitization transaction which are "A" rated or above by at least one national rating agency from an interest rate equal to the yield of 450 basis points over the corresponding treasury of the average life of the securities. For example, if the average life is 10 years and the U.S. ten (10) year treasury is trading at 5.0%, Pullman may buy down  the securities from  a yield of 9.50% at its sole discretion. Purchase price is to be set below par to reflect above yield.

    7.   <u>Refinancing or Asset Sale(s).</u>  Pullman is granted the exclusive right, at its sole discretion, to refinance any future transaction(s) or asset sale(s) for owner upon future recoupment of the Securities.  Such financing or asset sale shall be at a minimum transaction size of the initial transaction contemplated by this agreement.  Such refinancing will be on the same terms and conditions outlined herein.  This clause shall be interpreted to include all future financings during the greater of owner's life or two future financing periods in addition to the initial financing contemplated by this agreement.

    8.   <u>Breach.</u>  In order to make specific and definite and to eliminate, if possible, any controversy which may arise between the parties, if at any time Owner believes that the terms of this Engagement Letter are being breached by Pullman, it will give notice thereof to Pullman, setting forth with specificity the alleged breach, and shall allow Pullman a period of thirty (30) days after receipt thereof within which to cure the alleged breach.  No breach of this Engagement Letter, unless intentionally dishonest, will be construed as incurable.

    9.   <u>Indemnification.</u>  Owner will indemnify and hold harmless Pullman, its parent and affiliates, and their respective directors, officers, controlling persons, agents and employees past and present (each being an "Indemnified Party") from and against all claims, liabilities, losses, damages, proceedings or actions (collectively "claims") related to or arising out of this Engagement or Pullman's role in connection therewith, and will reimburse each Indemnified Party for all reasonable costs and expenses, including counsel fees, as they are incurred in connection with investigating, preparing for and defending any such claim, whether pending or threatened.  Owner will not, however, be responsible for any claims which are judicially determined by final order, without any further right to appeal, to have resulted primarily from Pullman's gross negligence or willful misconduct.  The foregoing right to indemnification shall be in addition to any other rights which an Indemnified Party may have and shall apply whether or not an Indemnified Party is named or threatened to be named as a party in any action, suit or proceeding, brought or to be brought.

    10.   <u>Non-circumvention.</u>  From the Commencement Date until three years after the Termination Date, Owner will not attempt to contact any of the investors or lenders introduced by Pullman to Owner without Pullman's prior written approval.  If such contact is made and any Transaction is consummated between Owner and/or its affiliates and the lender or investor introduced by Pullman, Owner will be liable to Pullman for fees on the Transaction pursuant to paragraph 5 hereof.

    11.   <u>Assignability.</u>  Pullman may not assign its rights and/or obligations under this Engagement Letter without the consent of Owner, except to one or more affiliates of Pullman.

© Copyright 1998-1999, The Pullman Group, LLC.  All rights expressly reserved.

V3476 D689   Page 5

Engagement between Pullman and Bovina Music, Inc.
Page 5

Owner may not assign its rights and/or obligations under this Engagement Letter without the consent of Pullman, except to any one or more single-purpose corporations or partnerships formed to hold the Assets and approved by counsel for the company issuing the Securities, if such assignment is necessary and prudent in connection with the securitization, and provided that such assignment shall not relieve Owner of its obligations hereunder.

12. **Law and venue.** This Engagement Letter shall be interpreted under and governed by the laws of the State of New York. In the event that any legal proceeding shall be instituted under or in connection with this Engagement Letter, the federal and state courts located in New York, New York, shall have full jurisdiction over both parties with regard thereto, and litigation shall be commenced solely in said courts. The losing party shall reimburse the prevailing party for its reasonable attorney's fees and costs incurred with respect to such legal proceeding.

13. **Authority.** Owner represents and warrants to Pullman that all requisite approval action required under Owner's by-laws relating to Owner's entering into and performing in full under this Engagement Letter has been duly taken. Owner designates Dennis Kennedy as its Authorized Representative(s) in connection with the Engagement and the Transactions and warrants that its Authorized Representative(s) is duly authorized to act on its behalf, including as to all matters on which Pullman may seek approval or authorization. Owner shall give prompt notice to Pullman in the event that an individual named herein ceases to be authorized or if any other individuals are designated Authorized Representatives during the Engagement Period.

14. **Confidentiality.** Each of Owner and Pullman, on its own behalf and on behalf of its partners, shareholders, officers, employees and agents, hereby acknowledges that the contents of this Engagement Letter, the form and contents of all documents, instruments and other materials relating to the other party and to the Transactions which may become available to it during the course of performance under this Engagement Letter, and all information pertaining to the Securities, including the structure, the credit spread, and the other terms (collectively, the "Materials"), are confidential. No such Materials, nor any portion of the contents or substance thereof or of this Engagement Letter may be communicated or made available to any person other than Owner and Pullman without the express prior written approval of the other party, except that each party may distribute Materials to its lawyers, accountants, lenders and advisors acting on its behalf as necessary for the party's performance hereunder and except that Pullman may publish information regarding the Transactions on the Bridge/Knight Ridder electronic screen and/or cause rating agencies to publish reports on the Transactions. Each of Owner and Pullman acknowledges that a breach of this provision shall cause irreparable harm to the other party that remedies at law will be inadequate to redress and that Pullman and Owner, as the case may be, will be entitled to injunctive or similar equitable relief against the other party in the event of breach of this provision.

15. **Modifications.** This Engagement Letter contains the entire agreement between the parties hereto and may be modified only in a writing signed by both Owner and Pullman.

16. **Notices.** All notices under this Engagement Letter must be in writing and will be considered given when delivered by hand (including by courier service), or on the fifth day after being mailed by prepaid certified or registered mail, return receipt requested, to the parties at the respective addresses stated at the beginning of this Engagement Letter (or at such other address as a party may specify by notice given to the other).

© Copyright 1998-1999, The Pullman Group, LLC. All rights expressly reserved.

Engagement between Pullman and Bovina Music, Inc.
Page 6

V3476 D689 Page 6

Please execute this Engagement Letter in the space provided below and return the original to us to acknowledge your understanding and acceptance of the terms hereof.

Very truly yours,
The Pullman Group, LLC

By: _David Pullman_

Its: _Founder, Chairman and CEO_

ACCEPTED AND AGREED:

BOVINA MUSIC, INC.

By: _Ronald Isley_
　　　Ronald Isley

Title: _Pres_

Date: _7/23/99_
　　　(Commencement Date)

BOVINA MUSIC, INC.

By: _Rudolph Isley_
　　　Rudolph Isley

Title: _V.P._

Date: _7/23/99_
　　　(Commencement Date)

© Copyright 1998-1999, The Pullman Group, LLC. All rights expressly reserved.

EXHIBIT A-3

# PULLMAN®

**THE PULLMAN GROUP,® LLC**
*1370 Avenue of the Americas*
*New York, NY 10019*
*212.750.0210 tel.*
*212.750.0464 fax*
*info@pullmanco.com*
*www.pullmanco.com*
Securitizing the Future℠

**V3476 D695**



JAN 16 2002

*STRUCTURED ASSET SALES GROUP*

July 20, 1999

VIA FEDERAL EXPRESS

Ronald Isley
C/o Isley Brothers Management
10866 Wilshire Blvd., Suite 560
Los Angeles, CA  90024

> Re:  Engagement as Exclusive Securitizing
>        Agent and Advisor

Dear Mr. Ronald Isley,

This engagement letter (the "Engagement Letter") confirms the engagement (the "Engagement") by Ronald Isley, ("Owner") of The Pullman Group. ("Pullman") to act as Owner's agent and advisor on an exclusive basis with respect to the financial transactions described in paragraph 3(a) through (f) hereof ("Transactions"), on the following terms and conditions:

1. <u>Engagement Period.</u>  The term of the Engagement (the "Engagement Period") shall commence on the date Owner executes this letter (as entered by Owner below its authorized signatory's signature) (the "Commencement Date") and shall expire unless extended by mutual agreement of the parties hereto, upon the expiration of Ron Isley's Federal bankruptcy proceeding.

2. <u>Exclusive Authority.</u>  During the Engagement Period, neither Owner nor anyone acting on its behalf shall, other than with or through Pullman, undertake any activities with regard to Transactions.  Notwithstanding the foregoing, Owner may obtain interim financing without doing so with or through Pullman, on condition that Owner provide notice and the particulars thereof to Pullman and that the interim financing is pre-payable and shall be refinanced in a transaction contemplated under this Engagement Letter to be the subject of Services by Pullman.  Owner will refer to Pullman any expressions of interest and offers which Owner receives during the Engagement Period with respect to any Transactions.  Pullman may perform the same or similar services for others, as well as engage in other business activities.

