UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| THE PULLMAN GROUP, LLC,<br><br>   Plaintiff,<br><br>      vs.<br><br>RONALD ISLEY, RUDOLPH ISLEY, RESERVOIR MEDIA MANAGEMENT, INC., THE ESTATE OF O'KELLY ISLEY, J.R., ISLEY BROTHERS, L.L.C., ISLEY BROTHERS ROYALTY VENTURE I SPC, INC., THREE BOYS MUSIC CORPORATION, BOVINA MUSIC INC., T-NECK RECORDS, INC., TRIPLE THREE MUSIC, INC. AND JOHN DOE CORPORATIONS 1-5,<br><br>   Defendants. | Civil Action No. 1:20-cv-07293-GHW |

**ISLEY DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF
MOTION TO DISMISS PLAINTIFF'S COMPLAINT**

**(ORAL ARGUMENT REQUESTED)**

**TABLE OF CONTENTS**

I. INTRODUCTION .................................................................................................................. 1

II. FACTUAL BACKGROUND ................................................................................................ 2

III. ARGUMENT AND AUTHORITIES .................................................................................... 4

    A. LEGAL STANDARD. ....................................................................................................... 4

    B. THERE IS NO BREACH OF CONTRACT BECAUSE THE ENGAGEMENT LETTERS EXPIRED IN 2007, AND PULLMAN'S THEORY FOR EXTENDING THE AGREEMENTS HINGES ON ONE SENTENCE APPLICABLE TO ONLY 'FINANCINGS' AND NOT TO 'ASSET SALES.' ........................................................................................................ 5

        1. The Engagement Letters Expired in 2007. ................................................. 5

        2. Paragraph 7 Does Not Extend the Engagement Period for Asset Sales. .... 5

    C. THERE IS NO BREACH OF CONTRACT BECAUSE THE SECOND CIRCUIT PROHIBITS PULLMAN'S PURPORTED "EXCLUSIVE RIGHT OF SALE." .................................. 9

        1. The *Dominick* Standard for an Exclusive Right of Sale Requires 'Clear and Express Language.' ............................................................................. 9

        2. Any Purported "Exclusive Authority" Ended When the Engagement Period Expired in 2007. ........................................................................... 11

        3. Pullman Cannot Recover Any Fees on Asset Sales to Reservoir and EMI. ................................................................................................................. 12

    D. PULLMAN'S OTHER CLAIMS ARE DERIVATIVE CLAIMS THAT ALSO FAIL. .............. 13

        1. Pullman's Foreclosure of Contractual Liens Claim Fails. ........................ 13

        2. Pullman's Attorney's Fees and Costs Claim Fails. ................................... 14

        3. Pullman's Derivative Claim for Tortious Interference Fails. ................... 15

IV. CONCLUSION ..................................................................................................................... 15

# **TABLE OF AUTHORITIES**

**CASES**

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ................................................................................................................ 4

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ................................................................................................................ 4

*Diversified Media Brokerage Partners v. Upscale Commc'ns., Inc.*,
    No. 07-cv-4285, 2010 WL 5068936 (E.D.N.Y. Dec. 6, 2010) ............................................... 5

*Dominick & Dickerman LLC v. Deutsche Oel & Gas AG*,
    756 F. App'x. 58 (2d. Cir. 2018) ..................................................................... 9, 10, 11, 12

*Dominick & Dominick LLC v. Deutsche Oel & Gas Ag*,
    No. 14-cv-06445(PCK), 2016 U.S. Dist. LEXIS 189380 (S.D.N.Y. Aug. 15, 2016) ...... 10

*First Tech. Capital, Inc. v. Airborne, Inc.*,
    261 F. Supp. 3d 371 (W.D.N.Y. 2017) ................................................................................. 6

*Grant & Eisenhofer, P.A. v. Bernstein Liebhard, LLP*,
    No. 14-CV-9839 (JMF), 2016 U.S. Dist. LEXIS 98760 (S.D.N.Y. July 27, 2016) ........... 7

*Harris v. Mills*,
    572 F.3d 66 (2d Cir. 2009) ..................................................................................................... 4

*Int'l Techs. Mktg, Inc. v. Verint Sys., Ltd.*,
    157 F. Supp. 3d 352 (S.D.N.Y. 2016) (J. Woods) ......................................................... 5, 6, 7

*Kropschot Fin. Servs., Inc. v. Balboa Capital Corp.*,
    No. 11-cv-8609, 2012 WL 1870697 (S.D.N.Y May 21, 2012) .......................................... 5

*Lama Holding Co. v. Smith Barney Inc.*,
    88 N.Y.2d 413, 668 N.E.2d 1370, 646 N.Y.S.2d 76 (N.Y. 1996) ..................................... 15

