**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------X

The Pullman Group, LLC,                                    **Case No.: 20-cv-7293**

                    *Plaintiff*,

          *-against-*                                **FIRST AMENDED COMPLAINT**

Ronald Isley, Rudolph Isley, Reservoir Media
Management, Inc., The Estate of O'Kelly Isley,
J.R., Isley Brothers, L.L.C., Isley Brothers Royalty
Venture I SPC, Inc., Three Boys Music
Corporation, Bovina Music Inc., T-Neck Records,
Inc., Triple Three Music, Inc. and John Doe
Corporations 1-5,

                   *Defendants*.

-------------------------------------------------------------X



       Plaintiff, The Pullman Group, LLC ("Pullman" or "Plaintiff"), appearing by their attorneys

Levin-Epstein & Associates, P.C., complaining of defendants Ronald Isley ("Ronald"), Rudolph

Isley ("Rudolph"), Reservoir Media Management, Inc. ("Reservoir"), The Estate of O'Kelly Isley,

J.R. (the "O'Kelly Estate"),  Isley Brothers, L.L.C. ("Isley Brothers LLC"), Isley Brothers Royalty

Venture I SPC, Inc. ("Royalty Venture"), Three Boys Music Corporation ("Three Boys"), Bovina

Music Inc. ("Bovina"), T-Neck Records, Inc. ("T-Neck"), Triple Three Music, Inc. ("Triple

Three") and John Doe Corporations 1-5 (the "John Doe Defendants")[1], herein, alleges as follows:

---

[1] All of the aforesaid defendants are hereby defined collectively as the "Defendants", and each individually, a
"Defendant".

# PRELIMINARY STATEMENT

1.      This action arises out Pullman's contractual agreements (the "Engagement Letters")[2] with the Isley Brothers[3] that provided Pullman with the exclusive contractual right to refinance or sell valuable music copyrights and other assets related to a large number of musical compositions and songs created by the musical group known as The Isley Brothers.  This complaint seeks damages arising out of the Isley Brothers' two separate breaches of Pullman's exclusive contractual rights under the Engagement Letters.

2.      The first breach in 2017: In violation of Pullman's exclusive rights, the Isley Brothers, secretly behind Pullman's back, negotiated an agreement to sell valuable exclusive Musical Assets[4] to EMI Music Publishing, Ltd. ("EMI") for an eight-figure price (the "EMI Asset Sale Agreement"), which prevented and blocked Pullman's involvement (the "EMI Transaction").[5]  The EMI Asset Sale Agreement violated Pullman's exclusive contractual right to arrange such sales for the Isley Brothers. Consequently, Pullman filed a lien with the United States Copyright Office.[6] Pullman is entitled to substantial damages, in an amount no less than 10% of

---

[2] A copy of the Engagement Letters are attached hereto as a compendium exhibit, "**Exhibits A1-A7**."  It should respectfully be noted that Pullman has highlighted certain portions of the Engagement Letter in "**Exhibit AA-1**."

[3] Ronald, Rudolph, and their corporate entities, Three Boys, Bovina, T-Neck, and Triple Three, and each of their corporate successor and assigns, are collectively the owners of the right, title and interest in certain musical compositions and recording of the Isley Brothers' songs and Musical Assets (as defined below) (hereinafter, the "Isley Brothers").

[4] The term "Musical Assets" includes all of the Isley Brothers' right, title and interest in certain musical compositions and recordings of the Isley Brothers songs as set forth in the Engagement Letters, that were successfully securitized into the Pullman Bonds (as defined below) in the Isley Brothers' first transaction under the Engagement Agreement, exclusively authorized Pullman for the structure of a securitization program for the issuance of securities or **asset sales** backed by the Isley Brothers' musical assets, record masters, music publishing, and writers' share.

[5] The sellers under the EMI Asset Sales Agreement are Isley Brothers, L.L.C., Ronald Isley, individually and as co-administrator of the Estate of Sallye Isley, Rudolph Isley, individually and as co-administrator of the Estate of O'Kelly Isley and as co-administrator of the Estate of Sallye Isley.

[6] On November 20, 2017, Pullman filed a Notice of Lien with the United States Copyright Office, recording its lien plus attorneys' fees, costs and interest.  A copy of Pullman's Notice of Lien is attached hereto as "**Exhibit B**."  On November 27, 2017, after Pullman learned the true amount of the consideration being paid by EMI, Pullman filed an Amended Notice of Lien with the United States Copyright Office, recording its lien, representing 10% of the consideration EMI agreed to pay the Isley Brothers, plus liquidated damages in the amount of $250,000. A copy of the said "Amended Notice of Lien" or "Amended EMI lien" is attached hereto as "**Exhibit C**."

the value of the sale, representing Pullman's contractual fee for a sale of such magnitude, as well as liquidated damages in the amount of $250,000, and contractual costs, legal fees, expenses, and interest from the date of the breach, from the Isley Brothers.

3.      The second breach in 2018: In violation of the express terms of Pullman's contractual rights, the Isley Brothers, secretly behind Pullman's back, sold valuable exclusive Musical Assets to Reservoir (the "Reservoir Asset Sale Agreement") for a much higher purchase price than under the contemplated EMI Asset Sale Agreement.  Consequently, Pullman filed a lien with the United States Copyright Office.[7]  The Reservoir Asset Sale Agreement violated Pullman's exclusive contractual right to arrange such sales for the Isley Brothers (the "Reservoir Transaction"). Pullman is entitled to substantial damages, in an amount no less than 10% of the value of the gross aggregate sales price, representing Pullman's contractual fee for a sale of such magnitude, as well as liquidated damages in the amount of $250,000, and contractual costs, legal fees, expenses, and interest from the date of the breach, from the Isley Brothers.

4.      By way of background, Pullman entered into seven separate, but identical, Engagement Letters with the individuals and corporate constituencies that owned the Musical Assets' of the Isley Brothers: Ronald, Rudolph, O'Kelly Isley Estate, Three Boys, Bovina, T-Neck, and Triple Three.[8] At the time of the execution of the Engagement Letters, the Isley Brothers were at risk of losing control of their musical assets because of financial difficulties.

5.      Following the execution of the Engagement Letters, Pullman successfully arranged an eight-figure sale of securities for the Isley Brothers.  Having received the benefit of Pullman's

---

[7] On November 28, 2018, Pullman filed a "Notice of Additional Lien" with the United States Copyright Office, recording its lien plus attorneys' fees, costs and interest.  A copy of Pullman's Notice of Lien is attached hereto as "**Exhibit D**."  The liens included in Exhibits "B","C", and "D" are hereinafter referred to as "Pullman's Liens."

[8] Upon information and belief, Three Boys, Bovina, T-Neck and Triple Three were entities set up by the Isley Brothers that were dissolved subsequent to and/or their assets assigned to Isley Brothers LLC after the dates of the Engagement Letters.  Upon information and belief, Isely Brothers LLC, Royalty Venture, Ronald and Rudolph are the successors-in-interest to Three Boys, Bovina, T-Neck and Triple Three.

services, the Isley Brothers colluded with EMI and Reservoir to deprive Pullman of valuable exclusivity rights to arrange refinancing and asset sales of the Isley Brothers' Musical Assets under the Engagement Letters.

6.      Reservoir had knowledge of Pullman's exclusive rights under the Engagement Letters because Pullman had annexed copies of each of the Engagement Letters to documents recorded with the United States Copyright Office.

7.      As the Engagement Letters provide that Pullman is granted the exclusive rights to refinance any future transaction(s) or asset sale(s) related to the Isley Brothers' Musical Assets, the sales arranged by the Isley Brothers gives rise to claims against the Isley Brothers and their corporate constituencies sounding in breach of contract and unjust enrichment and claims against Reservoir sounding in tortious interference with contract and tortious interference, and for related common law claims as herein pleaded.   Pullman seeks, liquidated damages, compensatory damages, and attorneys' fees and costs pursuant to the Engagement Letters.

## THE PARTIES

8.      Pullman is a limited liability company with its principal place of business in Los Angeles, California. Pullman is a sole member limited liability company owned and operated by David Pullman.  David Pullman is a resident and citizen of California.

9.      Pullman buys, sells and invests in assets and owns rights to thousands of songs and musical compositions, who its founder, David, is credited as the originator of the issuance of first ever music, entertainment, intellectual property, future royalties asset backed securities known as the eponymously named Pullman Bonds$^{TM}$.[9]  Pullman's $55 million transaction for the recently passed world-renowned, iconic musical artist David Bowie rated single-A level by multiple ratings

---

[9] *See* https://www.pullmanbonds.com

agencies represented a financial landmark that garnered worldwide acclaim. Pullman Bonds have been used by some of the most well-known and successful musical artists, including the Motown Hit Machine, Holland Dozier Holland, R & B Royalty, Ashford & Simpson, The Godfather of Soul, James Brown, and The Isley Brothers, among others.

10.     Pullman Bonds are backed by an artist's and/or songwriter's expected future royalty income, and their proceeds benefit the artist.  Pullman has done dozens of deals backed by artists' and/or songwriters' catalogues, providing financing of all types, including acquisition financing, engaging in asset sales in whole or in part, and making direct purchases of such assets and/or doing alternative investments or investment banking services.

11.     Defendant Ronald Isley is an individual residing in Otisville, New York and controls directly or indirectly the Isley Brothers' Musical Assets and/or certain of the John Doe entities which will be identified through discovery.

12.     Defendant Rudolph Isley is an individual residing in Saint Louis, Missouri and controls directly or indirectly the Isley Brothers' Musical Assets and/or certain of the John Doe entities which will be identified through discovery.

13.     Defendants Ronald and Rudolph, along with their deceased brother, O'Kelly Isley, Jr., were the founding members of The Isley Brothers singing group. The Isley Brothers are, collectively, the owners of the right, title and interest in certain musical compositions and recordings of the Isley Brothers' Musical Assets.