3. <u>Pullman's Services.</u>  Subject in the case of each particular Transaction to Pullman's due-diligence review and the approval of Pullman's Commitment Committee and Credit Committee

© Copyright 1998-1999, The Pullman Group, LLC.  All rights expressly reserved.

V3476 D695   Page 1

Engagement between Pullman and Ronald Isley
Page 2

approval, Pullman or an affiliate, as appropriate, will, using reasonable best efforts, perform or cause to be performed under its supervision the following services (collectively the "Services"):

(a) Structuring a securitization program for the issuance of securities (the "Securities") or asset sale(s) backed by Record Royalties, Record Masters, Music Publishing and Writers' share (the "Assets").

(b) Additionally subject to (i) the Securities' receiving an investment-grade rating by at least two nationally recognized rating agencies and (ii) no material, adverse changes in Owner, Owner's financial condition, or the Assets, and subject to the governing securities laws and regulations, marketing the Securities.

(c) Structuring and obtaining a secured line of credit or similar lending facility ("Warehouse Loan") on commercially reasonable terms.

(d) Compiling information, research and supporting data with respect to the Transactions and Owner (the "Due Diligence Package"), qualifying investors to review the Due Diligence Package and overseeing investors' due diligence review.

(e) Performing such due diligence with respect to the proposed parties to Transactions and other matters as Pullman shall reasonably deem necessary.

4.    Obligations of Owner.  Owner undertakes that, using its reasonable best efforts, Owner will:

(a) Make available or cause to be made available to Pullman, at Owner's expense, all documents, agreements and other information, in hard copy and database form, which in Pullman's reasonable judgment are necessary or appropriate for the performance of due diligence, marketing or sales in any of the Transactions.

(b) Provide Pullman with access to Owner's officers, directors, employees and other agents, as well as obligors under any loans, encumbrances or obligations of Owner.

(c) Ensure that all information provided by Owner and its officers, directors, employees or agents is accurate and complete in all material respects, on the express understanding that Pullman shall be entitled to rely thereon without verification and to include all or any portions thereof in any marketing, issuance or offering documents with respect to the Transactions.

(d) Negotiate in good faith and, subject to said negotiations, enter into all documentation reasonably necessary to obtain the required ratings relating to the Securities and to complete the Transactions with the third parties proposed by Pullman.

(e) Approve and retain, at Owner's expense, third-party contractors of Pullman's choosing, including but not limited to accountants, rating agencies, auditors, and attorneys to serve as Transaction counsel or Issuer's, Pullman's and/or investor's counsel, on any Transaction, which Pullman determines in the reasonable exercise of its discretion are necessary and appropriate to perform due diligence or other Services.

© Copyright 1998-1999, The Pullman Group, LLC.  All rights expressly reserved.

Engagement between Pullman and Ronald Isley
Page 3

(f) Reimburse Pullman on a current basis for the out-of-pocket expenses incurred by Pullman in the performance of the Services.

(g) Ensure that Pullman receives, promptly on execution thereof, a fully executed copy of every agreement entered into by Owner in any Transaction, and all amendments and modifications thereto.

5.   Compensation to Pullman.

(a) As compensation for Pullman's performance of the Services, Owner shall pay to Pullman:

(i) A non-refundable retainer of $25,000, payable at execution of this Engagement Letter and credited toward fees. **Pullman will waive the retainer specifically for this transaction.**

(ii) A fee equal to ten percent (10%) of the aggregate commitment amount of a Warehouse Loan or asset sale, including any increase in the commitment amount, payable at the closing of the Warehouse Loan or, in the event of an increase, at the time the commitment to the increase is issued, or

(iii) A fee equal to ten percent (10%) of the aggregate principal amount of investment-grade Securities or proceeds from asset sale(s), payable at the time the Securities or assets are sold,

(b) Pullman shall give written notice in the event it declines to undertake to provide the Services as to any particular Transaction, in which event Owner shall be free to engage a third party to perform Services as to that Transaction and will have no obligation to pay Pullman a fee therefor.

(c) Owner acknowledges that Pullman shall be entitled to its fee in full, pursuant to paragraph 5(a), in the event that:

(i) An investor from whom Owner accepts an offer to purchase the Securities requires Pullman to cease its marketing and sales efforts or Owner otherwise fails to permit Pullman to carry out its undertaking herein with regard to the transaction.

(ii) A Transaction as to which Pullman commences providing Services during the Engagement Period does not close prior to the Termination Date for any reason other than the willful breach of this Engagement Letter by Pullman, so long as Pullman remains ready, willing and able to perform the Services through the closing of the Transaction (whether or not Owner chooses to permit Pullman to do so).

(iii) A Transaction does not occur because of Owner's failure or refusal to perform its obligations under this Engagement Letter, in which event, since Owner acknowledges that

V3476 D695   Page 3

© Copyright 1998-1999, The Pullman Group, LLC.  All rights expressly reserved.

Engagement between Pullman and Ronald Isley
Page 4

Pullman will incur consequential damages by reason of the injury to its relations to third parties involved in the Transaction which are not susceptible to quantifiable proof, Owner shall be additionally liable to Pullman for liquidated damages for such injury in the amount of $250,000.

        (iv)  With respect to 5(c)(i) and 5(c)(ii) above, Owner agrees that Pullman can file an attachment or lien for the full extent of any fees or structuring fees of Pullman or out-of-pocket expenses, interest, Interest Rate and/or Interest Rate Buydown and/or any other fees contemplated herein and third-party expenses incurred by Pullman related to performance of the Services.

    6.   <u>Interest Rate</u>.  Subject to Paragraph 5(d), Pullman is granted the exclusive option, at its sole discretion, to buy down the Interest rate on the securities from the securitization transaction which are "A" rated or above by at least one national rating agency from an interest rate equal to the yield of 450 basis points over the corresponding treasury of the average life of the securities.  For example, if the average life is 10 years and the U.S. ten (10) year treasury is trading at 5.0%, Pullman may buy down the securities from a yield of 9.50% at its sole discretion. Purchase price is to be set below par to reflect above yield.

    7.   <u>Refinancing or Asset Sale(s)</u>.  Pullman is granted the exclusive right, at its sole discretion, to refinance any future transaction(s) or asset sale(s) for owner upon future recoupment of the Securities.  Such financing or asset sale shall be at a minimum transaction size of the initial transaction contemplated by this agreement.  Such refinancing will be on the same terms and conditions outlined herein.  This clause shall be interpreted to include all future financings during the greater of owner's life or two future financing periods in addition to the initial financing contemplated by this agreement.

    8.   <u>Breach</u>.  In order to make specific and definite and to eliminate, if possible, any controversy which may arise between the parties, if at any time Owner believes that the terms of this Engagement Letter are being breached by Pullman, it will give notice thereof to Pullman, setting forth with specificity the alleged breach, and shall allow Pullman a period of thirty (30) days after receipt thereof within which to cure the alleged breach.  No breach of this Engagement Letter, unless intentionally dishonest, will be construed as incurable.

    9.   <u>Indemnification</u>.  Owner will indemnify and hold harmless Pullman, its parent and affiliates, and their respective directors, officers, controlling persons, agents and employees past and present (each being an "Indemnified Party") from and against all claims, liabilities, losses, damages, proceedings or actions (collectively "claims") related to or arising out of this Engagement or Pullman's role in connection therewith, and will reimburse each Indemnified Party for all reasonable costs and expenses, including counsel fees, as they are incurred in connection with investigating, preparing for and defending any such claim, whether pending or threatened.  Owner will not, however, be responsible for any claims which are judicially determined by final order, without any further right to appeal, to have resulted primarily from Pullman's gross negligence or willful misconduct.  The foregoing right to indemnification shall be in addition to any other rights which an Indemnified Party may have and shall apply whether or not an Indemnified Party is named or threatened to be named as a party in any action, suit or proceeding, brought or to be brought.

    10.   <u>Non-circumvention</u>.  From the Commencement Date until three years after the Termination Date, Owner will not attempt to contact any of the investors or lenders introduced by Pullman to Owner without Pullman's prior written approval.  If such contact is made and any

   © Copyright 1998-1999, The Pullman Group, LLC.  All rights expressly reserved.

Engagement between Pullman and Ronald Isley
Page 5

Transaction is consummated between Owner and/or its affiliates and the lender or investor introduced by Pullman, Owner will be liable to Pullman for fees on the Transaction pursuant to paragraph 5 hereof.

11.   Assignability.  Pullman may not assign its rights and/or obligations under this Engagement Letter without the consent of Owner, except to one or more affiliates of Pullman. Owner may not assign its rights and/or obligations under this Engagement Letter without the consent of Pullman, except to any one or more single-purpose corporations or partnerships formed to hold the Assets and approved by counsel for the company issuing the Securities, if such assignment is necessary and prudent in connection with the securitization, and provided that such assignment shall not relieve Owner of its obligations hereunder.