*Morpheus Capital Advisors LLC v. UBS AG*,
    23 N.Y.3d 528, 992 N.Y.S.2d 178, 15 N.E.3d 1187 (N.Y. 2014) ................................. 9, 10

*Raymond Weil, S.A. v. Theron*,
    585 F. Supp. 2d 473 (S.D.N.Y. 2008) .................................................................................. 5

*Rich v. Fox News Network, LLC*,
    939 F.3d 112 (2d Cir. 2019) ................................................................................................ 15

*Sevel Arg., S.A. v. GMC*,
    46 F. Supp. 2d 261 (S.D.N.Y. 1999) .................................................................................... 5

TO THE HONORABLE UNITED STATES DISTRICT COURT:

Defendants Ronald Isley, Rudolph Isley, The Estate of O'Kelly Isley, Jr., Isley Brothers, L.L.C., Isley Brothers Royalty Venture I SPC, Inc., Three Boys Music Corporation, Bovina Music Inc., T-Neck Records, Inc., and Triple Three Music, Inc. (collectively, "the Isleys" or "Isley Defendants"), file this Memorandum of Law in Support of Motion to Dismiss Plaintiff's Complaint and would respectfully show as follows:

## I.  INTRODUCTION

This is a breach of contract case based on seven identical Engagement Letters each dated July 20, 1999 ("Engagement Letters").[1] Plaintiff The Pullman Group, LLC ("Pullman" or "Plaintiff") alleges that the Isleys breached the Engagement Letters twice by negotiating a sale of their own music assets without paying a fee to Pullman, including an asset sale to EMI in 2017, which Pullman refers to as the "EMI Asset Sale Agreement,"[2] and an asset sale to Defendant Reservoir Media Management, Inc. ("Reservoir") in 2018, which Pullman refers to as the "Reservoir Asset Sale Agreement."[3] Pullman admits that it had no involvement whatsoever in either sale.[4] Specifically, Pullman alleges breaches of paragraphs 2 and 7 of the Engagement Letters.[5] In addition to the breach of contract claims, Pullman also brings derivative claims,

---

[1] Original Complaint ("OC") at ¶ 4. The seven identical Engagement Letters are attached to the Original Complaint ("OC") as Exhibits A1-A7 and are between Pullman and seven of the Isley Defendants: Ronald Isley, Rudolph Isley, The Estate of O'Kelly Isley, Jr., Three Boys Music Corporation, Bovina Music Inc., T-Neck Records, Inc., and Triple Three Music, Inc.
[2] OC at ¶ 2.
[3] OC at ¶ 3.
[4] OC at ¶ 2 (in 2017, "the Isley Brothers, secretly behind Pullman's back, negotiated an agreement to sell valuable exclusive Musical Assts to EMI"); OC at ¶ 3 (in 2018, "the Isley Brothers, secretly behind Pullman's back, sold valuable exclusive Musical Assets to Reservoir"); OC at ¶ 60 (in August 2017, "the Isley Brothers secretly reached an agreement with EMI on the essential terms of an approximate eight figure sale, without advising Pullman or allowing Pullman to participate."); OC at ¶ 74 ("the Isley Brothers secretly behind Pullman's back sold valuable Musical Assets to Reservoir").
[5] OC at ¶¶ 105-121 (First Cause of Action: "Breach of Contract – Violation of Paragraphs 2 and 7 of the Engagement Letters – EMI Asset Sale Agreement; Second Cause of Action: "Breach of Contract – Violation of Paragraphs 2 and 7 of the Engagement Letters – Reservoir Transaction").

1

including foreclosure of a contractual lien and contractual attorney's fees and costs, as well as tortious interference claims against Reservoir and two of the Isley Defendants.[6]  All of Pullman's claims fail.

As discussed below, this lawsuit should be dismissed in its entirety for at least the following reasons: (1) the Engagement Letters expired on November 2, 2007, and no clause in the Engagement Letters, including paragraph 7, extends this time period with respect to asset sales; (2) the Engagement Letters do not give Pullman an "exclusive right of sale;" and (3) the Engagement Letters do not grant Pullman the right to receive a fee on an asset sale in which Pullman had no involvement.  Pullman's other claims are all derivative of the futile breach of contract claims, so those claims likewise should be dismissed.