14.     Upon information and belief, Defendants Ronald and Rudolph, are co-administrators of Defendant The O'Kelly Estate.

15.     Upon information and belief, Defendant Reservoir Media Management, Inc. is a New York corporation with its principal place of business located at 75 Varick Street, 9th Floor, New York, NY 10013.

16.     Upon information and belief, Defendant The Estate of O'Kelly Isley, J.R has been fully administered and distributed its ownership of the Isley Brothers' Musical Assets to Ronald and Rudolph in equal share.

17.     Upon information and belief, Defendant Isley Brothers, L.L.C. was and is a domestic limited liability company organized and existing under the laws of the State of Delaware. Upon information and belief, Rudolph and Ronald are the only members of Defendant Isley Brothers, L.L.C.  Rudolph and Ronald are not residents or citizens of the State of California.

18.     Upon information and belief, Defendant Isley Brothers Royalty Venture I SPC, Inc. was and is a domestic limited liability company organized and existing under the laws of the State of Delaware.

19.     Upon information and belief, Defendant Three Boys Music Corporation is or was a New York corporation.

20.     Upon information and belief, Defendant Bovina Music Inc. is or was a New York corporation.

21.     Upon information and belief, Defendant T-Neck Records, Inc. is or was a New York corporation.

22.     Upon information and belief, Defendant Triple Three Music, Inc. is or was a New York corporation.

23.     Upon information and belief, Defendants Three Boys, Bovina, and T-Neck Triple Three were entities set up by the Isley Brothers that were dissolved subsequent to the dates of the Engagement Letters.

24.     Upon information and belief, Defendants Isley Brothers LLC, Ronald Isley and Rudolph Isley are the successors-in-interest to Defendants Three Boys, Bovina, T-Neck and Triple Three.

25.     The John Doe Defendants are entities or persons not presently known to Plaintiff but who contracted with, for, or on behalf, of the Isley Brothers and their corporate constituencies.

## JURISDICTION AND VENUE

26.     This Court has subject matter jurisdiction based on diversity pursuant to 28 U.S.C. § 1332(a)(1) because this case is a civil action where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different States.  As set forth more fully above, Plaintiff, by virtue of the citizenship of its sole member, is a citizen of California and all the Defendants are citizens of different states than Plaintiff.  Thus, the Plaintiff and the Defendants are considered diverse under 28 U.S.C. § 1332(a)(1).

27.     Venue is proper in this Judicial District pursuant to 28 USC 1391(b) because each of Ronald, Rudolph, O'Kelley Isley, Three Boys, Bovina, T-Neck, and Triple Three has consented to venue in this District in their respective Engagement Letters with Pullman.

28.     Each of the Engagement Letters provides as follows:

> In the event that any legal proceeding shall be instituted under or in connection with this Engagement Letter, the **federal** and state courts located in **New York, New York**, shall have full **jurisdiction** over…[the] parties with regard thereto, and litigation shall be commenced solely in said courts.

Engagement Letters ¶ 12 (emphasis added).

29.     Each of the Engagement Letters provides that the Engagement Letters shall be interpreted under and governed by the laws of the State of New York.  *Id* at ¶ 12

30.     Venue is also appropriate under 28 U.S.C. 1391 as Reservoir is headquartered in New York, New York.

## FACTS COMMON TO ALL ALLEGATIONS

### A.  The Engagement Letters

31.     On July 20, 1999, Pullman entered into seven separate, but identical, Engagement Letters with Three Boys, Bovina, O'Kelly Isley Estate, T-Neck, Triple Three, Ronald Isley and Rudolph Isley.[10]  A true and accurate copy of each of the Engagement Letters is attached hereto as a compendium exhibits, "**Exhibits A1-A-7**."

32.     The Isley Brothers had multiple attorneys representing them at the time of the execution of the Engagement Letters, in multiple states, including in New Jersey, Los Angeles, St. Louis, and New York.

**(i)     The Engagement Letters in Five Sections Provide Pullman with Exclusivity Rights for the Arrangement of Asset Sales/Refinancing of the Isley Brothers' Musical Assets**

33.     Each of the Engagement Letters provides Pullman with exclusive rights regarding certain financial transactions, *inter alia*, the right to refinance any future transaction(s) or asset sale(s)/refinancing.

34.     The introductory paragraph of the Engagement Letters states, in relevant part, that Pullman has exclusive contractual rights, as follows:

> This engagement letter (the "Engagement Letter") confirms the engagement (the "Engagement") . . . of The Pullman Group ("Pullman") to act as Owner's agent and advisor on an **exclusive basis** . . . with respect to the financial transactions described in paragraph 3(a) through (f) hereof . . .

*Engagement Letters* at page 1 (emphasis added).

---

[10] Upon information and belief, Three Boys, Bovina, T-Neck and Triple Three were entities set up by the Isley Brothers that were dissolved subsequent to the dates of the aforementioned agreements.

35.     Furthermore, paragraph 2 of the Engagement Letters states, in relevant part, as follows:

> 2.      **<u>Exclusive Authority</u>**.  During the Engagement Period, neither Owner [(the Isley Brothers)] nor anyone acting on [their] behalf shall, <u>other than with or through Pullman</u>, undertake any activities with regard to **Transactions** [(defined as the financial transactions described in paragraphs 3(a) through (f) of the Engagement Letter)].

(emphasis added).

36.     Furthermore, paragraph 4 of the Engagement Letters states that Pullman's services includes, as follows:

> (e)  Approve and retain, at Owner's [each of the Isley Brothers'] expense, third-party contractors of Pullman's choosing, including but not limited to accountants, rating agencies, auditors, and attorneys to serve as Transaction counsel or Issuer's, Pullman's and/or investor's counsel, **on any Transaction**, which Pullman determines in the reasonable exercise of its discretion are necessary and appropriate to perform due diligence or other Services.

(emphasis added).

37.     The Engagement Letters broadly defines the scope of Pullman's exclusive contractual rights and interests in relation to Pullman's compensation. Paragraph 5 of the Engagement Letters states, in relevant part, as follows:

> (ii) **A fee equal to ten percent (10%)** of the aggregate commitment amount of a Warehouse Loan or **asset sale** . . .
> (iii) **a fee equal to ten percent (10%)** of the aggregate principal amount investment-grade Securities or proceeds from **asset sales(s)** payable at the time Securities or **assets are sold** . . .

(emphasis added).

38.     Furthermore, paragraph 5(c) of each of the Engagement Letters provides, in relevant part, as follows:

> Owner [(the Isley Brothers)] acknowledges that **Pullman shall be entitled to its fee in full**, pursuant to paragraph 5(a), in the event that:

**(iii) A Transaction does not occur because of Owner's failure or refusal to perform its obligations under this Engagement Letter . . .**

(emphasis added).

39.     Pullman had additional rights under the Engagement Letters: The Engagement Letters states as follows:

> 2. Exclusive Authority.   During the Engagement Period, neither Owner [(the Isleys)] nor anyone acting on [their] behalf shall, other than with or through Pullman, undertake any activities with regard to Transactions [(defined as the financial transactions described in paragraphs 3(a) through (f) of the Engagement Letter)].
>
> ***
>
> 7.     Refinancing or **Asset Sale(s)**.  Pullman is granted the exclusive right, at its sole discretion, to refinance any future transaction(s) or **asset sale(s)** for owner upon future recoupment of the securities…. Such refinancing will be on the same terms and conditions outlined herein.  This clause shall be interpreted to include all future financings during the greater of owner's life or two future financing periods in addition to the initial financing contemplated by this agreement.  [Emphasis added.]

*Engagement Letters*, ¶¶ 2, 7 (emphasis added).

40.     The Engagement Letters further provide that the losing party in any litigation involving the Engagement Letter "shall reimburse the prevailing party for its reasonable attorney's fees and costs incurred with respect to such legal proceeding."  See Ex. A1-A-7 [Engagement Letters] at ¶ 12.

**(ii)     The Isley Brothers Violated the Engagement Letters Exclusivity Provisions**

41.     The term of Pullman's original financing securitization for the Isley Brothers under the Engagement Letters was twenty (20) years, commencing in 2001.  Thus, Pullman's exclusive rights with respect to refinancing/asset sales continued for the original plus the greater of the life of any "Owner" under the Engagement Letters or two "future financing periods," or, at least, through 2061.  Ronald and Rudolph are both still alive.

42.     The exclusive rights with respect to future asset sale(s) and refinancing(s) were an essential component of Pullman's compensation under the Engagement Letters.

43.     The Isley Brothers' transaction(s) and deals, each of them (1) the EMI Asset Sale Agreement, and over one (1) year late in a subsequent transaction, (2) the Reservoir Asset Sale Agreement, each violated the exclusivity provisions of the Engagement Letters in that Pullman had the exclusive contractual right to arrange "**Refinancings or Asset Sales(s)**." *Engagement Letters* at ¶7 (emphasis added).

44.     There are **two** main types **of financing** available for companies: **debt and equity**. Debt is a loan that must be paid back often with interest, but it is typically cheaper than raising capital because of tax deduction considerations. Equity does not need to be paid back, but it relinquishes ownership stakes to the shareholder. Both debt and equity have their advantages and disadvantages. Most companies use a combination of both to **finance** operations.

45.     Pullman had the right to file the Notice of Lien and Amended Notice of Lien pursuant to Section 5(iv) of the Engagement Letters, which provides as follows:

> With respect to 5(c)(i) and 5(c)(ii) above Owner agrees that **Pullman can file an attachment or lien for the full extent of any fees or structuring fees of Pullman or out-of-pocket expenses**, interest, Interest Rate and/or Interest Rate Buydown and/or **any other fees contemplated herein** and third-party expenses incurred by Pullman related to performance of the Services.[11]

(emphasis added).

---

[11] (emphasis added). Pullman also had the right to file the Notice of Lien or attachment pursuant to the Engagement Letters wherein the Isley Brothers granted Pullman a security interest in their copyrights, musical compositions, and Musical Assets to secure their obligations under the Engagement Letters.