12.   Law and venue.  This Engagement Letter shall be interpreted under and governed by the laws of the State of New York.  In the event that any legal proceeding shall be instituted under or in connection with this Engagement Letter, the federal and state courts located in New York, New York, shall have full jurisdiction over both parties with regard thereto, and litigation shall be commenced solely in said courts.  The losing party shall reimburse the prevailing party for its reasonable attorney's fees and costs incurred with respect to such legal proceeding.

13.   Authority.  Owner represents and warrants to Pullman that all requisite approval action required under Owner's by-laws relating to Owner's entering into and performing in full under this Engagement Letter has been duly taken.

14.   Confidentiality.  Each of Owner and Pullman, on its own behalf and on behalf of its partners, shareholders, officers, employees and agents, hereby acknowledges that the contents of this Engagement Letter, the form and contents of all documents, instruments and other materials relating to the other party and to the Transactions which may become available to it during the course of performance under this Engagement Letter, and all information pertaining to the Securities, including the structure, the credit spread, and the other terms (collectively, the "Materials"), are confidential.  No such Materials, nor any portion of the contents or substance thereof or of this Engagement Letter may be communicated or made available to any person other than Owner and Pullman without the express prior written approval of the other party, except that each party may distribute Materials to its lawyers, accountants, lenders and advisors acting on its behalf as necessary for the party's performance hereunder and except that Pullman may publish information regarding the Transactions on the Bridge/Knight Ridder electronic screen and/or cause rating agencies to publish reports on the Transactions.  Each of Owner and Pullman acknowledges that a breach of this provision shall cause irreparable harm to the other party that remedies at law will be inadequate to redress and that Pullman and Owner, as the case may be, will be entitled to injunctive or similar equitable relief against the other party in the event of breach of this provision.

15.   Modifications.  This Engagement Letter contains the entire agreement between the parties hereto and may be modified only in a writing signed by both Owner and Pullman.

16.   Notices.  All notices under this Engagement Letter must be in writing and will be considered given when delivered by hand (including by courier service), or on the fifth day after being mailed by prepaid certified or registered mail, return receipt requested, to the parties at the respective addresses stated at the beginning of this Engagement Letter (or at such other address as a party may specify by notice given to the other).

© Copyright 1998-1999, The Pullman Group, LLC.  All rights expressly reserved.

Engagement between Pullman and Ronald Isley
Page 6

Please execute this Engagement Letter in the space provided below and return the original to us to acknowledge your understanding and acceptance of the terms hereof.

Very truly yours,
The Pullman Group, LLC

By: _____

Its: _Funder Chairman and CFO_

ACCEPTED AND AGREED:

RONALD ISLEY

By: _____

Title: _Pres._

Date: _7/23/99_
     (Commencement Date)

V3476 D695  Page 6

© Copyright 1998-1999, The Pullman Group, LLC.  All rights expressly reserved.

EXHIBIT A-4

# PULLMAN ®



**THE PULLMAN GROUP,® LLC**  V3476 D696

*1370 Avenue of the Americas*
*New York, NY 10019*
*212.750.0210 tel.*
*212.750.0464 fax*
info@pullmanco.com
*www.pullmanco.com*
Securitizing the Future℠

JAN 16 2002

*STRUCTURED ASSET SALES GROUP*

July 20, 1999

VIA FEDERAL EXPRESS

Rudolph Isley
C/o Isley Brothers Management
10866 Wilshire Blvd., Suite 560
Los Angeles, CA  90024

Re:    Engagement as Exclusive Securitizing
       Agent and Advisor

Dear Mr. Rudolph Isley,

This engagement letter (the "Engagement Letter") confirms the engagement (the "Engagement") by Rudolph Isley, ("Owner") of The Pullman Group. ("Pullman") to act as Owner's agent and advisor on an exclusive basis with respect to the financial transactions described in paragraph 3(a) through (f) hereof ("Transactions"), on the following terms and conditions:

1.    Engagement Period.  The term of the Engagement (the "Engagement Period") shall commence on the date Owner executes this letter (as entered by Owner below its authorized signatory's signature) (the "Commencement Date") and shall expire unless extended by mutual agreement of the parties hereto, upon the expiration of Ron Isley's Federal bankruptcy proceeding.

2.    Exclusive Authority.  During the Engagement Period, neither Owner nor anyone acting on its behalf shall, other than with or through Pullman, undertake any activities with regard to Transactions.  Notwithstanding the foregoing, Owner may obtain interim financing without doing so with or through Pullman, on condition that Owner provide notice and the particulars thereof to Pullman and that the interim financing is pre-payable and shall be refinanced in a transaction contemplated under this Engagement Letter to be the subject of Services by Pullman.  Owner will refer to Pullman any expressions of interest and offers which Owner receives during the Engagement Period with respect to any Transactions.  Pullman may perform the same or similar services for others, as well as engage in other business activities.

3.    Pullman's Services.  Subject in the case of each particular Transaction to Pullman's due-diligence review and the approval of Pullman's Commitment Committee and Credit Committee

© Copyright 1998-1999, The Pullman Group, LLC.  All rights expressly reserved.

Engagement between Pullman and Rudolph Isley
Page 5

Transaction is consummated between Owner and/or its affiliates and the lender or investor introduced by Pullman, Owner will be liable to Pullman for fees on the Transaction pursuant to paragraph 5 hereof.

11.   Assignability.  Pullman may not assign its rights and/or obligations under this Engagement Letter without the consent of Owner, except to one or more affiliates of Pullman. Owner may not assign its rights and/or obligations under this Engagement Letter without the consent of Pullman, except to any one or more single-purpose corporations or partnerships formed to hold the Assets and approved by counsel for the company issuing the Securities, if such assignment is necessary and prudent in connection with the securitization, and provided that such assignment shall not relieve Owner of its obligations hereunder.

12.   Law and venue.  This Engagement Letter shall be interpreted under and governed by the laws of the State of New York.  In the event that any legal proceeding shall be instituted under or in connection with this Engagement Letter, the federal and state courts located in New York, New York, shall have full jurisdiction over both parties with regard thereto, and litigation shall be commenced solely in said courts.  The losing party shall reimburse the prevailing party for its reasonable attorney's fees and costs incurred with respect to such legal proceeding.

13.   Authority.  Owner represents and warrants to Pullman that all requisite approval action required under Owner's by-laws relating to Owner's entering into and performing in full under this Engagement Letter has been duly taken.

14.   Confidentiality.  Each of Owner and Pullman, on its own behalf and on behalf of its partners, shareholders, officers, employees and agents, hereby acknowledges that the contents of this Engagement Letter, the form and contents of all documents, instruments and other materials relating to the other party and to the Transactions which may become available to it during the course of performance under this Engagement Letter, and all information pertaining to the Securities, including the structure, the credit spread, and the other terms (collectively, the "Materials"), are confidential.  No such Materials, nor any portion of the contents or substance thereof or of this Engagement Letter may be communicated or made available to any person other than Owner and Pullman without the express prior written approval of the other party, except that each party may distribute Materials to its lawyers, accountants, lenders and advisors acting on its behalf as necessary for the party's performance hereunder and except that Pullman may publish information regarding the Transactions on the Bridge/Knight Ridder electronic screen and/or cause rating agencies to publish reports on the Transactions.  Each of Owner and Pullman acknowledges that a breach of this provision shall cause irreparable harm to the other party that remedies at law will be inadequate to redress and that Pullman and Owner, as the case may be, will be entitled to injunctive or similar equitable relief against the other party in the event of breach of this provision.

15.   Modifications.  This Engagement Letter contains the entire agreement between the parties hereto and may be modified only in a writing signed by both Owner and Pullman.

16.   Notices.  All notices under this Engagement Letter must be in writing and will be considered given when delivered by hand (including by courier service), or on the fifth day after being mailed by prepaid certified or registered mail, return receipt requested, to the parties at the respective addresses stated at the beginning of this Engagement Letter (or at such other address as a party may specify by notice given to the other).

® Copyright 1998-1999, The Pullman Group, LLC.  All rights expressly reserved.

Engagement between Pullman and Rudolph Isley
Page 3

(f) Reimburse Pullman on a current basis for the out-of-pocket expenses incurred by Pullman in the performance of the Services.

(g) Ensure that Pullman receives, promptly on execution thereof, a fully executed copy of every agreement entered into by Owner in any Transaction, and all amendments and modifications thereto.

5.   Compensation to Pullman.

(a) As compensation for Pullman's performance of the Services, Owner shall pay to Pullman:

(i) A non-refundable retainer of $25,000, payable at execution of this Engagement Letter and credited toward fees. **Pullman will waive the retainer specifically for this transaction.**

(ii) A fee equal to ten percent (10%) of the aggregate commitment amount of a Warehouse Loan or asset sale, including any increase in the commitment amount, payable at the closing of the Warehouse Loan or, in the event of an increase, at the time the commitment to the increase is issued, or

(iii) A fee equal to ten percent (10%) of the aggregate principal amount of investment-grade Securities or proceeds from asset sale(s), payable at the time the Securities or assets are sold,

(b) Pullman shall give written notice in the event it declines to undertake to provide the Services as to any particular Transaction, in which event Owner shall be free to engage a third party to perform Services as to that Transaction and will have no obligation to pay Pullman a fee therefor.