## II.    FACTUAL BACKGROUND

The Isley Brothers are a Grammy-award winning and Hall of Fame R&B music group that started in the 1950's as a vocal trio consisting of brothers Ronald Isley, Rudolph Isley and O'Kelly Isley, Jr.  Some of their top hits include "Shout" and "This Old Heart of Mine."  On April 2, 1997, Ronald Isley filed bankruptcy in Los Angeles, California.[7]  During the pendency of the bankruptcy, Pullman entered into the Engagement Letters with some of the Isley Defendants on July 20, 1999,[8] in order to structure a securitization/bond deal backed by the Isleys' record masters, music publishing and the writers share of their music catalog ("music assets").[9]

---

[6] Pullman asserts five causes of action: claims against the Isleys for breach of contract (First and Second Causes of Action, OC ¶¶ 105-121), foreclosure of contractual liens (Fifth Cause of Action, OC ¶¶ 138-142), and attorney's fees and costs (Third Cause of Action, OC ¶¶ 122-124); and a claim against Reservoir, Isley Brothers, L.L.C. and Isley Brothers Royalty Venture I SPC for tortious interference with contract (Fourth Cause of Action, OC ¶¶ 125-137).
[7] U.S Bankruptcy Court for the Central District of California (Los Angeles) in Case No. 2:97-bk-22489-BR.
[8] Engagement Letters, OC, Exs. A1-A7.
[9] OC at n.4.

The Engagement Letters, which form the basis for this breach of contract case, provide that the Isleys engaged Pullman to act as their "securitizing agent and advisor" with respect to certain financial transactions involving their music assets for a *specified time period*:

> 1. Engagement Period.  The term of the Engagement ("Engagement Period") shall commence on the date Owner executes this letter … (the "Commencement Date") and *shall expire unless extended by mutual agreement of the parties hereto, upon the expiration of Ron Isley's Federal bankruptcy proceeding*.[10]

Ronald Isley's federal bankruptcy proceeding ended on **November 2, 2007**.[11]  Accordingly, the Engagement Letters expired over a decade ago.

As contemplated by the Engagement Letters, Pullman structured a securitization deal for the Isleys secured by the Isleys' music assets through the issuance of bonds (referred to as "Pullman Bonds").[12] The Pullman Bonds were issued in 2000,[13] which was during the Engagement Period.  Pullman admits that the bonds were fully satisfied and paid off by the Isleys in 2011.[14] Pullman also acknowledges that it was paid millions of dollars for the Pullman Bonds.[15]  The Isleys had no further business with Pullman following this securitization/bond transaction.  Years later and well after the expiration of the Engagement Letters, the Isleys chose to sell their own music assets without involving Pullman in the 2017 EMI Asset Sale or the 2018 Reservoir Asset Sale. The Isleys owe nothing further to Pullman.

---

[10] Engagement Letters at ¶1 (emphasis added).
[11] U.S Bankruptcy Court for the Central District of California (Los Angeles) in Case No. 2:97-bk-22489-BR.
[12] OC at ¶¶ 57-58
[13] OC at ¶¶ 57-58.
[14] OC at ¶¶ 57-58.
[15] OC at ¶ 57.

### III.     ARGUMENT AND AUTHORITIES

The parties agreed that any disputes with respect to the Engagement Letters are to be governed by New York law.[16] Under prevailing authority, each claim asserted by Pullman fails and should be dismissed.

**A.     LEGAL STANDARD.**

A motion to dismiss under Rule 12(b)(6) should be granted if a complaint does not contain enough factual allegations to state a claim that would be "plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). To be "plausible," a claim must present "more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A plaintiff must make "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id*. And if a plaintiff "ha[s] not nudged [its] claims across the line from conceivable to plausible, [its] complaint must be dismissed." *Twombly*, 550 U.S. at 570.

Although a court usually should accept the allegations in a complaint as true, this general rule "'is inapplicable to legal conclusions,' and '[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.'" *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (quoting *Iqbal*, 556 U.S. at 678). Determining whether a complaint fails to state a plausible claim is a "'context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" *Id.* (quoting *Iqbal*, 556 U.S. at 679). Even if a court decides that allegations are presumably true, the facts alleged must also "plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 664. In short, Rule 8 "does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Id.* at 678–79.

---

[16] Engagement Letters at ¶ 12.

Here, Plaintiff has failed to plead facts that would enable it to meet these standards. Therefore, Plaintiff's Complaint should be dismissed, with prejudice.

B.   **THERE IS NO BREACH OF CONTRACT BECAUSE THE ENGAGEMENT LETTERS EXPIRED IN 2007, AND PULLMAN'S THEORY FOR EXTENDING THE AGREEMENTS HINGES ON ONE SENTENCE APPLICABLE TO ONLY 'FINANCINGS' AND NOT TO 'ASSET SALES.'**

   **1.   The Engagement Letters Expired in 2007.**

The Engagement Letters have a defined and ***specified expiration*** in the first paragraph:

> 1. <u>Engagement Period</u>.  The term of the Engagement (the "Engagement Period") shall commence on the date Owner executes this letter … (the "Commencement Date") and ***shall expire*** unless extended by mutual agreement of the parties hereto, ***upon the expiration of Ron Isley's Federal bankruptcy proceeding***.[17]

Ronald Isley's federal bankruptcy proceeding ended on ***<u>November 2, 2007</u>***.[18]  Accordingly, the Engagement Letters expired over a decade ago and well before the 2017 and 2018 asset sales at issue here.  It is axiomatic that no breach of contract may exist where the breach allegedly occurred after the contract expired.[19]  Here, the Isleys have no obligation to pay a fee to Pullman for asset sales over a decade after the parties' contract expired. Pullman's breach of contract claims fail.