46.     The Isley Brothers assignment of the Musical Assets to Reservoir violated section 11 of the Engagement Letters, entitled "Assignability," which provides, in relevant part, as follows:

> 11. Assignability.   . . . Owner may not assign its rights and/or obligations under this Engagement Letter without the consent of Pullman, except to any one or more single-purpose corporations or partnerships formed to hold the Assets and approved by counsel for the company issuing the Securities, if such assignment is necessary and prudent in connection with the securitization, **and provided that such assignment shall not relieve Owner of its obligations hereunder**.

(emphasis added).

### (iii)     The Isley Brothers Violated the Engagement Letters' Exclusivity Provisions By Arranging the EMI Transaction and the Reservoir Transaction Non-Independently and Without Pullman

47.     Paragraph 2 of the Engagement Letters states, in relevant part, as follows:

> Exclusive Authority. During the Engagement Period, **<u>neither Owner</u>** [(the Isley Brothers)] **<u>nor anyone acting on [their] behalf shall, other than with or through Pullman</u>**, undertake any activities with regard to Transactions [(defined as the financial transactions described in paragraphs 3(a) through (f) of the Engagement Letter)].

(emphasis added). This is clear.

48.     In violation of Paragraph 2, the Isley Brothers hired professionals to undertake "activities" regarding the EMI Transaction and the Reservoir Transaction and/or the sale of the Isley Brothers' Musical Assets.

49.     The Isley Brothers hired professionals to undertake "activities" regarding the EMI Transaction and the Reservoir Transaction and/or the sale of the Isley Brothers' Musical Assets because the Isley Brothers did not have the requisite professional expertise to arrange such transactions.

50.     The Isley Brothers hired professionals to undertake "activities" regarding the EMI Transaction and the Reservoir Transaction and/or the sale of the Isley Brothers' Musical Assets

because the Isley Brothers did not have contacts or buyers or experience in financings/asset sales of the Musical Assets.

51.     The Isley Brothers, at the time of the EMI Transaction and the Reservoir Transaction and/or the sale of the Isley Brothers' Musical Assets, were desirous of hiring an agent, without the payment of a retainer, if possible, on a success fee and/or for a percentage fee and/or contingency fee basis for finding and negotiating an asset sale and dealing with all of the potential buyers and to identify ready, willing, and able buyers.

52.     The Isley Brothers hired Shukat Arrow Hafer & Herbsman LLP ("Shukat") to undertake "activities" regarding financings/asset sale(s) in connection with the  EMI Transaction and the Reservoir Transaction and/or the sale of the Isley Brothers' Musical Assets.

53.     The Isley Brothers hired Shukat for the purpose of the equivalent of investment banking services to market the EMI Transaction and the Reservoir Transaction and/or the Isley Brothers' Musical Assets.

54.     The Isley Brothers hired Shukat to shop the EMI Transaction and the Reservoir Transaction and/or the sale of the Isley Brothers' Musical Assets to potential interested counterparties.

55.     Shukat performed "activities" for the Isley Brothers in connection with the EMI Transaction and the Reservoir Transaction and/or the sale of the Isley Brothers' Musical Assets.

56.     Skukat rendered services for the Isley Brothers in connection with the EMI Transaction and the Reservoir Transaction and/or the Isley Brothers' Musical Assets.

57.     Michael Frisch and Jonas Herbson of Shukat and the Shukat firm specifically rendered brokerage and/or agency services for the Isley Brothers in connection with the EMI Transaction and the Reservoir Transaction and/or the Isley Brothers' Musical Assets.

58.     While Shukat is nominally a law firm, Shukat provided services, including brokerage and/or agency services, separate and apart from legal services for the Isley Brothers, in connection with the EMI Transaction and the Reservoir Transaction and/or the Isley Brothers' Musical Assets to market the Musical Assets, identify and find buyers and negotiate sales, in addition to the sales and/or marketing information for and distribution of such.

59.     The payment arrangement between the Isley Brothers and Shukat was based on a success fee customary in investment banking services.

60.     The payment arrangement between the Isley Brothers and Shukat was based on a contingency fee.

61.     The Isley Brothers had nothing at all to do with marketing the EMI Transaction and the Reservoir Transaction and/or the sale of Isley Brothers' Musical Assets to potential interested counterparties.

62.     It should be noted that the Isley Brothers did not sell of their Musical Assets, *i.e.*, the Isley Brothers did not sell every song they ever recorded or wrote or every revenue stream emanating from the Musical Assets and/or the Isley Brothers reserved certain rights that would be sold over time and retained certain rights and interests.

**B.  The Security Agreement**

47.     In connection with the Engagement Letters, to secure Pullman's compensation, Pullman, as the secured party, entered into that certain Security Agreement dated as of July 29, 1999 (the "Security Agreement") with the following grantors: Ronald, Rudolph, O'Kelly Isley, Three Boys, Bovina, the O'Kelly Estate, T-Neck, and Triple Three.

48.     The Security Agreement secured all obligations (monetary or otherwise) under the Engagement Letters.

49.     In connection with the Security Agreement, the Isley Brothers signed UCC-1 Financing Statements acknowledging their obligation to pay Pullman a fee and costs in connection with the contemplated securitization.

50.     Pullman caused the recordation of certain UCC-1 Financing Statements to be paid in its first successful deal for the Isley Brothers, as against the following debtors:  Ronald, Rudolph, O'Kelly Isley, Three Boys, Bovina, the O'Kelly Estate,  T-Neck, and Triple Three.

51.     The UCC-1 Financing Statements granted Pullman a security interest in, *inter alia*, all of the Isley Brothers' Musical Assets, and certain money judgments contained in Schedule I of each of the UCC-1 Financing Statements.

52.     Attached hereto as "**Exhibit E**" is a Certificate of Recordation of a Security Agreement, dated as of July 20, 1999, executed by the Isley Brothers and Pullman, securing Pullman's compensation under the Engagement Letters, along with UCC Financing Statements executed by the Isley Brothers.

**C.  Third-Party Litigation Ensued at the Time of the Engagement Letters**

53.     The Isley Brothers failed to close on the securitization contemplated by the Engagement Letters because, before the securitization could be effectuated, EMI sued to block the transaction, claiming that EMI had matching rights and a first right of refusal with respect to the contemplated transaction, which EMI contended they had to approve.

54.     The Isley Brothers and Pullman disputed that EMI had any such rights.

55.      By Settlement Agreement dated as of January 18, 2000 (the "Settlement Agreement"), EMI agreed to waive its objections to Pullman's deal with the Isley Brothers.

56.     The Settlement Agreement only resolved claims relating to the bankruptcy estate of Ronald Isley.  First, the Settlement Agreement cannot possibly have any relevance to the six

Engagement Letters between Pullman and the other Isley Brothers. Second, the release contained in the Settlement Agreement did not release any of Pullman's exclusive rights under any of the Engagement Letters.  Third, Pullman's contract with Ronald was a post-petition contract, which was not in any way affected by Ronald Isley's bankruptcy.  Nor were any of the other Isley Brothers contracting parties to the bankruptcy of Ronald Isley.

57.     Pursuant to the Engagement Letters, Pullman arranged an eight-figure sale of asset-backet securities Pullman Bonds for the Isley Brothers in or about 2000.  Pullman was paid seven figures in fees and costs in connection with the Pullman Bond securitization transaction.

58.     The securities issued pursuant to the Engagement Letters were 20-year bonds, but were fully satisfied after ten years and paid off from the music royalties cash flow, in 2011.

59.     Having received the benefit of Pullman's services, the Isley Brothers secretly arranged a deal with EMI (which had notice of the exclusive Engagement Letters by virtue of EMI's prior dealings with Pullman and the public filings in the Copyright Office of the United States) to deprive Pullman of additional fees due and payable under the Engagement Letters.

**D.  The EMI Asset Sale Agreement and the Isley Brothers' Breach of the Engagement Letters**

60.     In August 2017, Pullman learned that, in breach of its exclusive rights to asset sales, the Isley Brothers secretly reached an agreement with EMI on the essential terms of an approximate eight figure sale, without advising Pullman or allowing Pullman to participate, in total violation of Pullman's exclusive rights to any financing/asset sale.

61.     On November 20, 2017, Pullman filed a Notice of Lien with the United States Copyright Office, recording its lien in the amount of $2,250,000 plus attorneys' fees, costs and interest.  A copy of Pullman's Notice of Lien is attached hereto as "**Exhibit B**".

62.     Pullman's calculation of the value of its lien was based on its understanding that the price EMI was paying the Isley Brothers was no less than $20,000,000.

63.     On November 27, 2017, after Pullman learned the true amount of the consideration being paid by EMI was over $20,000,000, Pullman filed an Amended Notice of Lien with the United States Copyright Office, recording its lien in the amount of $2,651,125, representing 10% of the consideration EMI agreed to pay the Isley Brothers, plus liquidated damages in the amount of $250,000 plus attorneys' fees, costs and interest.  A copy of Pullman's Amended Notice of Lien is attached hereto as "**Exhibit C.**"

64.     On November 28, 2018, Pullman filed that certain Notice of Additional Lien with the United States Copyright Office.  A copy of Pullman's Notice of Additional Lien is attached hereto as "**Exhibit D**."

65.     The monetary amounts in the liens contained in **Exhibit B**, **Exhibit C**, and **Exhibit D**, respectively, are the minimum amounts owed to Pullman and do not constitute any financial limit on the amount owed under Pullman's Liens.

66.     Upon information and belief, the purchase price of the Reservoir deal was higher than the EMI deal.  Thus, Pullman reserves the right to amend the Reservoir lien upon discovery of the true amount of the Reservoir deal to reflect the actual amount owed to Pullman, as the current Reservoir lien represents the minimum amount owed.