(c) Owner acknowledges that Pullman shall be entitled to its fee in full, pursuant to paragraph 5(a), in the event that:

(i) An investor from whom Owner accepts an offer to purchase the Securities requires Pullman to cease its marketing and sales efforts or Owner otherwise fails to permit Pullman to carry out its undertaking herein with regard to the transaction.

(ii) A Transaction as to which Pullman commences providing Services during the Engagement Period does not close prior to the Termination Date for any reason other than the willful breach of this Engagement Letter by Pullman, so long as Pullman remains ready, willing and able to perform the Services through the closing of the Transaction (whether or not Owner chooses to permit Pullman to do so).

(iii) A Transaction does not occur because of Owner's failure or refusal to perform its obligations under this Engagement Letter, in which event, since Owner acknowledges that

V3476 D696 Page 3

© Copyright 1998-1999. The Pullman Group, LLC. All rights expressly reserved.

Engagement between Pullman and Rudolph Isley
Page 4

Pullman will incur consequential damages by reason of the injury to its relations to third parties involved in the Transaction which are not susceptible to quantifiable proof, Owner shall be additionally liable to Pullman for liquidated damages for such injury in the amount of $250,000.

      (iv)  With respect to 5(c)(i) and 5(c)(ii) above, Owner agrees that Pullman can file an attachment or lien for the full extent of any fees or structuring fees of Pullman or out-of-pocket expenses, interest, Interest Rate and/or Interest Rate Buydown and/or any other fees contemplated herein and third-party expenses incurred by Pullman related to performance of the Services.

6.    <u>Interest Rate.</u>  Subject to Paragraph 5(d), Pullman is granted the exclusive option, at its sole discretion, to buy down the Interest rate on the securities from the securitization transaction which are "A" rated or above by at least one national rating agency from an interest rate equal to the yield of 450 basis points over the corresponding treasury of the average life of the securities.  For example, if the average life is 10 years and the U.S. ten (10) year treasury is trading at 5.0%, Pullman may buy down  the securities from  a yield of 9.50% at its sole discretion. Purchase price is to be set below par to reflect above yield.

7.    <u>Refinancing or Asset Sale(s).</u>  Pullman is granted the exclusive right, at its sole discretion, to refinance any future transaction(s) or asset sale(s) for owner upon future recoupment of the Securities.  Such financing or asset sale shall be at a minimum transaction size of the initial transaction contemplated by this agreement.  Such refinancing will be on the same terms and conditions outlined herein.  This clause shall be interpreted to include all future financings during the greater of owner's life or two future financing periods in addition to the initial financing contemplated by this agreement.

8.    <u>Breach.</u>  In order to make specific and definite and to eliminate, if possible, any controversy which may arise between the parties, if at any time Owner believes that the terms of this Engagement Letter are being breached by Pullman, it will give notice thereof to Pullman, setting forth with specificity the alleged breach, and shall allow Pullman a period of thirty (30) days after receipt thereof within which to cure the alleged breach.  No breach of this Engagement Letter, unless intentionally dishonest, will be construed as incurable.

9.    <u>Indemnification.</u>  Owner will indemnify and hold harmless Pullman, its parent and affiliates, and their respective directors, officers, controlling persons, agents and employees past and present (each being an "Indemnified Party") from and against all claims, liabilities, losses, damages, proceedings or actions (collectively "claims") related to or arising out of this Engagement or Pullman's role in connection therewith, and will reimburse each Indemnified Party for all reasonable costs and expenses, including counsel fees, as they are incurred in connection with investigating, preparing for and defending any such claim, whether pending or threatened.  Owner will not, however, be responsible for any claims which are judicially determined by final order, without any further right to appeal, to have resulted primarily from Pullman's gross negligence or willful misconduct.  The foregoing right to indemnification shall be in addition to any other rights which an Indemnified Party may have and shall apply whether or not an Indemnified Party is named or threatened to be named as a party in any action, suit or proceeding, brought or to be brought.

10.    <u>Non-circumvention.</u>  From the Commencement Date until three years after the Termination Date, Owner will not attempt to contact any of the investors or lenders introduced by Pullman to Owner without Pullman's prior written approval.  If such contact is made and any

V3476 D696  Page 4

® Copyright 1998-1999, The Pullman Group, LLC.  All rights expressly reserved.

Engagement between Pullman and Rudolph Isley
Page 6

Please execute this Engagement Letter in the space provided below and return the original to us to acknowledge your understanding and acceptance of the terms hereof.

Very truly yours,
The Pullman Group, LLC

By: _David Pullman_____

Its: _Founder Chairman and CEO_

ACCEPTED AND AGREED:

RUDOLPH ISLEY

By: _Rudolph Isley_____

Title: _____

Date: _7/23/99_____

(Commencement Date)

© Copyright 1998-1999, The Pullman Group, LLC. All rights expressly reserved.

# EXHIBIT A-5

JUN-15-2000  12:35    MWE

# PULLMAN

**THE PULLMAN GROUP,® LLC**
*1370 Avenue of the Americas*
*New York, NY 10019*
*212.750.0210 tel.*
*212.750.0464 fax*
*info@pullmanco.com*
*www.pullmanco.com*
*Securitizing the Future™*

V3476 D682

July 20, 1999

VIA FEDERAL EXPRESS

Ron and Rudolph Isley
Three Boys' Music Corporation
C/o Isley Brothers Management
10866 Wilshire Blvd., Suite 560
Los Angeles, CA 90024

JAN 16 2002

Re:   Engagement as Exclusive Securitizing
      Agent and Advisor

Dear Mr. Ron and Rudolph Isley,

     This engagement letter (the "Engagement Letter") confirms the engagement (the "Engagement") by Three Boys' Music Corporation, ("Owner") of The Pullman Group. ("Pullman") to act as Owner's agent and advisor on an exclusive basis with respect to the financial transactions described in paragraph 3(a) through (f) hereof ("Transactions"), on the following terms and conditions:

    1.   Engagement Period.  The term of the Engagement (the "Engagement Period") shall commence on the date Owner executes this letter (as entered by Owner below its authorized signatory's signature) (the "Commencement Date") and shall expire unless extended by mutual agreement of the parties hereto, upon the expiration of Ron Isley's Federal bankruptcy proceeding.

    2.   Exclusive Authority.  During the Engagement Period, neither Owner nor anyone acting on its behalf shall, other than with or through Pullman, undertake any activities with regard to Transactions. Notwithstanding the foregoing, Owner may obtain interim financing without doing so with or through Pullman, on condition that Owner provide notice and the particulars thereof to Pullman and that the interim financing is pre-payable and shall be refinanced in a transaction contemplated under this Engagement Letter to be the subject of Services by Pullman. Owner will refer to Pullman any expressions of interest and offers which Owner receives during the Engagement Period with respect to any Transactions. Pullman may perform the same or similar services for others, as well as engage in other business activities.

© Copyright 1998-1999, The Pullman Group, LLC.  All rights expressly reserved.

99%                                              P.06

JUN-15-2000  12:41

Engagement between Pullman and Three Boys' Music Corporation    V3476 D682 Page 2
Page 2

3. <u>Pullman's Services</u>. Subject in the case of each particular Transaction to Pullman's due-diligence review and the approval of Pullman's Commitment Committee and Credit Committee approval, Pullman or an affiliate, as appropriate, will, using reasonable best efforts, perform or cause to be performed under its supervision the following services (collectively the "Services"):

(a) Structuring a securitization program for the issuance of securities (the "Securities") or asset sale(s) backed by Record Masters, Music Publishing and Writers' share, including the composition "Love Is A Wonderful Thing" and its full copyright infringement judgment obtained against Michael Bolton, Sony, et al. and future royalties from such (the "Assets").

(b) Additionally subject to (i) the Securities' receiving an investment-grade rating by at least two nationally recognized rating agencies and (ii) no material, adverse changes in Owner, Owner's financial condition, or the Assets, and subject to the governing securities laws and regulations, marketing the Securities.

(c) Structuring and obtaining a secured line of credit or similar lending facility ("Warehouse Loan") on commercially reasonable terms.

(d) Compiling information, research and supporting data with respect to the Transactions and Owner (the "Due Diligence Package"), qualifying investors to review the Due Diligence Package and overseeing investors' due diligence review.

(e) Performing such due diligence with respect to the proposed parties to Transactions and other matters as Pullman shall reasonably deem necessary.