   **2.   Paragraph 7 Does Not Extend the Engagement Period for Asset Sales.**

Despite the explicit language defining the expiration of the Engagement Period, Pullman argues that one sentence in the Engagement Letters—the last sentence of paragraph 7—extends the time period with respect to asset sales.[20]  Paragraph 7 provides:

---

[17] Engagement Letters at ¶ 1 (emphasis added).
[18] *See* U.S Bankruptcy Court for the Central District of California (Los Angeles) in Case No. 2:97-bk-22489-BR.
[19] *Int'l Techs. Mktg, Inc. v. Verint Sys., Ltd.,* 157 F. Supp. 3d 352, 363-364 (S.D.N.Y. 2016) (J. Woods); *see also Kropschot Fin. Servs., Inc. v. Balboa Capital Corp.*, No. 11-cv-8609, 2012 WL 1870697, at *5 (S.D.N.Y May 21, 2012) (breach of contract dismissed because alleged breach occurred months after contract expired); *Diversified Media Brokerage Partners v. Upscale Commc'ns., Inc.*, No. 07-cv-4285, 2010 WL 5068936, at *1 (E.D.N.Y. Dec. 6, 2010) (same); *Raymond Weil, S.A. v. Theron*, 585 F. Supp. 2d 473, 485 (S.D.N.Y. 2008) (breach of contract cannot occur after contract has expired); *Sevel Arg., S.A. v. GMC*, 46 F. Supp. 2d 261, 268 (S.D.N.Y. 1999) (same).
[20] *See* OC at ¶ 109; *see also* Engagement Letters at ¶ 7 ("***This clause shall be interpreted to include all <u>future financings</u>*** during the greater of owner's life or two future financing periods in addition to the initial financing contemplated by this agreement.") (emphasis added).

5

> 7. ***Refinancing or Asset Sale(s)***. Pullman is granted the exclusive right, at its sole discretion, to ***refinance any future transactions or asset sale(s)*** for owner upon future recoupment of the Securities. Such ***financing or asset sale*** shall be at a minimum transaction size of the initial transaction contemplated by this agreement. Such refinancing will be on the same terms and conditions outlined herein. ***This clause shall be interpreted to include all future financings during the greater of owner's life or two future financing periods in addition to the initial financing contemplated by this agreement***.[21]

A plain reading of paragraph 7 makes clear that the parties draw a distinction between "financings" and "asset sales." Throughout Paragraph 7, there is a repeated reference to an either/or proposition with respect to the two terms, even in the title of the paragraph:

- Title: "***Refinancing or Asset Sale(s)***"
- "to ***refinance*** any future transaction(s) ***or asset sale(s)*** for owner"
- "Such ***financing or asset sale*** shall be at a minimum transaction size"

Paragraph 7 is replete with references to 'financings or asset sales.' Yet, in the final sentence, which Pullman relies on for the proposition that the Engagement Period is extended, it is plainly and unmistakably limited to '***financings***' and makes no mention of 'asset sales':

- "This clause shall be interpreted to include ***all future financings*** during the greater of owner's life or two future ***financing periods*** in addition to the initial ***financing*** contemplated by this agreement."

"The fundamental, neutral precept of contract interpretation is that agreements are construed in accord with the parties' intent. Thus, [t]he best evidence of what parties to a written agreement intend is what they say in their writing." *Int'l Techs. Mktg., Inc. v. Verint Sys., Ltd.*, 157 F. Supp. 3d 352, 360 (S.D.N.Y. 2016) (J. Woods).[22] "[C]ourts may not by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties

---

[21] Engagement Letters at ¶ 7 (emphasis added).
[22] *See also First Tech. Capital, Inc. v. Airborne, Inc.*, 261 F. Supp. 3d 371, 381 (W.D.N.Y. 2017) (quoting *Int'l Techs. Mktg.*).

6

under the guise of interpreting the writing." *Int'l Techs. Mktg.,* 157 F. Supp. 3d at 362-63; *see also Grant & Eisenhofer, P.A. v. Bernstein Liebhard, LLP*, No. 14-CV-9839 (JMF), 2016 U.S. Dist. LEXIS 98760, at *12 (S.D.N.Y. July 27, 2016) (quoting *Int'l Techs. Mktg.*).