67.     Pullman is entitled to liquidated damages under the Engagement Letters. Paragraph 5(c) states, in relevant part:

> 5(c)     Owner acknowledges that Pullman shall be entitled to its **fee in full, pursuant to paragraph 5(a)**, in the event that:
>
>          (i)     An investor from whom Owner accepts an offer to purchase the Securities requires Pullman to cease its marketing and

> sales efforts **or Owner otherwise fails to permit Pullman to carry out its undertaking herein with regard to the transaction**.
>
> * * *
>
> (iii)   **A Transaction does not occur because of Owner's failure or refusal to perform its obligations under this Engagement Letter, in which event**, since Owner acknowledges that Pullman will incur consequential damages by reason of the injury to its relations to third parties involved in the Transaction which are not susceptible to quantifiable proof, **Owner shall be additionally liable to Pullman** for liquidated damages for such injury in the amount of $250,000.  [Emphasis added.]

*Engagement Letters*, ¶ 5(c) (emphasis added).

68.     Pullman had the right to file the Notice of Lien and Amended Notice of Lien pursuant to Section 5(iv) of the Engagement Letters, which provides as follows:

> With respect to 5(c)(i) and 5(c)(ii) above Owner agrees that **Pullman can file an attachment or lien for the full extent of any fees or structuring fees of Pullman or out-of-pocket expenses**, interest, Interest Rate and/or Interest Rate Buydown and/or **any other fees contemplated herein** and third-party expenses incurred by Pullman related to performance of the Services.[12]

69.     The discussions, negotiations, and contemplated deal between the Isley Brothers and EMI, which presumably began long before Pullman learned about them, deprived Pullman of its exclusive rights under Paragraph 7 of the Engagement Letters to finance an asset sale.

70.      Under the unambiguous terms of the Engagement Letters, the Isley Brothers' breach entitles Pullman to recover his fee in full with respect to the contemplated asset sale as well as liquidated damages in the amount of $250,0000, plus attorneys' fees and costs, and interest, as expressly provided for in the Engagement Letter.

---

[12] Pullman also had the right to file the Notice of Lien and/or attachment pursuant to the Engagement Letters dated as of July 20, 1999, wherein the Isley Brothers granted Pullman the right to lien or attach the Music Assets to secure their obligations and fees, attorneys' fees, costs and expenses, and interest  under the Engagement Letters.

71.     EMI wanted Pullman to be paid out of the sale proceeds, but the Isley Brothers' refused, in violation of the Engagement Letters, *to wit*:

> 7.     <u>Refinancing or **Asset Sale(s)**</u>.  Pullman is granted the <u>exclusive right, at its sole discretion, to refinance any future transaction(s) or **asset sale(s)** for owner upon future recoupment of the securities</u>…. Such refinancing will be on the same terms and conditions outlined herein.  <u>This clause shall be interpreted to include all future financings during the greater of owner's life or two future financing periods in addition to the initial financing contemplated by this agreement</u>.  [Emphasis added.]

*Engagement Letters*, ¶7 (emphasis added).

### E. The Isley Brothers Unilaterally Breached a Mediation Session Scheduled Before the Honorable Judge Michael H. Dolinger

72.     In an attempt to settle the dispute between Pullman and the Isley Brothers concerning the EMI deal, Pullman and the Isley Brothers agreed to a mediation administered by JAMS that was scheduled before the Honorable Ret. Judge Michael H. Dolinger in November 2018.  The mediation was intended to resolve the dispute on a global basis.

73.     A few days before the scheduled mediation date, the Isley Brothers unilaterally, and without warning, and without good cause or reason and in bad faith, terminated the mediation.

### F. The Reservoir Asset Sale Agreement Breached Pullman's Exclusive Right to Arrange an Asset Sale/ReFinancing Under the Engagement Letters

74.     Upon information and belief, in violation of the express terms of Pullman's exclusive contractual rights, the Isley Brothers, secretly behind Pullman's back, sold valuable Musical Assets to Reservoir for a much higher price than the EMI deal.  The Reservoir Asset Sale Agreement violated Pullman's exclusive contractual right to arrange such sales for the Isley Brothers.

75.     On or about September 7, 2018, Reservoir entered into an agreement with Ronald, Rudolph, both individually and in their capacity as co-administrators of The O'Kelly Estate, Isley Brothers LLC, that sold all rights in any and all Musical Assets of the Isley Brothers.

76.     Reservoir bought the Musical Assets subject to Pullman's liens.  Pullman filed the first lien, as later amended, upon discovery of the EMI Asset Sale Agreement.  Pullman also filed a second and separate lien upon discovery of the Reservoir Asset Sale Agreement.   The Isley Brothers and Reservoir entered into an agreement with each other knowing full well about the aforesaid liens.

77.     On or about September 7, 2018, in connection with the Reservoir Transaction, Reservoir entered into that certain copyright assignment agreement (the "Copyright Assignment Agreement") with Ronald, Rudolph, both individually and in their capacity as co-administrators of The O'Kelly Estate, and Isley Brothers LLC.   A true and correct copy of the Copyright Assignment Agreement is annexed hereto as "**Exhibit F**."

78.     Section (a) of the Copyright Assignment Agreement provides the agreement included assignment of the following:

> (a) Any and all musical compositions and/or musical works written in whole or in part by and or all of Ronald, Rudolph, and/or O'Kelly Isley Jr. a/k/a Kelly Isley ("O'Kelly") (collectively, the "Bandmembers") on or before December 31, 1983, including, without limitation, the musical compositions and musical works listed on Schedule A attached hereto and by this reference made a part hereof, whether the same were originally claimed or registered as a musical composition or as a musical part of a dramatic-musical work, and any music, lyrics, titles or cues thereof, whether domestic or foreign, and/or any direct or indirect interests therein or other rights arising therefrom, respecting which Assignor and/or any Assignor Related Entity currently owns and/or controls any right, title or interest anywhere in the world (whether resulting from sole or partial ownership of the copyrights therein, a contract granting a right to participate in the proceeds or exploitation thereof, or otherwise), as well as any derivative works based thereon now existing or hereafter created, regardless of whether such derivative works were created before or after December 31, 1983 or are hereafter created from and after the Effective Date, in each instance to

the extent of Assignor's and/or any Assignor Related Entity's interest therein (collectively, the "Compositions"), including, without limitation, all rights under United States federal or state copyright or foreign copyright and all renewals, extensions, continuations, restorations and revivals thereof (whether vested, contingent or inchoate, whether registered or unregistered and whether such renewals, extensions, continuations, restorations and revivals are now in existence or hereafter come into existence for any reason, including, but not limited to, as a result of future legislation or the interpretation thereof), in all countries of the world or otherwise throughout the universe, as well as all United States or foreign applications for copyright registration and all causes of action, including without limitation those for infringement, arising from the date of creation of the work, whether now known or unknown to Assignor or Assignee in all events, to the extent of Assignor's and/or any Assignor Related Entity's current or future interest in them.

79.     Section (b) of the Copyright Assignment Agreement further provides as follows:

(b) Any and all credits, monies, fees, royalties, revenues, amounts and sums of any kind of description (collectively, "Royalties") payable and/or becoming payable from and after July 31, 2018 by any individual, corporation, partnership, association or any other organized group of persons or legal successors or representatives of the foregoing (each, an "Entity"), anywhere in the universe, with respect to (i) Assignor's and/or any Assignor Related Entity's copyright ownership interest in and to the Compositions in connection with the use or exploitation thereof anywhere in the world, including, but not limited to, the so-called "publishers share" or Royalties payable by the American Society of Composers, Authors ("ASCAP") Broadcast Music, Inc ("BMI"), and/or any other performing rights society or organization anywhere in the world or any other Entity in respect of the public performance or other use or exploitation of the Compositions, and/or, (II) the capacity of any Bandmember as a songwriter, lyricist, composer, or arranger of the Compositions in connection with the use or exploitation thereof anywhere in the world, including, but not limited to, the so-called "writer's share" of Royalties payable by ASCAP, BMI, and/or any other performing rights society or organization anywhere in the world or any other Entity in respect of the public performance or other use or exploitation of the Compositions;

80.     The Copyright Assignment Agreement specifically conveyed all rights, title and interest of Ronald, Rudolph, and the O'Kelley Estate and any affiliate, predecessor, and or successor, including, Bovina, T-Neck, Three Boys, and Triple Three, and/or any affiliate, predecessor, and/or successor to Reservoir.

81.    The Copyright Assignment Agreement has been recorded with the United States Copyright Office.

82.    The Reservoir Asset Sale Agreement and the Copyright Assignment Agreement each violated paragraph 7 of each of the Engagement Letters.

83.    Reservoir bought the Isley Brothers' Musical Assets subject to Pullman's liens.

**G. Reservoir Had Actual and Constructive Notice of the Engagement Letters Because of Public Filings of Pullman's Exclusive Rights**

84.    Since or at the time of the Engagement Letters, on at least three (3) separate occasions, Pullman caused a series of documents to be publicly recorded with the United States Copyright Office concerning Pullman's exclusive rights and interests in the Engagement Letters.

85.    The first series of recordation with the United States Copyright Office occurred on January 12, 2000, when Pullman caused the Security Agreement to be recorded together with each UCC-1 Financing Statement.  A true and correct copy of each of the Certificates of Recordation are attached hereto as a compendium "**Exhibit E**."

86.    The second series of recordation with the United States Copyright Office occurred on January 16, 2002 when Pullman caused the Engagement Letters to be recorded.  To secure Pullman's compensation under the Engagement Letters, Pullman caused seven (7) separate Certificates of Recordation (all together, the "Certificates of Recordation") of the seven (7) Engagement Letters, to be filed with the United States Copyright Office.   A true and correct copy of each of the Certificates of Recordation are attached hereto as a compendium exhibit "**Exhibits G1-G7**."

87.    The third series of recordation with the United States Copyright Office occurred on November 20, 2017 when, in connection with the Isley Brothers' separate and independent breach of the Engagement Letters through their dealings with EMI, Pullman caused a Notice of Lien and

an Amended Notice of Lien to be filed with the United States Copyright Office.  A true and

accurate copy of Pullman's Notice of Lien and the Amended Notice of Lien are attached hereto as

"**Exhibit B**" and "**Exhibit C**", respectively.