4. <u>Obligations of Owner</u>. Owner undertakes that, using its reasonable best efforts, Owner will:

(a) Make available or cause to be made available to Pullman, at Owner's expense, all documents, agreements and other information, in hard copy and database form, which in Pullman's reasonable judgment are necessary or appropriate for the performance of due diligence, marketing or sales in any of the Transactions.

(b) Provide Pullman with access to Owner's officers, directors, employees and other agents, as well as obligors under any loans, encumbrances or obligations of Owner.

(c) Ensure that all information provided by Owner and its officers, directors, employees or agents is accurate and complete in all material respects, on the express understanding that Pullman shall be entitled to rely thereon without verification and to include all or any portions thereof in any marketing, issuance or offering documents with respect to the Transactions.

(d) Negotiate in good faith and, subject to said negotiations, enter into all documentation reasonably necessary to obtain the required ratings relating to the Securities and to complete the Transactions with the third parties proposed by Pullman.

(e) Approve and retain, at Owner's expense, third-party contractors of Pullman's choosing, including but not limited to accountants, rating agencies, auditors, and attorneys to serve as Transaction counsel or Issuer's, Pullman's and/or investor's counsel, on any Transaction, which

© Copyright 1998-1999, The Pullman Group, LLC. All rights expressly reserved.

Engagement between Pullman and Three Boys' Music Corporation          V3476 D682   Page 3
Page 3

Pullman determines in the reasonable exercise of its discretion are necessary and appropriate to perform due diligence or other Services.

(f) Reimburse Pullman on a current basis for the out-of-pocket expenses incurred by Pullman in the performance of the Services.

(g) Ensure that Pullman receives, promptly on execution thereof, a fully executed copy of every agreement entered into by Owner in any Transaction, and all amendments and modifications thereto.

5.   Compensation to Pullman.

(a) As compensation for Pullman's performance of the Services, Owner shall pay to Pullman:

(i) A non-refundable retainer of $25,000, payable at execution of this Engagement Letter and credited toward fees.  Pullman will waive the retainer specifically for this transaction.

(ii) A fee equal to ten percent (10%) of the aggregate commitment amount of a Warehouse Loan or asset sale, including any increase in the commitment amount, payable at the closing of the Warehouse Loan or, in the event of an increase, at the time the commitment to the increase is issued, or

(iii) A fee equal to ten percent (10%) of the aggregate principal amount of investment-grade Securities or proceeds from asset sale(s), payable at the time the Securities or assets are sold,

(b) Pullman shall give written notice in the event it declines to undertake to provide the Services as to any particular Transaction, in which event Owner shall be free to engage a third party to perform Services as to that Transaction and will have no obligation to pay Pullman a fee therefor.

(c) Owner acknowledges that Pullman shall be entitled to its fee in full, pursuant to paragraph 5(a), in the event that:

(i) An investor from whom Owner accepts an offer to purchase the Securities requires Pullman to cease its marketing and sales efforts or Owner otherwise fails to permit Pullman to carry out its undertaking herein with regard to the transaction.

(ii) A Transaction as to which Pullman commences providing Services during the Engagement Period does not close prior to the Termination Date for any reason other than the willful breach of this Engagement Letter by Pullman, so long as Pullman remains ready, willing and able to perform the Services through the closing of the Transaction (whether or not Owner chooses to permit Pullman to do so).

(iii) A Transaction does not occur because of Owner's failure or refusal to perform its obligations under this Engagement Letter, in which event, since Owner acknowledges that

© Copyright 1998-1999, The Pullman Group, LLC. All rights expressly reserved.

Pullman will incur consequential damages by reason of the injury to its relations to third parties involved in the Transaction which are not susceptible to quantifiable proof, Owner shall be additionally liable to Pullman for liquidated damages for such injury in the amount of $250,000.

(iv)  With respect to 5(c)(i) and 5(c)(ii) above, Owner agrees that Pullman can file an attachment or lien for the full extent of any fees or structuring fees of Pullman or out-of-pocket expenses, interest, Interest Rate and/or Interest Rate Buydown and/or any other fees contemplated herein and third-party expenses incurred by Pullman related to performance of the Services.

6.  <u>Interest Rate.</u>  Subject to Paragraph 5(d), Pullman is granted the exclusive option, at its sole discretion, to buy down the Interest rate on the securities from the securitization transaction which are "A" rated or above by at least one national rating agency from an interest rate equal to the yield of 450 basis points over the corresponding treasury of the average life of the securities. For example, if the average life is 10 years and the U.S. ten (10) year treasury is trading at 5.0%, Pullman may buy down the securities from a yield of 9.50% at its sole discretion. Purchase price is to be set below par to reflect above yield.

7.  <u>Refinancing or Asset Sale(s).</u>  Pullman is granted the exclusive right, at its sole discretion, to refinance any future transaction(s) or asset sale(s) for owner upon future recoupment of the Securities. Such financing or asset sale shall be at a minimum transaction size of the initial transaction contemplated by this agreement. Such refinancing will be on the same terms and conditions outlined herein.  This clause shall be interpreted to include all future financings during the greater of owner's life or two future financing periods in addition to the initial financing contemplated by this agreement.

8.  <u>Breach.</u>  In order to make specific and definite and to eliminate, if possible, any controversy which may arise between the parties, if at any time Owner believes that the terms of this Engagement Letter are being breached by Pullman, it will give notice thereof to Pullman, setting forth with specificity the alleged breach, and shall allow Pullman a period of thirty (30) days after receipt thereof within which to cure the alleged breach. No breach of this Engagement Letter, unless intentionally dishonest, will be construed as incurable.

9.  <u>Indemnification.</u>  Owner will indemnify and hold harmless Pullman, its parent and affiliates, and their respective directors, officers, controlling persons, agents and employees past and present (each being an "Indemnified Party") from and against all claims, liabilities, losses, damages, proceedings or actions (collectively "claims") related to or arising out of this Engagement or Pullman's role in connection therewith, and will reimburse each Indemnified Party for all reasonable costs and expenses, including counsel fees, as they are incurred in connection with investigating, preparing for and defending any such claim, whether pending or threatened. Owner will not, however, be responsible for any claims which are judicially determined by final order, without any further right to appeal, to have resulted primarily from Pullman's gross negligence or willful misconduct. The foregoing right to indemnification shall be in addition to any other rights which an Indemnified Party may have and shall apply whether or not an Indemnified Party is named or threatened to be named as a party in any action, suit or proceeding, brought or to be brought.

10.  <u>Non-circumvention.</u>  From the Commencement Date until three years after the Termination Date, Owner will not attempt to contact any of the investors or lenders introduced by Pullman to Owner without Pullman's prior written approval. If such contact is made and any

© Copyright 1998-1999, The Pullman Group, LLC.  All rights expressly reserved.

*Engagement between* Pullman and Three Boys' Music Corporation          V3476 D682   Page 5
Page 5

Transaction is consummated between Owner and/or its affiliates and the lender or investor introduced by Pullman, Owner will be liable to Pullman for fees on the Transaction pursuant to paragraph 5 hereof.

11.   <u>Assignability</u>.  Pullman may not assign its rights and/or obligations under this Engagement Letter without the consent of Owner, except to one or more affiliates of Pullman. Owner may not assign its rights and/or obligations under this Engagement Letter without the consent of Pullman, except to any one or more single-purpose corporations or partnerships formed to hold the Assets and approved by counsel for the company issuing the Securities, if such assignment is necessary and prudent in connection with the securitization, and provided that such assignment shall not relieve Owner of its obligations hereunder.

12.   <u>Law and venue</u>.  This Engagement Letter shall be interpreted under and governed by the laws of the State of New York.  In the event that any legal proceeding shall be instituted under or in connection with this Engagement Letter, the federal and state courts located in New York, New York, shall have full jurisdiction over both parties with regard thereto, and litigation shall be commenced solely in said courts.  The losing party shall reimburse the prevailing party for its reasonable attorney's fees and costs incurred with respect to such legal proceeding.

13.   <u>Authority</u>.  Owner represents and warrants to Pullman that all requisite approval action required under Owner's by-laws relating to Owner's entering into and performing in full under this Engagement Letter has been duly taken.

14.   <u>Confidentiality</u>.  Each of Owner and Pullman, on its own behalf and on behalf of its partners, shareholders, officers, employees and agents, hereby acknowledges that the contents of this Engagement Letter, the form and contents of all documents, instruments and other materials relating to the other party and to the Transactions which may become available to it during the course of performance under this Engagement Letter, and all information pertaining to the Securities, including the structure, the credit spread, and the other terms (collectively, the "Materials"), are confidential.  No such Materials, nor any portion of the contents or substance thereof or of this Engagement Letter may be communicated or made available to any person other than Owner and Pullman without the express prior written approval of the other party, except that each party may distribute Materials to its lawyers, accountants, lenders and advisors acting on its behalf as necessary for the party's performance hereunder and except that Pullman may publish information regarding the Transactions on the Bridge/Knight Ridder electronic screen and/or cause rating agencies to publish reports on the Transactions.  Each of Owner and Pullman acknowledges that a breach of this provision shall cause irreparable harm to the other party that remedies at law will be inadequate to redress and that Pullman and Owner, as the case may be, will be entitled to injunctive or similar equitable relief against the other party in the event of breach of this provision.