Even under the strained interpretation of paragraph 7 proposed by Pullman, the last sentence refers only to "financings" and not to "asset sales," and both terms are distinct and used throughout paragraph 7 as different types of transactions with an either/or proposition. Notably, the last sentence of paragraph 7 is completely devoid of the term "asset sales." Unlike the rest of paragraph 7, the last sentence does not include the phrase "financings or asset sales." Pullman improperly requests that the Court read something into the last sentence that simply does not exist—that is, Pullman wants the Court to add the term "asset sales" to the last sentence when the plain language simply does not do so. As noted by this Honorable Court in *International Technologies*, "courts may not by construction add" terms.[23]

Alternatively, Pullman proposes that the Court improperly distort the meaning of the term "financings" to include "asset sales" when the two terms are distinct, separate and clearly different as used throughout paragraph 7. Pullman's sole argument is that the last sentence of paragraph 7 somehow extends the Engagement Period by stating: "This clause shall be interpreted to include all future *financings* during the greater of the owner's life or two future *financing* periods in addition to the initial *financing* contemplated by this agreement." However, there is no mention of extending the time period for "asset sales." Nothing in paragraph 7 extends the Engagement Period with respect to "asset sales."

---

[23] *Int'l Techs. Mktg., Inc. v. Verint Sys., Ltd.,* 157 F. Supp. 3d 352, 362-363 (S.D.N.Y. 2016) (J. Woods); *see also Grant & Eisenhofer, P.A. v. Bernstein Liebhard, LLP*, No. 14-CV-9839 (JMF), 2016 U.S. Dist. LEXIS 98760, at *12 (S.D.N.Y. July 27, 2016) (quoting *Int'l Techs. Mktg.*).

It is undisputed that Pullman's claims here are specifically premised on "asset sales" by the Isleys. Pullman states repeatedly in the Complaint that the claims in this matter are based on the 2017 "EMI Asset Sale Agreement" and the 2018 "Reservoir Asset Sale Agreement":

- "The first breach in 2017: In violation of Pullman's exclusive rights, the Isley Brothers, secretly behind Pullman's back, negotiated ***an agreement to sell valuable exclusive Musical Assets*** to EMI Music Publishing, Ltd. ('EMI') for an eight-figure price (the '***EMI Asset Sale Agreement***'), which prevented and blocked Pullman's involvement…."[24]

- "The second breach in 2018: In violation of the express terms of Pullman's contractual rights, the Isley Brothers, secretly behind Pullman's back, ***sold valuable exclusive Musical Assets to Reservoir (the "Reservoir Asset Sale Agreement")*** for a much higher purchase price than under the contemplated EMI Asset Sale Agreement…. The Reservoir Asset Sale Agreement violated Pullman's exclusive contractual right to arrange such ***sales*** for the Isley Brothers."[25]

- "***the sales arranged by the Isley Brothers gives rise to claims*** against the Isley Brothers and their corporate constituencies…."[26]

- "In August 2017, Pullman learned that, ***in breach of its exclusive rights to asset sales***, the Isley Brothers secretly reached an agreement with EMI on the essential terms of an approximate eight figure sale, without advising Pullman or allowing Pullman to participate…."[27]

- "Under the unambiguous terms of the Engagement Letters, the Isley Brothers' breach entitles Pullman to recover his fee in full with respect to the contemplated ***asset sale***…."[28]

- "the Isley Brothers, secretly behind Pullman's back, ***sold valuable Musical Assets*** to Reservoir for a much higher price than the EMI deal. The Reservoir Asset Sale Agreement violated ***Pullman's exclusive contractual right to arrange such sales*** for the Isley Brothers."[29]

- "On or about September 7, 2018, Reservoir entered into an agreement with [the Isleys] that ***sold all rights in any and all Musical Assets*** of the Isley Brothers."[30]

---

[24] OC ¶ 2 (emphasis added).
[25] OC ¶ 3 (emphasis added).
[26] OC ¶ 7 (emphasis added).
[27] OC ¶ 60 (emphasis added).
[28] OC ¶ 70 (emphasis added).
[29] OC ¶ 74 (emphasis added).
[30] OC ¶ 75 (emphasis added).

8

The Engagement Period with respect to asset sales expired when the Engagement Letters expired in 2007—more than a decade ago. Nothing in paragraph 7 extends that time period with respect to "asset sales." The Court should deny Pullman's urging for the Court to improperly "add terms" and "distort the meaning" of terms. Pullman's claims should be dismissed.