88.     Pullman had the right to file the Notice of Lien pursuant to Section 5(iv) of the

Engagement Letters, which provides as follows:

> With respect to 5(c)(i) and 5(c)(ii) above **Owner agrees that Pullman can file an attachment or lien for the full extent of any fees or structuring fees of Pullman or out-of-pocket expenses, interest**, Interest Rate and/or Interest Rate Buydown and/or **any other fees contemplated herein** and third-party expenses incurred by Pullman related to performance of the Services.[13]

(emphasis added).

89.     Accordingly, Reservoir had actual knowledge and constructive notice of said

agreements given the fact that it had later filed its own security agreements with the United States

Copyright Office that mirrored the security agreements Pullman had filed.


## LEGAL STANDARD

### A. Under New York Law, The Engagement Letters are Exclusive Sales Agreements That Prohibited the Isley Brothers from Renegotiating Any Refinancing/Asset Sale Other Than Through Pullman

90.     The law in New York is clear. Under well-settled precedent, there is a long-

established distinction in New York law between agreements that give a broker the exclusive right

of sale, as contrasted with an exclusive agency. Under the former, the principal is liable to the

broker if the principal makes a sale without involving the broker.  Under the latter, the principal is

precluded from employing another broker, but can make a sale himself without becoming liable to

---

[13] Pullman also had the right to file the Notice of Lien and/or attachment pursuant to the Engagement Letters dated as of July 20, 1999, wherein the Isley Brothers granted Pullman the right to lien or attach the Music Assets to secure their obligations and fees, attorneys' fees, costs and expenses, and interest  under the Engagement Letters.

the broker for a commission.   *Gaillard Realty Company, Inc. v. Rogers Wire Works, Inc.*, 215 A.D. 326 (1st Dept. 1926) ("'The general rule is that where an exclusive right of sale is given a broker, the principal cannot make a sale himself without becoming liable for the commissions. [Citations omitted.].'"); *Interactive Properties v. Doyle Dane Bernbach, Inc.*, 125 A.D.2d 265 (1st Dept. 1986) ("It is well-accepted that a principal who makes a direct sale of property in violation of an exclusive right to sell certain property is liable to the broker for the agreed-upon commission, regardless of whether he [the broker] would have effected the sale."); *Hammond, Kennedy & Co., Inc. v. Servinational, Inc.*, 48 A.D.2d 394 (1st Dept. 1975) ("If it was an exclusive agency, defendant could not employ another broker, but would not be precluded from itself making the sale without becoming liable to plaintiff for a commission.  On the other hand, if the agreement was considered an exclusive right to sell, then plaintiff would be entitled to a commission even if the defendant alone was responsible for the sale."); *Barnet v. Cannizzaro*, 3 A.D.2d 745, 746 (2d Dept. 1957) (A brokerage agreement granting plaintiff "the 'sole and exclusive' right, for a period of 180 days, to sell the property…was one of exclusive right of sale as contrasted to one of exclusive agency.");  *see also Julien J. Studley, Inc. v. Coach, Inc.*, 3 A.D.3d 358, 359-360 (1st Dept. 2004) (holding that broker's claim for pre-termination breach of an exclusive agreement, which specified that all dealings would be handled through the broker for a specified period, had been erroneously dismissed where broker alleged that principal had excluded broker from negotiations).

91.    New York courts have not confined the distinction between exclusive sales and exclusive agency agreements to real property transactions, and have applied it in numerous commercial contexts, including the type of investment banking and related services presented in this case.  *See, e.g., CV Holdings, LLC v. Artisan Advisors, LLC*, 9 A.D.3d 654 (3d Dept. 2004)

(discussing whether a contract to provide "advisory and investment banking services with respect to the exploration of strategic alternatives that may lead to a possible…sale, merger, joint venture, or otherwise" created an "exclusive right to sell" and required "a fee even when defendant [investment banking firm] played no active role in the transaction"); *Carnes Communications, Inc. v. Russo*, 305 A.D.2d 332 (1st Dept. 2003) (analyzing nature of agreement pursuant to which plaintiff "was to act as defendants' exclusive agent in placing advertising" and finding that contract "while affording plaintiff an exclusive agency, did not afford plaintiff an exclusive right to sell"); *Solid Waste Institute, Inc. v. Sanitary Disposal, Inc*., 120 A.D.2d 915 (3d Dept. 1986) (analyzing nature of a contract to arrange for sale of a business and holding that the contract at issue was an exclusive agency agreement and not an exclusive sales agreement, and that consequently broker who "played no role in procuring the buyer" was not entitled commissions).

92.     Here, the Engagement Letters (all of the terms and conditions of which are applicable, pursuant to paragraph 7 thereof, to "all future financings," including asset sales such as the EMI and Reservoir separate and different transaction and breaches in different years and separate transactions) sequentially breached Pullman's "exclusive right, at its sole discretion, to refinance any future transaction(s) or asset sales.…" *See* Ex. A1-A-7 [Engagement Letters] at ¶¶ 2, 7.  Thus, the Engagement Letters are, unambiguously, exclusive sales agreements, as opposed to an exclusive agency agreement.  Under the cases cited above, the Isley Brothers are explicitly prohibited from negotiating any refinancing/asset sales other than through Pullman.

93.     In the context of exclusive sales agreements, the broker is entitled to receive his commission on a sale negotiated by the principal without the broker, regardless of whether the broker was involved in procuring the buyer.  *See, e.g., Rachmani Corp. v. 9 East 96th St. Apt. Corp.,* 211 A.D.2d 262 (1st Dept. 1995) ("It should be noted that an exclusive right to sell

agreement entitles the broker to receive a commission on a sale to any purchaser, whether or not the broker played a part in the negotiations."); *see also Interactive Properties,* 125 A.D.2d 265 ("[A] principal who makes a direct sale of property in violation of an exclusive right to sell certain property is liable to the broker for the agreed-upon commission, regardless of whether he would have effected the sale."); *Barnet,* 3 A.D.2d at 746 (broker entitled to his commission where during period of broker's exclusivity, seller agreed on all essential terms of sale directly with a purchaser not procured by the broker).

94.     Moreover, under the law governing exclusive sales agreements, a "sale" as to which the broker has the exclusive rights need not finally "close" in order for the broker to be entitled to his full commission.   Instead, as happened here, the principal's unilateral agreement with a purchaser on the essential terms of a proposed sale, in violation of the broker's exclusive rights, triggers the principal's liability.

95.     For example, in *Barnet v. Cannizzaro*, 3 A.D.2d 745, 160 N.Y.S.2d 329 (2d Dept. 1957) an exclusive sales agreement gave the plaintiff broker the "sole and exclusive right," for a period of 180 days, to sell the property at issue.   The defendant owners had agreed to pay plaintiff a commission of 5% (a) if the property were sold during the specified 180-day period "by me/us [i.e., the owners] or by any other person, or if by your [the broker's] office," or (b) "within six months from the expiration, to anyone with whom you [the broker] have negotiated."   During the specified 180-day period, the owners, circumventing the plaintiff broker, agreed upon "the essential terms of the sale" of the property to a purchaser not procured by the plaintiff broker, but did not prepare or sign the contract of sale.   Title was not conveyed until after the end of the 180-day period of exclusivity.   The broker sued for his commission on the ground that there had been a "sale" during the specified 180-day period.   The owner contended the evidence was not sufficient

to support the finding that the essential terms of the sale had been agreed upon during that 180-day period.  After trial without a jury, the lower court awarded judgment for the broker on his claim for the commission, holding that "neither the preparation of the contract of sale nor the signing by the respective parties was necessary to entitle plaintiff to his commission."  Id., 160 N.Y.S.2d at 332-333.  The Appellate Division, Second Department, affirmed, noting that there was no dispute that "plaintiff would be entitled to damages if [owner] and the purchaser actually agreed on the essential terms of the sale prior to October 14, 1952 [the end of the exclusivity period], despite the fact that the written contract of sale and the conveyance to the purchaser were not executed prior to that date."  Id.

96.     Cases from other jurisdictions are to the same effect.  In Mattingly v. Bohn, 84 Ariz. 369, 329 P.2d 1095 (1958), a broker under an exclusive sales agreement was held entitled to his fee where the property owner executed a contract of sale, placed the deed to the property in escrow, and the purchasers placed their deposit or "earnest money" in escrow, even though title never passed to the purchaser.  The court in Mattingly wrote:

> When an owner gives one agent the exclusive right to sell within a specified time, he in effect contracts he will not within such time make a sale through another agent and if such be done, the owner has breached his exclusive agency contract.  It is not always necessary to constitute a sale that a conveyance must be made or the title pass. [Citation omitted].  The word sale has not a fixed an invariable meaning.  It may be given a narrow or broad meaning depending upon the circumstances and what the parties reasonably intend.  [Citations omitted.]  The purpose of not permitting an owner to make a sale in violation of a prior exclusive right of sale is to enable the agent with the exclusive right to perform his contract and earn his commission.   Under such circumstances a binding contract of sale with an established escrow is equally as effective to prevent the exclusive agent's performance as a completed transaction with deed delivered.  We rule, therefore that there was such a sale in this instance as breached defendants' contract with plaintiff giving exclusive right to sell and plaintiff is entitled to whatever is the correct measure of damages. … The defendants urge that plaintiff is not entitled to recover because he did not prove he presented a purchaser ready, able and willing to buy the property.   No such showing is necessary when plaintiff is prevented from performing by the defendants' wrongful violation of an exclusive agency.

…We conclude that the plaintiff was entitled to damages measure by the amount agreed in the listing contract.  [Emphasis added.]

*Mattingly,* 329 P.2d at 1096.