15.   <u>Modifications</u>.  This Engagement Letter contains the entire agreement between the parties hereto and may be modified only in a writing signed by both Owner and Pullman.

16.   <u>Notices</u>.  All notices under this Engagement Letter must be in writing and will be considered given when delivered by hand (including by courier service), or on the fifth day after being mailed by prepaid certified or registered mail, return receipt requested, to the parties at the respective addresses stated at the beginning of this Engagement Letter (or at such other address as a party may specify by notice given to the other).

© Copyright 1998-1999. The Pullman Group, LLC.  All rights expressly reserved.

Engagement between Pullman and Three Boys' Music Corporation     V3476 D682  Page 6
Page 6

respective addresses stated at the beginning of this Engagement Letter (or at such other address
as a party may specify by notice given to the other).

Please execute this Engagement Letter in the space provided below and return the
original to us to acknowledge your understanding and acceptance of the terms hereof.

Very truly yours,
The Pullman Group, LLC

By: _____

Its: _____CEO_____

ACCEPTED AND AGREED:

THREE BOYS' MUSIC CORPORATION

By_____
    Rudolph Isley

Title:____V. P_____

Date:____7/23/99_____
    (Commencement Date)

© Copyright 1998-1999, The Pullman Group, LLC. All rights expressly reserved.

# EXHIBIT A-6

# PULLMAN ®



**THE PULLMAN GROUP,® LLC** V3476 D693
*1370 Avenue of the Americas*
*New York, NY 10019*
*212.750.0210 tel.*
*212.750.0464 fax*
*info@pullmanco.com*
*www.pullmanco.com*
Securitizing the Future℠

JAN 16 2002

***STRUCTURED ASSET SALES GROUP***

July 20, 1999

VIA FEDERAL EXPRESS

Ron and Rudolph Isley
T-Neck Records, Inc.
C/o Isley Brothers Management
10866 Wilshire Blvd., Suite 560
Los Angeles, CA  90024

Re:   Engagement as Exclusive Securitizing
     Agent and Advisor

Dear Mr. Ron and Rudolph Isley,

This engagement letter (the "Engagement Letter") confirms the engagement (the "Engagement") by T-Neck Records, Inc., ("Owner") of The Pullman Group. ("Pullman") to act as Owner's agent and advisor on an exclusive basis with respect to the financial transactions described in paragraph 3(a) through (f) hereof ("Transactions"), on the following terms and conditions:

    1.   <u>Engagement Period</u>.  The term of the Engagement (the "Engagement Period") shall commence on the date Owner executes this letter (as entered by Owner below its authorized signatory's signature) (the "Commencement Date") and shall expire unless extended by mutual agreement of the parties hereto, upon the expiration of Ron Isley's Federal bankruptcy proceeding.

    2.   <u>Exclusive Authority</u>.  During the Engagement Period, neither Owner nor anyone acting on its behalf shall, other than with or through Pullman, undertake any activities with regard to Transactions.  Notwithstanding the foregoing, Owner may obtain interim financing without doing so with or through Pullman, on condition that Owner provide notice and the particulars thereof to Pullman and that the interim financing is pre-payable and shall be refinanced in a transaction contemplated under this Engagement Letter to be the subject of Services by Pullman.  Owner will refer to Pullman any expressions of interest and offers which Owner receives during the Engagement Period with respect to any Transactions.  Pullman may perform the same or similar services for others, as well as engage in other business activities.

© Copyright 1998-1999, The Pullman Group, LLC.  All rights expressly reserved.

V3476 D693   Page 2

Engagement between Pullman and T-Neck Records, Inc.
Page 2

3.   _Pullman's Services_.   Subject in the case of each particular Transaction to Pullman's due-diligence review and the approval of Pullman's Commitment Committee and Credit Committee approval, Pullman or an affiliate, as appropriate, will, using reasonable best efforts, perform or cause to be performed under its supervision the following services (collectively the "Services"):

(a) Structuring a securitization program for the issuance of securities (the "Securities") or asset sale(s) backed by Record Masters and Record Royalties (the "Assets").

(b) Additionally subject to (i) the Securities' receiving an investment-grade rating by at least two nationally recognized rating agencies and (ii) no material, adverse changes in Owner, Owner's financial condition, or the Assets, and subject to the governing securities laws and regulations, marketing the Securities.

(c) Structuring and obtaining a secured line of credit or similar lending facility ("Warehouse Loan") on commercially reasonable terms.

(d) Compiling information, research and supporting data with respect to the Transactions and Owner (the "Due Diligence Package"), qualifying investors to review the Due Diligence Package and overseeing investors' due diligence review.

(e) Performing such due diligence with respect to the proposed parties to Transactions and other matters as Pullman shall reasonably deem necessary.

4.   _Obligations of Owner_.   Owner undertakes that, using its reasonable best efforts, Owner will:

(a) Make available or cause to be made available to Pullman, at Owner's expense, all documents, agreements and other information, in hard copy and database form, which in Pullman's reasonable judgment are necessary or appropriate for the performance of due diligence, marketing or sales in any of the Transactions.

(b) Provide Pullman with access to Owner's officers, directors, employees and other agents, as well as obligors under any loans, encumbrances or obligations of Owner.

(c) Ensure that all information provided by Owner and its officers, directors, employees or agents is accurate and complete in all material respects, on the express understanding that Pullman shall be entitled to rely thereon without verification and to include all or any portions thereof in any marketing, issuance or offering documents with respect to the Transactions.

(d) Negotiate in good faith and, subject to said negotiations, enter into all documentation reasonably necessary to obtain the required ratings relating to the Securities and to complete the Transactions with the third parties proposed by Pullman.

(e) Approve and retain, at Owner's expense, third-party contractors of Pullman's choosing, including but not limited to accountants, rating agencies, auditors, and attorneys to serve as Transaction counsel or Issuer's, Pullman's and/or investor's counsel, on any Transaction, which Pullman determines in the reasonable exercise of its discretion are necessary and appropriate to perform due diligence or other Services.

© Copyright 1998-1999, The Pullman Group, LLC. All rights expressly reserved.

Engagement between Pullman and T-Neck Records, Inc.
Page 3

V3476 D693   Page 3

(f) Reimburse Pullman on a current basis for the out-of-pocket expenses incurred by Pullman in the performance of the Services.

(g) Ensure that Pullman receives, promptly on execution thereof, a fully executed copy of every agreement entered into by Owner in any Transaction, and all amendments and modifications thereto.

5.   Compensation to Pullman.

(a) As compensation for Pullman's performance of the Services, Owner shall pay to Pullman:

(i) A non-refundable retainer of $25,000, payable at execution of this Engagement Letter and credited toward fees. **Pullman will waive the retainer specifically for this transaction.**

(ii) A fee equal to ten percent (10%) of the aggregate commitment amount of a Warehouse Loan or asset sale, including any increase in the commitment amount, payable at the closing of the Warehouse Loan or, in the event of an increase, at the time the commitment to the increase is issued, or

(iii) A fee equal to ten percent (10%) of the aggregate principal amount of investment-grade Securities or proceeds from asset sale(s), payable at the time the Securities or assets are sold,

(b) Pullman shall give written notice in the event it declines to undertake to provide the Services as to any particular Transaction, in which event Owner shall be free to engage a third party to perform Services as to that Transaction and will have no obligation to pay Pullman a fee therefor.

(c) Owner acknowledges that Pullman shall be entitled to its fee in full, pursuant to paragraph 5(a), in the event that:

(i) An investor from whom Owner accepts an offer to purchase the Securities requires Pullman to cease its marketing and sales efforts or Owner otherwise fails to permit Pullman to carry out its undertaking herein with regard to the transaction.

(ii) A Transaction as to which Pullman commences providing Services during the Engagement Period does not close prior to the Termination Date for any reason other than the willful breach of this Engagement Letter by Pullman, so long as Pullman remains ready, willing and able to perform the Services through the closing of the Transaction (whether or not Owner chooses to permit Pullman to do so).

(iii) A Transaction does not occur because of Owner's failure or refusal to perform its obligations under this Engagement Letter, in which event, since Owner acknowledges that

© Copyright 1998-1999, The Pullman Group, LLC. All rights expressly reserved.

V3476 D693   Page 4

Engagement between Pullman and T-Neck Records, Inc.
Page 4

Pullman will incur consequential damages by reason of the injury to its relations to third parties involved in the Transaction which are not susceptible to quantifiable proof, Owner shall be additionally liable to Pullman for liquidated damages for such injury in the amount of $250,000.