**C. THERE IS NO BREACH OF CONTRACT BECAUSE THE SECOND CIRCUIT PROHIBITS PULLMAN'S PURPORTED "EXCLUSIVE RIGHT OF SALE."**

In *Dominick*, the Second Circuit set forth the strict requirements necessary for creating an "exclusive right of sale" in a contract under New York law. *Dominick & Dickerman LLC v. Deutsche Oel & Gas AG*, 756 F. App'x. 58, 61 (2d. Cir. 2018) (quoting *Morpheus Capital Advisors LLC v. UBS AG*, 23 N.Y.3d 528, 535, 992 N.Y.S.2d 178, 15 N.E.3d 1187 (N.Y. 2014)). As explained below, Pullman does not meet the *Dominick* criteria.

**1. The *Dominick* Standard for an Exclusive Right of Sale Requires 'Clear and Express Language.'**

In *Dominick*, a German oil and gas company, Deutsche Oel & Gas AG ("DOGAG"), engaged Dominick, an investment bank, to aid in procuring project financing for DOGAG's offshore production facility in Alaska.[31] Under their agreement, Dominick agreed to assist DOGAG in securing up to $325 million in funding.[32] Dominick sent an initial target list of investors to DOGAG and eventually identified two potential investors who provided term sheets to DOGAG for the funding.[33] However, DOGAG ultimately chose to accept funding from a different investor, Energy Capital Partners ("ECP"), with whom Dominick had never spoken.[34] DOGAG negotiated and closed the deal with ECP independently and without involving

---

[31] *Dominick & Dickerman LLC v. Deutsche Oel & Gas AG*, 756 F. App'x. 58, 60 (2d. Cir. 2018).
[32] *Id.*
[33] *Id.*
[34] *Id.*

9

Dominick.[35]  DOGAG insisted that it was not required to pay Dominick its funding fee because Dominick did not assist in securing the funding.[36]

Dominick sued and brought a breach of contract claim, alleging that it was entitled to a fee on the funding because the parties' agreement conferred an exclusive right to Dominick to procure the funding.  The district court disagreed, finding that the agreement conferred "an exclusive agency, rather than an exclusive right to sell."[37]  The Second Circuit affirmed the district court's ruling.[38]

The Second Circuit opined that "[u]nder New York law, 'a contract giving rise to an exclusive right of sale must clearly and expressly provide that a commission is due upon sale by the owner or exclude the owner from independently negotiating a sale.'"[39]  New York law adheres to the "general principle that an owner's freedom to dispose of [his] own property should not be infringed upon by mere implication."[40]  The Second Circuit determined that the *Dominick* agreement was one of exclusive agency, rather than an exclusive right to sell because it did not include such clear and express language conveying an exclusive right to sell.[41]  Further, the Second Circuit held that parole evidence is not admissible to demonstrate an exclusive right to sell because "an exclusive right to sell is **only created with an 'unequivocal expression of intent by its own terms** or by necessary implication from its terms.'"[42]

---

[35] *Id*.
[36] *Id*.
[37] *Dominick & Dominick LLC v. Deutsche Oel & Gas Ag*, No. 14-cv-06445(PCK), 2016 U.S. Dist. LEXIS 189380 (S.D.N.Y. Aug. 15, 2016), *aff'd*, *Dominick & Dickerman LLC v. Deutsche Oel & Gas AG*, 756 F. App'x. 58, 60-61 (2d. Cir. 2018).
[38] *Id*.
[39] *Dominick*, 756 F. App'x. at 61 (quoting *Morpheus Capital Advisors LLC v. UBS AG*, 23 N.Y.3d 528, 535, 992 N.Y.S.2d 178, 15 N.E.3d 1187 (N.Y. 2014)).
[40] *Morpheus Capital Advisors LLC v. UBS AG*, 23 N.Y.3d 528, 535, 992 N.Y.S.2d 178, 15 N.E.3d 1187 (N.Y. 2014)).
[41] *Dominick*, 756 F. App'x. at 61.
[42] *Id.* (quoting *Morpheus Capital Advisors LLC v. UBS AG*, 23 N.Y.3d 528, 535, 992 N.Y.S.2d 178, 15 N.E.3d 1187 (N.Y. 2014)).

### 2. Any Purported "Exclusive Authority" Ended When the Engagement Period Expired in 2007.

Here, in paragraph 2 of the Engagement Letters, the parties specifically addressed the limits of the "exclusive authority" being conveyed to Pullman under the terms of the agreement:

> 2. Exclusive Authority. ***During the Engagement Period***, neither Owner nor anyone acting on its behalf shall, other than with or through Pullman, undertake any activities with regard to Transactions. . . . Owner will refer to Pullman any expressions of interest and offers which Owner receives ***during the Engagement Period*** with respect to Transactions.[43]

The clear and unequivocal language of the agreement specifically limits any exclusive authority to Pullman to exist only "during the Engagement Period," which ended in 2007.