97.     Similarly, in *Shanklin v. Townsend*, 431 S.W.2d 874 (Ky. 1968), the court held that where an executed sales contract with a purchaser produced by the broker would have constituted a "sale" for purposes of entitling the broker to his commission, an executed sales contract with a purchaser produced by the seller, in violation of the broker's exclusive right of sale, "must also be regarded as a 'sale'" entitling the broker to his stipulated commission.  Shanklin, 431 S.W. 2d at 876.

98.     The rationale of the *Mattingly* and *Shanklin* cases -- in which the broker was held entitled to his commission despite the fact that an actual sale never transpired, because the broker was effectively prevented from performing his contract by the owner's unilateral negotiations for a sale -- is fully consistent with New York law, under which a party is held to have breached a contract by prohibiting the other party from performing thereunder.    *See, e.g., Dwyer v. Interborough Rapid Transit Co.*, 241 N.Y. 616, 150 N.E. 578 (1926); *Van-Go Transport Co., Inc. v. New York City Board  Of Education*, 53 F. Supp. 2d 278 (E.D.N.Y. 1999) ("A party to an executory contract breaches that contract by preventing performance and may be liable for damages [citations omitted]."); *Tripodo v. Chase Manhattan Bank, N.A.*, 152 Misc. 2d 372, 576 N.Y.S.2d 760 (N.Y. City Ct., 1991) ("A party who prevents performance of the contract by another party has perpetrated a breach of the contract and is liable to the other party…").

## B.  Pullman's Liens and Attachments Made Pursuant to the Engagement Letters Are Subject to Foreclosure

99.     The law in New York is clear. A security interest attaches where there is an agreement, when value is given, and when the debtor has rights in the collateral. *See Inland Bank & Tr. v. ARG Int'l AG,* 2018 WL 3543905, at *3 (S.D.N.Y. 2018) (security interest attaches when

there is agreement, when value is given, and when debtor has rights in the collateral) (*citing* N.Y. UCC 9–203(1)); *Walmart Stores, Inc. v. First Am. Corp.*, 2012 WL 3957184, at *6 (S.D.N.Y. 2012) ("once these three events have occurred, the security interest is enforceable and the interest is said to have attached"); *Micalden Investments S.A. v. Rostropovich*, 535 F. Supp. 2d 433, 435 (S.D.N.Y. 2008); *Cont'l Coffee Prod. Co. v. Banque Lavoro S.A*., 852 F.Supp. 1235, 1237 (S.D.N.Y.1994).

100.    "A security agreement…need not be embodied in a formal document…Rather, it is sufficient that there exist…some written evidence of the assignor's intent to grant the security interest." *Micalden Investments S.A.*, 535 F. Supp. 2d at 435.

101.    A security interest attaches especially here where the right to the lien or attachment is contractual and thus embodied in an agreement.  Here, there is an agreement that explicitly provided Pullman with lien rights. *In re Frigitemp Corp*., 34 B.R. 1000.  Section 5(iv) of the Engagement Letters, provides as follows:

> With respect to 5(c)(i) and 5(c)(ii) above Owner agrees that **Pullman can file an attachment or lien for the full extent of any fees or structuring fees of Pullman or out-of-pocket expenses**, interest, Interest Rate and/or Interest Rate Buydown and/or <u>**any other fees contemplated herein**</u> and third-party expenses incurred by Pullman related to performance of the Services.[1]

(emphasis added).

102.    Pullman fulfilled its obligations under each the Engagement Letters. Pursuant to the Engagement Letters, Pullman arranged an eight-figure sale of securities for the Isley Brothers in 2000.  For these services, Pullman received the 10% fee set forth in the Engagement Letters,  plus, *inter alia*, the "exclusive right, at [Pullman's] sole discretion, to refinance any future

---

[1] (emphasis added). Pullman also had the right to file the Notice of Lien and attachment pursuant to the Engagement Letters dated as of July 20, 1999, wherein the Isley Brothers granted Pullman the right to lien or attach the Music Assets to secure their obligations and fees, attorneys' fees, costs and expenses, and interest  under the Engagement Letters.

transaction(s) or asset sales(s) for [the Isleys] upon future recoupment of the Securities … on the same terms and conditions outlined herein."  Engagement Letters, ¶¶ 5, 7.

103.     Accordingly, the Musical Asset sales are subject to foreclosure. *In re Magnale Farms, LLC*, 2018 WL 1664849, at *5 (Bankr. N.D.N.Y. 2018) (Recognizing creditor's "lawful contractual right" to recovering under foreclosure action);*Chemtex, LLC v. St. Anthony Enterprises, Inc.*, 490 F. Supp. 2d 536, 548 (S.D.N.Y. 2007) ("a secured lender has the right to protect its own interests when making decisions to enforce its contractual foreclosure rights); *Rosenman Colin Freund Lewis & Cohen v. Richard*, 656 F. Supp. 196, 198 (S.D.N.Y. 1987) ("underlying contractual rights…[have] nevertheless been uniformly recognized to be a matter that a court of equity may and should determine without a jury in the course of an equitable proceeding to enforce a lien"), *MCEG Sterling, Inc. v. Phillips Nizer Benjamin Krim & Ballon*, 646 N.Y.S.2d 778, 778 (N.Y. Sup. Ct. 1996) (future stream of entertainment royalties are intangible asset-backed secured transactions under UCC Article 9, capable of foreclosure); *Triboro Entm't Grp., Inc. v. Filmcat Inc.*, 1996 WL 391859 (S.D.N.Y. 1996) (recognizing validity of security interest in entertainment royalties);  *Muse v. Mellin*, 212 F. Supp. 315, 316 (S.D.N.Y. 1962) (same).

## C. Pullman is Entitled to Damages for Each Independent Breach of the Engagement Letters Made In Connection with the EMI and Reservoir Deals

104.     New York law provides that successive breaches of a continuing contract trigger multiple awards of economic damages per breach. *Bouveng v. NYG Capital LLC*, No. 14 CIV. 5474 PGG, 2015 WL 3503947, at *16 (S.D.N.Y. June 2, 2015); *Uddo v. DeLuca*, 425 F. Supp. 3d 138, 158 (E.D.N.Y. 2019);  *RIDE, Inc. v. APS Tech., Inc.*, No. 3:11-CV-1721 (JCH), 2015 WL 9581728, at *11 (D. Conn. Dec. 30, 2015).  Here, the Isley Brothers breached the Engagement Letters (all of the terms and conditions of which are applicable, pursuant to paragraph 7 thereof, to "all future financings," including asset sales such as the EMI and Reservoir Transaction) in that

the Isley Brothers' violated Pullman's "exclusive right,  at its sole discretion, to refinance any future transaction(s) or asset sales…."  *See* Ex. A1-A-7 [Engagement Letters] at ¶¶ 2, 7.  Each of the Isley Brothers' sequential breaches under the Engagement Letters results in separate, independent, and enforceable breaches, that aggregate in damages by the EMI amended lien (the Amended Notice of Lien) that Reservoir bought subject to and the lien created by the Reservoir deal itself that vested immediately the moment the Reservoir deal began and/or commenced and/or started. *Bouveng v. NYG Capital LLC*, No. 14 CIV. 5474 PGG, 2015 WL 3503947, at *16 (S.D.N.Y. June 2, 2015); *Uddo v. DeLuca*, 425 F. Supp. 3d 138, 158 (E.D.N.Y. 2019);  *RIDE, Inc. v. APS Tech., Inc*., No. 3:11-CV-1721 (JCH), 2015 WL 9581728, at *11 (D. Conn. Dec. 30, 2015).

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION

**(Breach of Contract –Violation of Paragraphs 2 and 7 of the Engagement Letters – EMI Asset Sale Agreement)**
***(As Against the Isley Brothers and their Successors and Assigns)***

105.    Plaintiff hereby restates and realleges each and every allegation contained above as if fully set forth herein and incorporates them by reference.

106.    Each of the Engagement Letters is a binding contract between Pullman and each of Ronald Isley, Rudolph Isley, Three Boys, Bovina, O'Kelly Isley Estate, T-Neck, and Triple Three.

107.    Pullman fulfilled its obligations under each the Engagement Letters. Pursuant to the Engagement Letters, Pullman arranged an eight-figure sale of securities for the Isley Brothers in 2000.  For these services, Pullman received the 10% fee set forth in the Engagement Letters,[14]

---

[14] Pullman's compensation is set forth in Engagement Letter ¶ 5(a), as follows:

     5.    <u>Compensation to Pullman</u>.

plus, *inter alia*, the "exclusive right, at [Pullman's] sole discretion, to refinance any future transaction(s) **or asset sales(s) for [the Isleys]** upon future recoupment of the Securities ... on the same terms and conditions outlined herein."  Engagement Letters, ¶¶ 5, 7.

108.    Each of Ronald, Rudolph, Three Boys, Bovina, O'Kelly Isley Estate, T-Neck, and Triple Three violated paragraphs 2 and 7 of the Engagement Letters through the EMI Asset Sale Agreement, which states, in relevant part:

> 2<u>.</u>   **<u>Exclusive Authority</u>**.   Engagement Period, neither Owner [(the Isleys)] nor anyone acting on [their] behalf shall, **<u>other than with or through Pullman</u>**, undertake any activities with regard to Transactions [(defined as the financial transactions described in paragraphs 3(a) through (f) of the Engagement Letter)].
>
> \*\*\*
>
> 7.    <u>Refinancing or **Asset Sale(s)**</u>.   Pullman is granted the <u>exclusive right, at its sole discretion, to refinance any future transaction(s) or **asset sale(s)** for owner upon future recoupment of the securities</u>....  Such refinancing will be on the same terms and conditions outlined herein.   <u>This clause shall be interpreted to include all future financings during the greater of owner's life or two future financing periods in addition to the initial financing contemplated by this agreement</u>.  [Emphasis added.]