(iv) With respect to 5(c)(i) and 5(c)(ii) above, Owner agrees that Pullman can file an attachment or lien for the full extent of any fees or structuring fees of Pullman or out-of-pocket expenses, interest, Interest Rate and/or Interest Rate Buydown and/or any other fees contemplated herein and third-party expenses incurred by Pullman related to performance of the Services.

6.   Interest Rate.  Subject to Paragraph 5(d), Pullman is granted the exclusive option, at its sole discretion, to buy down the Interest rate on the securities from the securitization transaction which are "A" rated or above by at least one national rating agency from an interest rate equal to the yield of 450 basis points over the corresponding treasury of the average life of the securities.  For example, if the average life is 10 years and the U.S. ten (10) year treasury is trading at 5.0%, Pullman may buy down the securities from a yield of 9.50% at its sole discretion. Purchase price is to be set below par to reflect above yield.

7.   Refinancing or Asset Sale(s).  Pullman is granted the exclusive right, at its sole discretion, to refinance any future transaction(s) or asset sale(s) for owner upon future recoupment of the Securities.  Such financing or asset sale shall be at a minimum transaction size of the initial transaction contemplated by this agreement.  Such refinancing will be on the same terms and conditions outlined herein.  This clause shall be interpreted to include all future financings during the greater of owner's life or two future financing periods in addition to the initial financing contemplated by this agreement.

8.   Breach.  In order to make specific and definite and to eliminate, if possible, any controversy which may arise between the parties, if at any time Owner believes that the terms of this Engagement Letter are being breached by Pullman, it will give notice thereof to Pullman, setting forth with specificity the alleged breach, and shall allow Pullman a period of thirty (30) days after receipt thereof within which to cure the alleged breach.  No breach of this Engagement Letter, unless intentionally dishonest, will be construed as incurable.

9.   Indemnification.  Owner will indemnify and hold harmless Pullman, its parent and affiliates, and their respective directors, officers, controlling persons, agents and employees past and present (each being an "Indemnified Party") from and against all claims, liabilities, losses, damages, proceedings or actions (collectively "claims") related to or arising out of this Engagement or Pullman's role in connection therewith, and will reimburse each Indemnified Party for all reasonable costs and expenses, including counsel fees, as they are incurred in connection with investigating, preparing for and defending any such claim, whether pending or threatened.  Owner will not, however, be responsible for any claims which are judicially determined by final order, without any further right to appeal, to have resulted primarily from Pullman's gross negligence or willful misconduct.  The foregoing right to indemnification shall be in addition to any other rights which an Indemnified Party may have and shall apply whether or not an Indemnified Party is named or threatened to be named as a party in any action, suit or proceeding, brought or to be brought.

10.   Non-circumvention.  From the Commencement Date until three years after the Termination Date, Owner will not attempt to contact any of the investors or lenders introduced by Pullman to Owner without Pullman's prior written approval.  If such contact is made and any

© Copyright 1998-1999, The Pullman Group, LLC.  All rights expressly reserved.

V3476 D693   Page 5

Engagement between Pullman and T-Neck Records, Inc.
Page 5

Transaction is consummated between Owner and/or its affiliates and the lender or investor introduced by Pullman, Owner will be liable to Pullman for fees on the Transaction pursuant to paragraph 5 hereof.

11.   Assignability.  Pullman may not assign its rights and/or obligations under this Engagement Letter without the consent of Owner, except to one or more affiliates of Pullman. Owner may not assign its rights and/or obligations under this Engagement Letter without the consent of Pullman, except to any one or more single-purpose corporations or partnerships formed to hold the Assets and approved by counsel for the company issuing the Securities, if such assignment is necessary and prudent in connection with the securitization, and provided that such assignment shall not relieve Owner of its obligations hereunder.

12.   Law and venue.  This Engagement Letter shall be interpreted under and governed by the laws of the State of New York.  In the event that any legal proceeding shall be instituted under or in connection with this Engagement Letter, the federal and state courts located in New York, New York, shall have full jurisdiction over both parties with regard thereto, and litigation shall be commenced solely in said courts.  The losing party shall reimburse the prevailing party for its reasonable attorney's fees and costs incurred with respect to such legal proceeding.

13.   Authority.  Owner represents and warrants to Pullman that all requisite approval action required under Owner's by-laws relating to Owner's entering into and performing in full under this Engagement Letter has been duly taken.

14.   Confidentiality.  Each of Owner and Pullman, on its own behalf and on behalf of its partners, shareholders, officers, employees and agents, hereby acknowledges that the contents of this Engagement Letter, the form and contents of all documents, instruments and other materials relating to the other party and to the Transactions which may become available to it during the course of performance under this Engagement Letter, and all information pertaining to the Securities, including the structure, the credit spread, and the other terms (collectively, the "Materials"), are confidential.  No such Materials, nor any portion of the contents or substance thereof or of this Engagement Letter may be communicated or made available to any person other than Owner and Pullman without the express prior written approval of the other party, except that each party may distribute Materials to its lawyers, accountants, lenders and advisors acting on its behalf as necessary for the party's performance hereunder and except that Pullman may publish information regarding the Transactions on the Bridge/Knight Ridder electronic screen and/or cause rating agencies to publish reports on the Transactions.  Each of Owner and Pullman acknowledges that a breach of this provision shall cause irreparable harm to the other party that remedies at law will be inadequate to redress and that Pullman and Owner, as the case may be, will be entitled to injunctive or similar equitable relief against the other party in the event of breach of this provision.

15.   Modifications.  This Engagement Letter contains the entire agreement between the parties hereto and may be modified only in a writing signed by both Owner and Pullman.

16.   Notices.  All notices under this Engagement Letter must be in writing and will be considered given when delivered by hand (including by courier service), or on the fifth day after being mailed by prepaid certified or registered mail, return receipt requested, to the parties at the respective addresses stated at the beginning of this Engagement Letter (or at such other address as a party may specify by notice given to the other).

© Copyright 1998-1999, The Pullman Group, LLC.  All rights expressly reserved.

Engagement between Pullman and T-Neck Records, Inc.
Page 6

respective addresses stated at the beginning of this Engagement Letter (or at such other address as a party may specify by notice given to the other).

Please execute this Engagement Letter in the space provided below and return the original to us to acknowledge your understanding and acceptance of the terms hereof.

Very truly yours,
The Pullman Group, LLC

By: _____

Its: _____CEO_____

ACCEPTED AND AGREED:

T-NECK RECORDS, INC.

By: _____
    Rudolph Isley

Title: ___V.P._____

Date: ___7/23/99_____
    (Commencement Date)

© Copyright 1998-1999, The Pullman Group, LLC.  All rights expressly reserved.

EXHIBIT A-7

JUN-15-2000  12:30     MWE                                                    P.07



**THE PULLMAN GROUP,® LLC**   **V3476 D694**
*1370 Avenue of the Americas*                                        JAN 16 2002
*New York, NY 10019*
*212.750.0210 tel.*
*212.750.0464 fax*
*info@pullmanco.com*
*www.pullmanco.com*
Securitizing the Future™                          *STRUCTURED ASSET SALES GROUP*

July 20, 1999

VIA FEDERAL EXPRESS

Ron and Rudolph Isley
Triple Three Music, Inc.
C/o Isley Brothers Management
10866 Wilshire Blvd., Suite 560
Los Angeles, CA  90024

      Re:   Engagement as Exclusive Securitizing
              Agent and Advisor

Dear Mr. Ron and Rudolph Isley,

      This engagement letter (the "Engagement Letter") confirms the engagement (the "Engagement") by Triple Three Music, Inc., ("Owner") of The Pullman Group. ("Pullman") to act as Owner's agent and advisor on an exclusive basis with respect to the financial transactions described in paragraph 3(a) through (f) hereof ("Transactions"), on the following terms and conditions:

      1.   <u>Engagement Period</u>.  The term of the Engagement (the "Engagement Period") shall commence on the date Owner executes this letter (as entered by Owner below its authorized signatory's signature) (the "Commencement Date") and shall expire unless extended by mutual agreement of the parties hereto, upon the expiration of Ron Isley's Federal bankruptcy proceeding.

      2.   <u>Exclusive Authority</u>.  During the Engagement Period, neither Owner nor anyone acting on its behalf shall, other than with or through Pullman, undertake any activities with regard to Transactions. Notwithstanding the foregoing, Owner may obtain interim financing without doing so with or through Pullman, on condition that Owner provide notice and the particulars thereof to Pullman and that the interim financing is pre-payable and shall be refinanced in a transaction contemplated under this Engagement Letter to be the subject of Services by Pullman. Owner will refer to Pullman any expressions of interest and offers which Owner receives during the Engagement Period with respect to any Transactions. Pullman may perform the same or similar services for others, as well as engage in other business activities.