Paragraph 7 also does not salvage Pullman's argument that it had an exclusive right of sale a decade later in 2017 and 2018. Paragraph 7 states, in relevant part:

> Pullman is granted the exclusive right, at its sole discretion, to refinance any future transaction(s) or asset sale(s) for owner upon future recoupment of the Securities.[44]

Nothing in this sentence extends that time period for the purported exclusive right beyond the Engagement Period. In fact, this sentence is entirely consistent with the parties' intent that any exclusive authority would last only "during the Engagement Period," which was from 1999 to 2007.[45] The parties specifically contemplated that any purported exclusive right would cease once the "Engagement Period" ended. Nothing in paragraph 7 extends the time period for any exclusive authority.

In *Dominick*, the Second Circuit cautioned that when a clause is "silent," a court may not assume that the provision applies beyond its stated language.[46] The Court in *Dominick* also made

---

[43] Engagement Letters at ¶ 2 (emphasis added).
[44] Engagement Letters at ¶ 7.
[45] *See supra* pp 2-3.
[46] *Dominick & Dickerman LLC v. Deutsche Oel & Gas AG*, 756 F. App'x. 58, 61 (2d. Cir. 2018).

11

clear that "an exclusive right to sell is only created with an unequivocal expression of intent by" the specific terms of an agreement.[47]  Here, the specific terms of the Engagement Letters limit any purported exclusive authority by Pullman to the Engagement Period, which ended in 2007. Nothing in paragraph 7 extends the time period for an exclusive right to sell.  Pullman's claims should be dismissed.

### 3.      Pullman Cannot Recover Any Fees on Asset Sales to Reservoir and EMI.

Pullman's claims for a fee on asset sales in which it was not involved also fail and run afoul of the holding in *Dominick*.  The Second Circuit in *Dominick* further examined whether Dominick was entitled to a fee despite the fact that it was in no way involved in procuring the funding that DOGAG obtained.  In *Dominick*, the relevant contract contained a clause providing that Dominick would receive half its fee if funding was procured "from any entity 'listed in Schedule 1.'"[48] ECP—the entity that provided the funding—was one of the entities listed on Schedule 1.[49] However, the Second Circuit found Dominick's argument to be unavailing:

> Dominick's arguments regarding the fee provision, including the clause that provides that Dominick would receive half its fee if funding is procured from any entity listed in 'Schedule 1,' are unavailing because this section does not expressly provide that Dominick is entitled to a fee if funding is procured by DOGAG or that DOGAG is forbidden from independently seeking funding. ***Because the paragraph is silent, we cannot assume that the fee provision was intended to apply to funding procured by DOGAG alone***.  That Dominick would receive a fee for 'any funding' is not the type of clear and express statement envisioned by *Morpheus* to grant an exclusive right to sell.[50]

Here, paragraph 7 is completely silent on whether Pullman will receive a fee for an asset sale in which it was not involved.  Under *Dominick*, it would be improper to "assume" that such a

---

[47] *Id*.
[48] *Id*.
[49] *Id*.
[50] *Id*. at 61 (emphasis added).

12

fee provision applies to this clause. Further, the Engagement Letters expressly provide in paragraph 5 that Pullman will be compensated <u>only</u> for performing "Services" under the agreement.[51] Here, Pullman admits that it had no involvement whatsoever with the asset sales at issue.[52] Accordingly, because Pullman did not perform "Services" to earn a fee and nothing in paragraph 7 "clearly and expressly" provides that Pullman is to be paid a fee despite doing nothing, it is axiomatic that Pullman it is not entitled to a fee here.

Pullman relies on paragraph 7 in an attempt to avoid the inevitability that the Engagement Letters expired more than 10 years ago. However, paragraph 7 does not "clearly and expressly" preclude the Isleys from negotiating a sale of their own assets and does not provide that Pullman will be paid a fee if it is not involved in the sale as required by *Dominick*.[53] Pullman's claims should be dismissed.

D. **PULLMAN'S OTHER CLAIMS ARE DERIVATIVE CLAIMS THAT ALSO FAIL.**

    1. **Pullman's Foreclosure of Contractual Liens Claim Fails.**

Pullman filed liens against the Isleys' musical assets with the U.S. Copyright Office in 2017 and 2018.[54] Pullman seeks to foreclose on these liens, which is a derivative claim premised on the alleged breach of contract. That is, in order to be entitled to any contractual lien, Pullman must establish a breach of contract and fees owed under the contract. As previously discussed, Pullman's breach of contract claims fail, and Pullman is not entitled to any fees pursuant to the Engagement Letters.

---

[51] Engagement Letters at ¶ 5(a) ("As compensation for Pullman's performance of Services, Owner shall pay to Pullman…")
[52] OC at ¶¶ 2, 3, 60, 74.
[53] Engagement Letters at ¶ 7.
[54] OC at ¶¶ 2-3, n.4, n.7.