*See* Ex. A [Engagement Letters] ¶¶ 2, 7.[15]

---

> (a)    As compensation for Pullman's performance of the Services, Owner shall pay to Pullman:
>
> \*\*\*
>
> (ii)    **A fee equal to ten percent (10%)** of the aggregate commitment amount of a Warehouse Loan or **asset sale**, including any increase in the commitment amount, payable at the closing of the Warehouse Loan or, in the event of an increase, at the time the commitment to the increase is issued, or
>
> (iii)    **A fee equal to ten percent (10%)** of the aggregate principal amount of investment-grade Securities or **proceeds from the asset sale(s)** payable at the time the Securities or **assets are sold**.

[15] The term of Pullman's original financing securitization for the Isley Brothers under the Engagement Letters was twenty (20) years, commencing in 2001.  Thus, Pullman's exclusive rights with respect to refinancings/asset sales

109.    The Engagement Period only limits the time period that Pullman is to act as the Isleys' "agent and advisor on an exclusive basis with respect to the financial transactions described in paragraph 3(a) through (f) thereof ('Transactions')…" *See* Ex. A [Engagement Letters] at p. 1. Pullman's "exclusive right . . . to finance **future <u>transaction(s)</u> or asset sale(s)**," pursuant to Paragraph 7 of the Engagement Letters, is limited by a different time period altogether. Specifically, Paragraph 7 provides that "This clause shall be interpreted to include all **future <u>financings</u>** during the greater of owner's life or two future financing periods in addition to the initial financing contemplated by this agreement."  Moreover, Pullman's right is limited to the right to engage in "future transaction(s) or asset sale(s)," not "Transactions," which is a defined term in the Engagement Letters. *See* Ex. A [Engagement Letters] at ¶ 7.

110.    One of the "terms and conditions" referenced in Paragraph 7 of the Engagement Letters is Paragraph 5(c)(iii), which entitles Pullman "to its fee in full [*i.e.*, 10%, plus interest]" and liquidated damages in the amount of $250,000 in the event that a transaction "**does not occur because of [the Isleys'] failure or refusal to perform its obligations under this Engagement Letter.**"  Paragraph 5(c) states, in relevant part:

> 5(c)    Owner acknowledges that Pullman shall be entitled to its <u>fee in full, pursuant to paragraph 5(a)</u>, in the event that:
>
> (i)    <u>An investor from whom Owner accepts an offer to purchase the Securities requires Pullman to cease its marketing and sales efforts</u> **<u>or Owner otherwise fails to permit Pullman to carry out its undertaking herein with regard to the transaction</u>**.
>
> ***
>
> (iii)    **<u>A Transaction does not occur because of Owner's failure or refusal to perform its obligations under this</u>**

---

continued for the original plus the greater of the life of any "Owner" under the Engagement Letters or two "future financing periods," or, at least,  through 2061.  Ronald and Rudolph Isley are both still alive.

> **Engagement Letter, in which event**, since Owner acknowledges that Pullman will incur consequential damages by reason of the injury to its relations to third parties involved in the Transaction which are not susceptible to quantifiable proof, **Owner shall be additionally liable to Pullman** for liquidated damages for such injury in the amount of $250,000. [Emphasis added.]

*See* Ex. A [Engagement Letters] at ¶ 5(c).

111.    The exclusive rights with respect to future asset sale(s) and refinancing(s) were an essential component of Pullman's compensation under the Engagement Letter.

112.    The Engagement Letters further provide that the losing party in any litigation involving the Engagement Letter "shall reimburse the prevailing party for its reasonable attorney's fees and costs incurred with respect to such legal proceeding."  *See* Ex. A1-A-7 [Engagement Letters] at ¶ 12.

### SECOND CAUSE OF ACTION

**(Breach of Contract –Violation of Paragraphs 2 and 7 of the Engagement Letters – Reservoir Transaction)**
*(As Against the Isley Brothers and their Successors and Assigns)*

113.    Plaintiff hereby restates and realleges each and every allegation contained above as if fully set forth herein and incorporates them by reference.

114.    Each of the Engagement Letters is a binding contract between Pullman and each of Ronald Isley, Rudolph Isley, Three Boys, Bovina, O'Kelly Isley Estate, T-Neck, and Triple Three.

115.    Pullman fulfilled its obligations under each the Engagement Letters. Pursuant to the Engagement Letters, Pullman arranged an eight-figure sale of securities for the Isley Brothers in 2000.

116.    Each of the Isley Brothers, Three Boys, Bovina, O'Kelly Isley Estate, T-Neck, and Triple Three violated paragraph 7 of the Engagement Letters through the Reservoir Transaction.

117.    As a result of said breach of the Engagement Letters, Paragraph 5(c)(iii) of the Engagement Letters, entitles Pullman "to its fee in full [*i.e.*, 10%]" and liquidated damages in the amount of $250,000 in the event that a transaction "does not occur because of [the Isley Brothers] failure or refusal to perform its obligations under this Engagement Letter."  Paragraph 5(c) states, in relevant part:

> 5(c)    Owner acknowledges that Pullman shall be entitled to its fee in full, pursuant to paragraph 5(a), in the event that:
>
> (i)  An investor from whom Owner accepts an offer to purchase the Securities requires Pullman to cease its marketing and sales efforts or Owner otherwise fails to permit Pullman to carry out its undertaking herein with regard to the transaction.
>
> ***
>
> (iii)    A Transaction does not occur because of Owner's failure or refusal to perform its obligations under this Engagement Letter, in which event, since Owner acknowledges that Pullman will incur consequential damages by reason of the injury to its relations to third parties involved in the Transaction which are not susceptible to quantifiable proof, Owner shall be additionally liable to Pullman for liquidated damages for such injury in the amount of $250,000.

*See* Ex. A1-A-7 [Engagement Letters] at ¶ 5(c).

118.    Pullman has demanded payment for all the services rendered under each of the Engagement Letters, and by the filing of this complaint hereby demands payment of the unpaid sums.  Each of the Isley Brothers, Ronald, Rudolph, Three Boys, Bovina, O'Kelly Isley Estate, T-Neck, and Triple Three has failed and refused, and continue to fail and refuse to pay under the terms of the exclusive Engagement Letters.

119.    Reservoir bought the Isley Brothers' Musical Assets subject to Pullman's liens, including the liens filed in connection with the EMI Transaction, and the lien created by the Reservoir Transaction.

120.    In connection with the Reservoir Asset Purchase Agreement, Reservoir withheld certain monies due and owing to Pullman under Pullman's lien for the EMI amended lien (the Amended Notice of Lien), plus the fees, costs, attorneys' fees, expenses and interest from the date of the breach of the EMI deal for itsel, and should have paid Pullman the monies, that were due at the time of the Reservoir purchase deal itself to Pullman for Pullman's fees for the transaction, liquidated damages, interest, attorneys' fees, costs and expenses of the transaction in aggregate over and above and including the lien filed as against Reservoir, the moment the deal was entered into between the Isley Brothers and Reservoir.  Pullman demands immediate payment of same.

121.    Accordingly, the Plaintiff has sustained a cause of action for breach of contract.

## THIRD CAUSE OF ACTION

**(Breach of Contract – Violation of Paragraph 7 of the
Engagement Letters for Attorneys' Fees & Costs)**
***(As Against the Isley Brothers and their Successors and Assigns)***

122.    Plaintiff hereby restates and realleges each and every allegation contained above as if fully set forth herein and incorporates them by reference.

123.    Paragraph 12 of each the Engagement Letters provide that the losing party in any litigation involving the Engagement Letter shall reimburse the prevailing party for its "reasonable attorney's fees and costs incurred with respect to such legal proceeding."

124.    Accordingly, Plaintiff is entitled to a judgment awarding attorneys fees' and costs for each independent breach of the Engagement Letters.

## FOURTH CAUSE OF ACTION

**(Tortious Interference with Contract)**
***(As Against Reservoir Media Management, Inc., Isley Brothers, L.L.C., and Isley Brothers
Royalty Venture I SPC)***

125.    Plaintiff hereby restates and realleges each and every allegation contained above as if fully set forth herein and incorporates them by reference.

126.    To state a tortious interference with contract claim under New York law, a plaintiff must allege (1) the existence of a valid contract between the plaintiff and a third party; (2) the defendant's knowledge of the contract; (3) the defendant's intentional procurement of the third-party's breach of the contract without justification; (4) actual breach of the contract; and (5) damages resulting therefrom. *INV Accelerator, LLC v. MX Techs., Inc.*, 2020 WL 882902, at *4 (S.D.N.Y. 2020) (citations omitted); *see also Rich v. Fox News Network, LLC*, 939 F.3d 112, 129 (2d Cir. 2019); *Vista Outdoor Inc. v. Reeves Family Tr.*, 234 F. Supp. 3d 558, 569 (S.D.N.Y. 2017), *aff'd*, 725 F. App'x 17 (2d Cir. 2018), and *aff'd*, 725 F. App'x 17 (2d Cir. 2018); *Int'l Minerals & Res., S.A. v. Pappas*, 96 F.3d 586, 592 (2d Cir. 1996).  Here, Pullman easily satisfies the threshold for stating a claim for tortious interference with contact under New York law.

127.    Each of the Engagement Letters are valid exclusive contracts between Pullman and Ronald Isley, Rudolph Isley, O'Kelley Isley, Three Boys, Bovina, O'Kelly Isley Estate, T-Neck, and Triple Three.

128.    The Engagement Letters grant Pullman exclusive rights with regard to certain financial transactions, inter alia, the right to refinance any future transaction(s) or asset sale(s).

129.    Reservoir, Isley Brothers LLC, and Royalty Venture, had full knowledge of the Engagement Letters.

130.    Reservoir, Isley Brothers LLC, and Royalty Venture, had actual knowledge of the Engagement Letters.

131.    Reservoir, Isley Brothers LLC, and Royalty Venture, had knowledge of the Engagement Letters.

132.    Reservoir withheld funds and monies due Pullman for itself and for the Amended EMI lien as part of the Reservoir Asset Sale Agreement the Pullman EMI Amended lien, and any

other monies owed Pullman based on the size of the Reservoir deal,  because of its actual and constructive knowledge of Pullman's exclusive contractual rights under the exclusive Engagement Agreements and the Pullman EMI liens and lien created by and/or on the Reservoir deal.