® Copyright 1998-1999, The Pullman Group, LLC.  All rights expressly reserved.

                                                              TOTAL P.07

V3476 D694  Page 1

Engagement between Pullman and Triple Three Music, Inc.
Page 2

3. <u>Pullman's Services</u>. Subject in the case of each particular Transaction to Pullman's due-diligence review and the approval of Pullman's Commitment Committee and Credit Committee approval, Pullman or an affiliate, as appropriate, will, using reasonable best efforts, perform or cause to be performed under its supervision the following services (collectively the "Services"):

(a) Structuring a securitization program for the issuance of securities (the "Securities") or asset sale(s) backed by Record Masters, Music Publishing and Writers' share (the "Assets").

(b) Additionally subject to (i) the Securities' receiving an investment-grade rating by at least two nationally recognized rating agencies and (ii) no material, adverse changes in Owner, Owner's financial condition, or the Assets, and subject to the governing securities laws and regulations, marketing the Securities.

(c) Structuring and obtaining a secured line of credit or similar lending facility ("Warehouse Loan") on commercially reasonable terms.

(d) Compiling information, research and supporting data with respect to the Transactions and Owner (the "Due Diligence Package"), qualifying investors to review the Due Diligence Package and overseeing investors' due diligence review.

(e) Performing such due diligence with respect to the proposed parties to Transactions and other matters as Pullman shall reasonably deem necessary.

4. <u>Obligations of Owner</u>. Owner undertakes that, using its reasonable best efforts, Owner will:

(a) Make available or cause to be made available to Pullman, at Owner's expense, all documents, agreements and other information, in hard copy and database form, which in Pullman's reasonable judgment are necessary or appropriate for the performance of due diligence, marketing or sales in any of the Transactions.

(b) Provide Pullman with access to Owner's officers, directors, employees and other agents, as well as obligors under any loans, encumbrances or obligations of Owner.

(c) Ensure that all information provided by Owner and its officers, directors, employees or agents is accurate and complete in all material respects, on the express understanding that Pullman shall be entitled to rely thereon without verification and to include all or any portions thereof in any marketing, issuance or offering documents with respect to the Transactions.

(d) Negotiate in good faith and, subject to said negotiations, enter into all documentation reasonably necessary to obtain the required ratings relating to the Securities and to complete the Transactions with the third parties proposed by Pullman.

(e) Approve and retain, at Owner's expense, third-party contractors of Pullman's choosing, including but not limited to accountants, rating agencies, auditors, and attorneys to serve as Transaction counsel or Issuer's, Pullman's and/or investor's counsel, on any Transaction, which Pullman determines in the reasonable exercise of its discretion are necessary and appropriate to perform due diligence or other Services.

* Copyright 1998-1999, The Pullman Group, LLC. All rights expressly reserved.

Engagement between Pullman and Triple Three Music, Inc.
Page 3

(f) Reimburse Pullman on a current basis for the out-of-pocket expenses incurred by Pullman in the performance of the Services.

(g) Ensure that Pullman receives, promptly on execution thereof, a fully executed copy of every agreement entered into by Owner in any Transaction, and all amendments and modifications thereto.

5.    Compensation to Pullman.

(a) As compensation for Pullman's performance of the Services, Owner shall pay to Pullman:

(i) A non-refundable retainer of $25,000, payable at execution of this Engagement Letter and credited toward fees. Pullman will waive the retainer specifically for this transaction.

(ii) A fee equal to ten percent (10%) of the aggregate commitment amount of a Warehouse Loan or asset sale, including any increase in the commitment amount, payable at the closing of the Warehouse Loan or, in the event of an increase, at the time the commitment to the increase is issued, or

(iii) A fee equal to ten percent (10%) of the aggregate principal amount of investment-grade Securities or proceeds from asset sale(s), payable at the time the Securities or assets are sold,

(b) Pullman shall give written notice in the event it declines to undertake to provide the Services as to any particular Transaction, in which event Owner shall be free to engage a third party to perform Services as to that Transaction and will have no obligation to pay Pullman a fee therefor.

(c) Owner acknowledges that Pullman shall be entitled to its fee in full, pursuant to paragraph 5(a), in the event that:

(i) An investor from whom Owner accepts an offer to purchase the Securities requires Pullman to cease its marketing and sales efforts or Owner otherwise fails to permit Pullman to carry out its undertaking herein with regard to the transaction.

(ii) A Transaction as to which Pullman commences providing Services during the Engagement Period does not close prior to the Termination Date for any reason other than the willful breach of this Engagement Letter by Pullman, so long as Pullman remains ready, willing and able to perform the Services through the closing of the Transaction (whether or not Owner chooses to permit Pullman to do so).

(iii) A Transaction does not occur because of Owner's failure or refusal to perform its obligations under this Engagement Letter, in which event, since Owner acknowledges that

V3476 D694   Page 3

© Copyright 1998-1999, The Pullman Group, LLC. All rights expressly reserved.

JUN-15-2000  12:35       MWE                                          P.04

Engagement between Pullman and Triple Three Music, Inc.
Page 5

Transaction is consummated between Owner and/or its affiliates and the lender or investor introduced by Pullman, Owner will be liable to Pullman for fees on the Transaction pursuant to paragraph 5 hereof.

11.  _Assignability_.  Pullman may not assign its rights and/or obligations under this Engagement Letter without the consent of Owner, except to one or more affiliates of Pullman. Owner may not assign its rights and/or obligations under this Engagement Letter without the consent of Pullman, except to any one or more single-purpose corporations or partnerships formed to hold the Assets and approved by counsel for the company issuing the Securities, if such assignment is necessary and prudent in connection with the securitization, and provided that such assignment shall not relieve Owner of its obligations hereunder.

12.  _Law and venue_.  This Engagement Letter shall be interpreted under and governed by the laws of the State of New York.  In the event that any legal proceeding shall be instituted under or in connection with this Engagement Letter, the federal and state courts located in New York, New York, shall have full jurisdiction over both parties with regard thereto, and litigation shall be commenced solely in said courts.  The losing party shall reimburse the prevailing party for its reasonable attorney's fees and costs incurred with respect to such legal proceeding.

13.  _Authority_.  Owner represents and warrants to Pullman that all requisite approval action required under Owner's by-laws relating to Owner's entering into and performing in full under this Engagement Letter has been duly taken.

14.  _Confidentiality_.  Each of Owner and Pullman, on its own behalf and on behalf of its partners, shareholders, officers, employees and agents, hereby acknowledges that the contents of this Engagement Letter, the form and contents of all documents, instruments and other materials relating to the other party and to the Transactions which may become available to it during the course of performance under this Engagement Letter, and all information pertaining to the Securities, including the structure, the credit spread, and the other terms (collectively, the "Materials"), are confidential.  No such Materials, nor any portion of the contents or substance thereof or of this Engagement Letter may be communicated or made available to any person other than Owner and Pullman without the express prior written approval of the other party, except that each party may distribute Materials to its lawyers, accountants, lenders and advisors acting on its behalf as necessary for the party's performance hereunder and except that Pullman may publish information regarding the Transactions on the Bridge/Knight Ridder electronic screen and/or cause rating agencies to publish reports on the Transactions.  Each of Owner and Pullman acknowledges that a breach of this provision shall cause irreparable harm to the other party that remedies at law will be inadequate to redress and that Pullman and Owner, as the case may be, will be entitled to injunctive or similar equitable relief against the other party in the event of breach of this provision.

15.  _Modifications_.  This Engagement Letter contains the entire agreement between the parties hereto and may be modified only in a writing signed by both Owner and Pullman.

16.  _Notices_.  All notices under this Engagement Letter must be in writing and will be considered given when delivered by hand (including by courier service), or on the fifth day after being mailed by prepaid certified or registered mail, return receipt requested, to the parties at the respective addresses stated at the beginning of this Engagement Letter (or at such other address as a party may specify by notice given to the other).

© Copyright 1998-1999, The Pullman Group, LLC.  All rights expressly reserved.

JUN-15-2000  12:35       MWE

Engagement between Pullman and Triple Three Music, Inc.,
Page 6

respective addresses stated at the beginning of this Engagement Letter (or at such other address
as a party may specify by notice given to the other).

Please execute this Engagement Letter in the space provided below and return the
original to us to acknowledge your understanding and acceptance of the terms hereof.

Very truly yours,
The Pullman Group, LLC

By: _David Pullman_____

Its: _CEO_____

ACCEPTED AND AGREED:

TRIPLE THREE MUSIC, INC.

By: _Rudolph Isley_____
       Rudolph Isley

Title: _VP_____

Date: _7/23/99_____
       (Commencement Date)

V3-76 D694  Page 5

© Copyright 1998-1999. The Pullman Group, LLC. All rights expressly reserved.

99%                                          P.05