Pullman argues that it has a contractual lien in the amount of fees that it was not paid for the EMI Asset Sale and Reservoir Asset Sale pursuant to paragraph 5(c)(iv) of the Engagement Letters,[55] which provides:

> (iv) With respect to 5(c)(i) and 5(c)(ii) above, Owner agrees that Pullman can file an attachment or lien for the full extent of any fees or structuring fees of Pullman or out-of-pocket expenses, interest, Interest Rate and/or Interest Rate Buydown and/or any other fees contemplated herein and third-party expenses incurred by Pullman **_related to performance of the Services_**.[56]

Under the express terms of the agreement, Pullman may only file a lien or attachment for fees and expenses incurred by Pullman for the "performance of Services."[57] Here, Pullman seeks to foreclose on liens and attachments that were improperly filed. The Engagement Letters only contemplate a lien for fees and costs incurred relating to services actually performed.[58] Pullman filed a lien relating to fees for which it acknowledges that it did not provide any services.[59] Moreover, Pullman's derivative claim for a lien fails because there is no viable breach of contract as previously discussed. Accordingly, Pullman's claim for foreclosure of contractual liens should be dismissed, and any liens filed with the U.S. Copyright Office should also be dismissed and released.

    **2.    Pullman's Attorney's Fees and Costs Claim Fails.**

Pullman seeks attorney's fees and costs pursuant to paragraph 12 of the Engagement Letters, which provides that

> In the event that any legal proceeding shall be instituted under or in connection with this Engagement Letter . . . . [t]he losing party shall reimburse the prevailing party for its reasonable attorney's fees and costs incurred with respect to such legal proceeding.

---

[55] OC at ¶ 89.
[56] Engagement Letters at ¶ 5(c)(iv) (emphasis added).
[57] Engagement Letters at ¶ 5(c)(iv).
[58] *Id.*
[59] *See supra* n.4.

Because Pullman's claims fail, it is not entitled to a recovery of contractual attorney's fees and costs.[60]

### 3. Pullman's Derivative Claim for Tortious Interference Fails.

Pullman also asserts a tortious interference with contract claim against Defendants Reservoir and Isley Brothers, L.L.C. and Isley Brothers Royalty Venture I SPC.[61] Under New York law, a tortious interference claim requires: "(1) the existence of a valid contract between the plaintiff and a third party, (2) defendant's knowledge of that contract, (3) defendant's intentional procurement of the third-party's breach of the contract without justification, (4) actual breach of the contract, and (5) damages resulting therefrom." *Rich v. Fox News Network, LLC*, 939 F.3d 112, 126-27 (2d Cir. 2019) (quoting *Lama Holding Co. v. Smith Barney Inc.*, 88 N.Y.2d 413, 424, 668 N.E.2d 1370, 646 N.Y.S.2d 76 (N.Y. 1996)). Because there is no breach of contract,[62] Pullman's derivative tortious interference claim likewise fails.

## IV. CONCLUSION

For all the foregoing reasons, the Isley Defendants respectfully request that this Court dismiss Plaintiff's Complaint with prejudice.

---

[60] On the contrary, as the prevailing parties, the Isleys will be entitled to be reimbursed by Pullman for their attorney's fees and costs in this matter.
[61] Fourth Cause of Action, OC at ¶¶ 125-137.
[62] *See supra* pp. 4-13.

15

Dated: October 28, 2020　　　　　　　Respectfully submitted,

　　　　　　　　　　　　　　　　　　WILLS LAW FIRM, PLLC

　　　　　　　　　　　　　　　　　　*/s/ Rhonda H. Wills*
　　　　　　　　　　　　　　　　　　Rhonda H. Wills
　　　　　　　　　　　　　　　　　　New York Bar No. 5373295
　　　　　　　　　　　　　　　　　　rwills@rwillslawfirm.com
　　　　　　　　　　　　　　　　　　Wills Law Firm, PLLC
　　　　　　　　　　　　　　　　　　1776 Yorktown, Suite 570
　　　　　　　　　　　　　　　　　　Houston, Texas 77056
　　　　　　　　　　　　　　　　　　Telephone: (713) 528-4455
　　　　　　　　　　　　　　　　　　Facsimile: (713) 528-2047

　　　　　　　　　　　　　　　　　　ATTORNEY FOR ISLEY DEFENDANTS

## CERTIFICATE OF SERVICE

I, the undersigned counsel, hereby certify that the foregoing document has been electronically filed with the clerk of the Court by using the CM/ECF system, which will in turn send a notice of the electronic filing to all counsel of record, on this 28th day of October, 2020.

*/s/ Rhonda H. Wills*
Rhonda H. Wills