133.   Reservoir intentionally induced the Isley Brothers and their corporate constituencies to breach their contracts with Pullman and not to pay Pullman as to the exclusive amount, fees, costs, attorneys' fees, interest due to Pullman under the (1) Amended EMI lien and (2) all the money due Pullman under the Reservoir lien plus the monies over and above the amount due based on the size of the Reservoir deal, including fees, costs, expenses, interest, and all attorneys' fees.

134.   Reservoir, Isley Brothers LLC, and Royalty Venture, had and have no lawful justification for its tortious interference with the exclusive Engagement Letters not to pay Pullman as to the exclusive amounts.

135.   Reservoir, Isley Brothers LLC, and Royalty Venture, intended to damage Pullman's exclusive contractual rights arising under the Engagement Agreement. *See, e.g.*, *White Plains Coat & Apron Co. v. Cintas Corp.*, 8 N.Y.3d 422, 426–27, 867 N.E.2d 381, 384 (2007) ("When the defendant is simply a competitor of the plaintiff seeking prospective customers and plaintiff has a customer under contract for a definite period, defendant's interest is not equal to that of plaintiff and would not justify defendant's inducing the customer to breach the existing contract."); *NBT Bancorp Inc. v. Fleet/Norstar Fin. Grp., Inc.*, 87 N.Y.2d 614, 621, 664 N.E.2d 492, 496 (1996) ("the degree of protection available to a plaintiff for a competitor's tortious interference with contract is defined by the nature of the plaintiff's enforceable legal rights. Thus, where there is an existing, enforceable contract and a defendant's deliberate interference results in a breach of that contract, **a plaintiff may recover damages for tortious interference with**

**contractual relations even if the defendant was engaged in lawful behavior**.") (emphasis added).

136.    Reservoir, Isley Brothers LLC, and Royalty Venture, have no lawful justification for its tortious interference because each of the parties unjustifiably intended to damage Pullman's exclusive contractual relationship under the Engagement Letters.

137.    Pullman has suffered and will continue to suffer damages due to Reservoir's, Isley Brothers LLC's, and Royalty Venture's tortious interference with the Engagement Letters.

## FIFTH CAUSE OF ACTION

**(Foreclosure of Contractual Liens Granted by Ronald Isley, Rudolph Isley, O'Kelly Isley, Three Boys, Bovina, the O'Kelly Estate, T-Neck, and Triple Three)**
***(As Against Reservoir and the Isley Brothers and their Successors and Assigns)***

138.    Plaintiff hereby restates and realleges each and every allegation contained above as if fully set forth herein and incorporates them by reference.

139.    Plaintiff's rights under the Engagement Letters and all the contractual liens and attachments granted by the Isley Brothers to Pullman as filed with the United States Copyright Office, New York Uniform Commercial Code and the various agreements cited herein, authorize Plaintiff to foreclose on the liens in the collateral described therein otherwise known as the Isley Brothers Musical Assets.

140.    Plaintiff's rights under the exclusive Engagement Letters and Pullman's Liens and attachments granted by the Isley Brothers to Pullman as filed with the United States Copyright Office, New York Uniform Commercial Code and the various agreements cited herein, authorize Plaintiff to foreclose on Pullman's Liens.

141.    By virtue of the Engagement Letters, as well as Article 9 of the Uniform Commercial Code, which governs secured transactions, Plaintiff has the first and best right to, *inter alia*:

(a) foreclose upon the collateral described therein otherwise known as the Isley Brothers' Musical Assets;

(b) foreclose upon the liens Pullman filed with the United States Copyright Office in connection with the Isley Brothers' sales to EMI and Reservoir;

(c) take possession of the collateral described therein otherwise known as the Isley Brothers' Musical Assets;

(d) sell, lease or otherwise dispose of the collateral described therein otherwise known as the Isley Brothers' Musical Assets; and

(e) pursue any and all other rights or remedies of a secured party under the Uniform Commercial Code.

142.    Accordingly, Plaintiff is entitled to a judgment as set forth above.

## SIXTH CAUSE OF ACTION

**(Alternative Breach of Contract Exclusive Agency Agreement – Violation of Paragraphs 2 and 7 of the Engagement Letters – EMI Asset Sale Agreement/ Reservoir Asset Sale Agreement)**
*(As Against the Isley Brothers and their Successors and Assigns)*

157.    Plaintiff hereby restates and realleges each and every allegation contained above as if fully set forth herein and incorporates them by reference.

158.    Each of the Engagement Letters is a binding contract between Pullman and each of Ronald Isley, Rudolph Isley, Three Boys, Bovina, O'Kelly Isley Estate, T-Neck, and Triple Three.

159.    Each of the Isley Brothers, Three Boys, Bovina, O'Kelly Isley Estate, T-Neck, and Triple Three violated paragraph 7 of the Engagement Letters through the EMI Transaction and the Reservoir Transaction.

160.    Alternatively, to the extent that the Isley Brothers claim that the Engagement Letters constitute an exclusive agency agreement, Pullman is still entitled to compensation under

Paragraph 5 because the Isley Brothers did not independently arrange the EMI Transaction and the

Reservoir Transaction and/or the sale of the Isley Brothers' Musical Assets.

161.    Paragraph 2 of the Engagement Letters states, in relevant part, as follows:

> 2. Exclusive Authority. During the Engagement Period, neither Owner [(the Isley Brothers)] nor anyone acting on [their] behalf shall, <u>other than with or through Pullman</u>, undertake any activities with regard to Transactions [(defined as the financial transactions described in paragraphs 3(a) through (f) of the Engagement Letter)].

(emphasis added).

162.    Alternatively, to the extent that the Isley Brothers claim that the Engagement

Letters constitute an exclusive agency agreement, Pullman is still entitled to compensation under

Paragraph 5 because the Isley Brothers used another agent, Shukat, in violation of the express

terms of Pullman's exclusive contractual rights.

163.    As a result of said breaches of the Engagement Letters, Paragraph 5(c)(iii) of the

Engagement Letters, entitles Pullman "to its fee in full [*i.e.*, 10%]" and liquidated damages in the

amount of $250,000 in the event that a transaction "does not occur because of [the Isley Brothers]

failure or refusal to perform its obligations under this Engagement Letter." Paragraph 5(c) states,

in relevant part:

> 5(c)    Owner acknowledges that Pullman shall be entitled to its fee in full, pursuant to paragraph 5(a), in the event that:

> (i)  An investor from whom Owner accepts an offer to purchase the Securities requires Pullman to cease its marketing and sales efforts or Owner otherwise fails to permit Pullman to carry out its undertaking herein with regard to the transaction.

> ***

> (iii)    A Transaction does not occur because of Owner's failure or refusal to perform its obligations under this Engagement Letter, in which event, since Owner acknowledges that Pullman will incur consequential damages by reason of the injury to its relations

to third parties involved in the Transaction which are not susceptible
to quantifiable proof, Owner shall be additionally liable to Pullman
for liquidated damages for such injury in the amount of $250,000.

*See* Ex. A1-A-7 [Engagement Letters] at ¶ 5(c).

164.   Pullman has demanded payment for all the services rendered under each of the
Engagement Letters, and by the filing of this Complaint hereby demands payment of the unpaid
sums. Each of the Isley Brothers, Ronald, Rudolph, Three Boys, Bovina, O'Kelly Isley Estate,
TNeck, and Triple Three has failed and refused, and continue to fail and refuse to pay under the
terms of the exclusive Engagement Letters.

165.   Accordingly, Plaintiff is entitled to a judgment awarding attorneys' fees and costs
for each independent breach of the Engagement Letters.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment in its favor:

(a)   On the First Cause of Action, damages to Plaintiff in an amount to be determined
at trial, plus interest thereon;

(b)   On the Second Cause of Action, damages to Plaintiff in an amount to be determined
at trial, plus interest thereon;

(c)   On the Third Cause of Action, damages to Plaintiff in an amount to be determined
at trial, plus interest thereon;

(d)   On the Fourth Cause of Action, damages to Plaintiff in an amount to be determined
at trial, plus interest thereon;

(e)   On the Fifth Cause of Action, enforcing Plaintiff's rights under the New York
Uniform Commercial Code and the various agreements cited herein by foreclosing Plaintiff's
security interest in the collateral described therein otherwise known as the Isley Brothers Musical
Assets;

(f)   On the Sixth Cause of Action, damages to Plaintiff in an amount to be determined
at trial, plus interest thereon;

(g)     Granting Plaintiff an award in the amount of no less than a 10% fee, plus interest at the rate of 9%, liquidated damages in the amount of $250,000, and attorneys' fees, costs, and expenses,  in connection with the EMI Asset Sale Agreement;

(h)     Granting Plaintiff an award in the amount of no less than a 10% fee in connection with the Reservoir Asset Sale Agreement, plus interest at the rate of 9%, liquidated damages in the amount of $250,000, and attorneys' fees, costs, and expenses;

(i)     Granting Plaintiff contractual liquidated damages of not less than $10 million, including prejudgment interest under New York law, attorneys' fees, costs, and expenses;

(j)     Granting Plaintiff $100 million in tort claims against Reservoir;

(k)     Granting Plaintiff its attorneys' fees, costs, and expenses; and

(l)     Granting Plaintiff such other and further relief as the Court may deem just and proper.

Dated: New York, New York
         November 16, 2020

                                        By:     /s/ Joshua D. Levin-Epstein
                                                Joshua D. Levin-Epstein, Esq.
                                                Jason Mizrahi, Esq.
                                                Levin Epstein & Associates, P.C.
                                                420 Lexington Avenue, Suite 2525
                                                New York, New York 10170
                                                Telephone: (212) 792-0046
                                                Email: joshua@levinepstein.com
                                                *Attorneys for Plaintiff*