**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------X
The Pullman Group, LLC,

        *Plaintiff*,       Case No.: 1:20-cv-07293

    -against-        Hon. Gregory H. Woods

Ronald Isley, Rudolph Isley, Reservoir Media
Management, Inc., The Estate of O'Kelly Isley,
J.R., Isley Brothers, L.L.C., Isley Brothers Royalty
Venture I SPC, Inc., Three Boys Music
Corporation, Bovina Music Inc., T-Neck Records,
Inc., Triple Three Music, Inc. and John Doe
Corporations 1-5,

        *Defendants*.

-------------------------------------------------------------X

### THE PULLMAN GROUP, LLC'S MEMORANDUM OF LAW IN OPPOSITION TO THE ISLEY DEFENDANTS' MOTION TO DISMISS THE FIRST AMDENDED COMPLAINT

**LEVIN-EPSTEIN & ASSOCIATES, P.C.**
Joshua Levin-Epstein, Esq.
Jason Mizrahi, Esq.
420 Lexington Avenue, Suite 2525
New York, NY  10170
*Attorneys for Plaintiff*

Dated: New York, New York
   December 9, 2020

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................................. iv

PRELIMINARY STATEMENT ......................................................................................... 1

FACTUAL BACKGROUND ............................................................................................. 4

LEGAL STANDARD OF REVIEW ON A MOTION TO DISMISS CLAIMS ON THE
GROUND THAT THE STATUTE OF LIMITATIONS HAS EXPIRED ................................. 6

LEGAL ARGUMENT ..................................................................................................... 7

I.    The Isley Defendants Cannot Meet Their Burden on a Dismissal Motion to Demonstrate
that the Statute of Limitations for Breach of Contract has Expired ................................... 7

II.    Paragraph 7 of the Engagement Letters has not Expired ....................................... 8

      1.    The Term Financings in Paragraph 7 Includes Asset Sales .................................... 9

          a.   The Term "Financings" is Inherently Broad and Includes Both Debt and
Equity ....................................................................................................... 11

      2.    The Only Logical Interpretation of Paragraph 7 is that the Term Financings
Includes Asset Sales ................................................................................... 11

III.    Paragraph 7 has ot Expired Based on Controlling Principles of
Contract Interpretation ............................................................................................. 12

      1.    Paragraph 7 did not Expire in 2007 Upon the Expiration of Ron Isley's Bankruptcy
Proceeding ............................................................................................... 12

      2.    Paragraph 7's Inclusion of the Word "Clause" Further Demonstrates that
Paragraph 7 did not Expire in 2007 ............................................................. 13

          a.   The Isley Defendants' Interpretation of Paragraph 7 Violates a Basic Cannon
of Contract Interpretation, *Noscitur a Sociis* ............................................ 13

IV.    The Isley Defendants Mischaracterize Pullman's Argument Concerning the Length of
Time of the Exclusivity Period Included in Paragraph 7 .................................................. 15

      1.    The Isley Defendants' Wrongfully Insinuate that Pullman did not Earn the
Exclusivity Rights Contained in Paragraph 7 .................................................. 16

2.     Pullman Satisfied the Condition Precedent that Triggered his Rights Under Paragraph 7 of the Engagement Letters ................................................................. 17

V.   The Isley Defendants Rely on Inapposite Authority to Show that Pullman's FAC is out of Time ....................................................................................................................... 18

1.     The Remainder of the Cases the Isley Defendants Rely on are Also Inapposite.... 19

VI.  The Isley Defendants' Argument that the Engagement Letters Violate New York Law's Clear Statement Rule Presents a Question of Fact that Precludes Summary Dismissal Under Fed.R.Civ.P. 12(b)(6) ........................................................................................ 20

VII. The Engagement Letters are Drafted in Accordance With New York's Clear Statement Rule ..................................................................................................................... 21

1.     *Dominick* is Factually Distinguishable and Inapposite ........................................... 22

2.     Pullman is Contractually Entitled to Fees on Asset Sales to Reservoir and EMI... 23

VIII. Pullman's Causes of Action are Well Pled ..................................................................... 24

CONCLUSION........................................................................................................................ 24

# TABLE OF AUTHORITIES

## Cases

*242–44 E. 77th St., LLC v. Greater N.Y. Mut. Ins. Co.,*
    31 A.D.3d 100 (1st Dept. 2006).................................................................................. 13

*Advanced Mktg. Grp., Inc. v. Bus. Payment Sys.,*
    300 F. App'x 48 (2d Cir. 2008) .................................................................................... 8

*Crowley v. VisionMaker, LLC,*
    512 F. Supp. 2d 144 (S.D.N.Y. 2007)......................................................................... 20

*Cruz v. TD Bank, N.A.,*
    742 F.3d 520 (2d Cir. 2013)........................................................................................ 24

*Dominick & Dickerman LLC v. Deutsche Oel & Gas AG*
    756 F. App'x 58 (2d Cir. 2018)............................................................................. 20, 22

*Encyclopedia Brown Prods. v. Home Box Office, Inc.,*
    1998 WL 734355 (S.D.N.Y. 1998).......................................................................... 12, 14

*Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co.,*
    375 F.3d 168 (2d Cir. 2004).................................................................................... 8, 20

*Fischer & Mandell, LLP v. Citibank, N.A.,*
    632 F.3d 793 (2d Cir. 2011)......................................................................................... 7

*In re Cooper,*
    592 B.R. 469 (S.D.N.Y. 2018).................................................................................... 10

*In re Lehman Bros. Inc.,*
    478 B.R. 570 (S.D.N.Y. 2012)...................................................................................... 9

*Innophos, Inc. v. Rhodia, S.A.,*
    38 A.D.3d 368 (1st Dept. 2007)................................................................ 11, 13, 14, 15

*Kass v. Kass,*
    91 N.Y.2d 554 (1998) ................................................................................................. 13

*Kinek v. Paramount Commc'ns, Inc.,*
    22 F.3d 503 (2d Cir. 1994).......................................................................................... 12

*Levy v. BASF Metals Ltd.,*
    2017 WL 2533501 (S.D.N.Y. 2017).............................................................................. 8

*Maniolos v. United States*,
    741 F. Supp. 2d 555 (S.D.N.Y. 2010).................................................................... 20

*Mosdos Chofetz Chaim, Inc. v. RBS Citizens, N.A.*,
    14 F. Supp. 3d 191 (S.D.N.Y. 2014)............................................................... 7, 8

*Oppenheimer & Co. v. Oppenheim, Appel, Dixon & Co.*,
    86 N.Y.2d 685 (1995) ........................................................................................ 17

*Orlander v. Staples, Inc.*,
    802 F.3d 289 (2d Cir. 2015)................................................................................. 8

*Partner Canada Biomedical Int'l, Inc. v. Amgen, Inc.*,
    2018 WL 3462516 (S.D.N.Y. 2018)................................................................... 14

*Psenicska v. Twentieth Century Fox Film Corp.*,
    2008 WL 4185752 (S.D.N.Y. 2008)................................................................... 20

*Raymond Weil, S.A. v. Theron*,
    585 F. Supp. 2d 473 (S.D.N.Y. 2008).................................................................. 19

*Sevel Argentina, S.A. v. Gen. Motors Corp.*,
    46 F. Supp. 2d 261 (S.D.N.Y. 1999).................................................................. 19

*State St. Glob. Advisors Tr. Co. v. Visbal*,
    431 F. Supp. 3d 322, 357 (S.D.N.Y. 2020)........................................................ 9

*Subaru Distrib. Corp. v. Subaru of Am., Inc.*,
    425 F.3d 119 (2d Cir. 2005)............................................................................... 20

*United States v. Smith*,
    985 F. Supp. 2d 547 (S.D.N.Y. 2014)..................................................... 10, 11, 13, 17

*Wai Chu v. Samsung Elecs. Am., Inc.*,
    2020 WL 1330662 (S.D.N.Y. 2020)............................................................ 4, 6, 7, 8

*Wurtsbaugh v. Banc of Am. Sec. LLC*,
    2006 WL 1683416 (S.D.N.Y. 2006)................................................................... 20

## **Statutes**

Fed.R.Civ.P. 12(b)(6)................................................................................................ 21

Fed.R.Civ.P. 56....................................................................................................... 19

N.Y. CPLR § 213....................................................................................................... 7

## <u>Other Authorities</u>

*Clause*, Black's Law Dictionary (11th ed. 2019), *available at* Westlaw ...................................... 13

*Financing,* Black's Law  Dictionary (11th ed. 2019), *available at* Westlaw............................... 10

Restatement (Second) of Contracts § 202, cmt. d (1981) ............................................................ 12

*Sale*, Black's Law Dictionary (10th ed. 2014), *available at* Westlaw .......................................... 10

*Sale*, Merriam-Webster Dictionary (11th ed. 2011) .................................................................... 10

Plaintiff The Pullman Group, LLC ("Pullman" or "Plaintiff"), by and through the undersigned counsel, respectfully submit this Memorandum of Law together with the declaration of Joshua Levin-Epstein, Esq., (the "Epstein Decl.") and the exhibits annexed thereto, in opposition to the Isley Defendants'[1] motion to dismiss dated November 30, 2020 [Dckt. No. 51] (the "Motion to Dismiss") Plaintiff's first amended complaint filed on November 17, 2020 [Dckt. No. 49] (the "FAC"), and as grounds thereto respectfully states as follows:

## PRELIMINARY STATEMENT

David Pullman is an acclaimed innovator in the securities industry.[2] He is the inventor of the eponymous Pullman Bonds[3] used to securitize the Isley Defendants' musical assets in 2001.[4]

The Isley Defendants have upended the cliché about professionals exploiting the artist because, in this case, it is Pullman that has been exploited. The Isley Defendants got what they desperately needed, when they needed it, and now have forsaken Pullman based on a preposterous legal argument that the Engagement Letters (as defined below) have expired.

The Engagement Letters are clear. The Engagement Letters, in two separate places in paragraph 7 alone, provide that Pullman's exclusive right to arrange refinancing and asset sales remain in full force and effect, *to wit*:

> 7. <u>Refinancing or Asset Sale(s)</u>.  Pullman is granted the exclusive right, at its sole discretion, to refinance any future transaction(s) or asset sale(s) for owner upon future recoupment of the Securities…

---

[1] Defendants Ronald Isley ("Ronald"), Rudolph Isley ("Rudolph"), Reservoir Media Management, Inc. ("Reservoir"), The Estate of O'Kelly Isley, J.R. (the "O'Kelly Estate"), Isley Brothers, L.L.C. ("Isley Brothers LLC"), Isley Brothers Royalty Venture I SPC, Inc. ("Royalty Venture"), Three Boys Music Corporation ("Three Boys"), Bovina Music Inc. ("Bovina"), T-Neck Records, Inc. ("T-Neck"), Triple Three Music, Inc. ("Triple Three") are collectively referred to herein as the "Isley Defendants."

[2] FAC at ¶ 9.

[3] https://www.investopedia.com/terms/b/bowie-bond.asp (definition of Pullman Bond); *see also* https://financial-dictionary.thefreedictionary.com/Pullman+Bond (same).

[4] Pullman is credited as the originator of the issuance of first ever music, entertainment, intellectual property, future royalties asset backed securities known as Pullman Bonds[T.M.] *See* https://www.pullmanbonds.com.

This clause shall be interpreted to include all future financings during the greater of owner's life or two future financing periods in addition to the initial financing contemplated by this agreement.[5]

Considering paragraph 7 of the Engagement Letters, the Isley Defendants' principal argument that the Engagement Letters have expired defies logic, common sense – and basic laws on contract interpretation. ***The Isley Defendants' main argument that paragraph 7 expired in 2007 begs the question: why is paragraph 7 included at all?*** The answer to the question of whether paragraph 7 of the Engagement Letters has expired is simply: no, of course not.

Historical context is critical to understanding this case. When Pullman created the Pullman Bond, the investment banking business was a far cry from what it is today. Wall Street (and investment banks) had not yet conjured up unconventional asset-backed securitizations that are common-place in today's financial market. In the early 2000s, Pullman could command whatever price he wanted to arrange Pullman Bonds. When the Isley Defendants' attorneys[6] and professionals negotiated the securitization of the Isley Defendants' musical assets, the Engagement Letters specifically provided Pullman exclusive rights with respect to refinancing/asset sales that continued for the original plus the greater of the life of any "Owner"[7] under the Engagement Letters or two "future financing periods,"[8] or, at least, through 2061[9]; provided however, that Pullman successfully arranged "Securities"[10] in the first place.

---

[5] *Epstein Decl.* at ¶ 3 [Exs. A1-A7 at ¶ 7] [Engagement Letters].
[6] FAC at ¶ 32 (the Isley Defendants had multiple attorneys involved in the negotiation of the Engagement Letters with Pullman).
[7] *Id.* Pursuant to each of the respective Engagement Letters, the term "Owner" is defined as each of the Isley Defendants.
[8] *Id.*
[9] *Id.* The term of Pullman's original financing securitization for the Isley Defendants under the Engagement Letters was twenty (20) years, commencing in 2001. Thus, Pullman's exclusive rights with respect to refinancing/asset sales continued for the original plus the greater of the life of any "Owner" under the Engagement Letters or two "future financing periods," or, at least, through 2061. Ronald and Rudolph are both still alive.
[10] *Epstein Decl.* at ¶ 3 [Exs. A1-A7 at ¶ 7] [Engagement Letters].

Pullman's arrangement of Pullman Bonds for the Isley Defendants was so successful that the 20-year bonds were fully satisfied after ten years and paid off from the music royalties cash flow, in 2011. The recoupment of the Isley Defendants' "Securities"[11] satisfied the condition precedent in paragraph 7 that functioned to spring into effect the grant of Pullman's exclusivity rights.[12] Pullman bargained for – and earned the exclusivity rights contained in paragraph 7.

Upon the satisfaction of the Isley Defendants' bonds, the Isley Defendants could have simply lived off their valuable music copyrights and other musical assets, without any payment to Pullman. Up until 2017, the Isley Defendants were doing just that.

When the market for so-called golden oldies surged in the last five-years, the Isley Defendants exploited the hot market without Pullman, in violation of Pullman's exclusive contractual rights under paragraph 7.  Having received the benefit of Pullman's services, the Isley Defendants cut-out Pullman in the EMI Transaction[13] and the Reservoir Transaction[14], in violation of paragraph 7.

For the reasons set forth more fully below, the Isley Defendants' Motion to Dismiss should respectfully be denied in its entirety because the Isley Defendants cannot meet the legal threshold for demonstrating that "the complaint clearly shows the [breach of contract] claim is out of time,"[15] pursuant to Rule 12(b)(6) of the Federal Rule of Civil Procedure ("Fed.R.Civ.P.").

---

[11] *Id.*

[12] *Id.* Paragraph 7 states in relevant part:

> Pullman is granted the exclusive right, at its sole discretion, to refinance any future transaction(s) or asset sale(s) for owner **upon future recoupment of the Securities**…

(emphasis added).

[13] The **"EMI Transaction"** refers to the Isley Brothers' secret sale of musical assets to EMI Music Publishing, Ltd.in 2017, in violation of Pullman's exclusive contractual right to arrange such sales for the Isley Brothers. *See* FAC at ¶ 2.

[14] The **"Reservoir Transaction"** refers to the Isley Brothers' secret sale of musical assets to Reservoir in 2018, in violation of Pullman's exclusive contractual right to arrange such sales for the Isley Brothers. *See id.* at ¶ 3.

[15] *Wai Chu v. Samsung Elecs. Am., Inc.*, 2020 WL 1330662, at *8 (S.D.N.Y. 2020).

## FACTUAL BACKGROUND

On July 20, 1999, Pullman entered into seven separate, but identical, Engagement Letters[16] with the Isley Defendants.  FAC at ¶¶ 4, 31. At the time the Engagement Letters were executed, the Isley Defendants were at risk of losing control of their valuable musical assets because of financial difficulties that, in 1999, caused Ronald Isley to file his second bankruptcy petition. *Id.* at ¶ 56.[17] The Isley Defendants had multiple attorneys representing them at the time of the execution of the Engagement Letters, in multiple states, including in New Jersey, Los Angeles, St. Louis, and New York. FAC at ¶ 32. Pullman Bonds have been used by some of the most well-known and successful musical artists, including the Motown Hit Machine, Holland Dozier Holland, R & B Royalty, Ashford & Simpson, The Godfather of Soul, James Brown, and The Isley Brothers, among others. *See e.g.*, *id.* at ¶¶ 9, 10.

Of critical importance here, the exclusive rights with respect to future asset sale(s) and refinancing(s) were an essential component of Pullman's compensation under the Engagement Letters. *Id.* at ¶¶ 42, 111. Pullman specifically bargained for – and earned – valuable exclusivity rights to arrange asset sales of the Isley Defendant's musical assets. *Id.* at ¶ 5.

Following the execution of the Engagement Letters, Pullman successfully arranged an eight-figure sale of securities for the Isley Defendants. *Id.*  The securities issued pursuant to the Engagement Letters were 20-year bonds, but were fully satisfied after ten years and paid off from the music royalties cash flow, in 2011. *Id.* at ¶ 58.  Having received the benefit of Pullman's services, the Isley Defendants now claim that Engagement Letters have expired.  *Motion to Dismiss* at § IV(B)(1).   This is pure nonsense.

---

[16] *Epstein Decl.* at ¶ 3 [Exs. A1-A7] [Engagement Letters].
[17] U.S Bankruptcy Court for the Central District of California (Los Angeles) in Case No. 2:97-bk-22489-BR.

Paragraph 7 is clear, in that:

7. <u>Refinancing or **Asset Sale(s)**</u>.  Pullman is granted the exclusive right, at its sole discretion, to refinance any future transaction(s) or **asset sale(s) for owner upon future recoupment of the Securities**.  Such refinancing or **asset sale** shall be at a minimum transaction size of the initial transaction contemplated by this agreement.  Such refinancing will be on the same terms and conditions outlined herein.  **This clause shall be interpreted to include all future financings during the greater of owner's life or two future financing periods in addition to the initial financing contemplated by this agreement**.

*Epstein Decl.* at ¶ 3 (emphasis added) [Exs. A1-A7 at ¶ 7] [Engagement Letters].  The plain language of the last sentence of paragraph 7 unambiguously provides that this provision has not expired.

The term of Pullman's original financing securitization for the Isley Defendants under the Engagement Letters was twenty (20) years, commencing in 2001.  FAC at ¶¶ 41, 108 fn. 15.  Thus, Pullman's exclusive rights with respect to refinancings/asset sales continued for the original plus the greater of the life of any "Owner"[18] under the Engagement Letters or two "future financing periods," or, at least, through 2061. FAC at ¶ 41. Ronald and Rudolph Isley are both still alive. *Id.* Accordingly, the plain language and the context of paragraph 7 demonstrate that Pullman's claims sounding in breach of contract are timely.

Context is crucial here. Pullman's compensation under the Engagement Letters was conditioned on a successful issuance of "Securities"[19] by the time of "the expiration of Ron Isley's Federal Bankruptcy Proceeding".[20] Had Pullman not arranged the issuance of "Securities" within the contractually prescribed period, Pullman would not have been entitled to any compensation under paragraph 5.[21] Nor would Pullman have been entitled to the exclusivity rights contained in

---

[18] *Epstein Decl.* at ¶ 3 [Exs. A1-A7 at ¶ 7] [Engagement Letters].
[19] The terms "Securities" is defined as "Structuring a securitization program for the issuance of securities."  *Id.* [Exs. A1-A7 at ¶ 3(a)] [Engagement Letters].
[20] *Id.* [Exs. A1-A7 at ¶ 1] [Engagement Letters]; *id.* [Exs. A1-A7 at ¶¶ 3(a), 5] [Engagement Letters] (Conditioning Pullman's compensation to the issuance of "Securities").
[21] *Id.*

paragraph 7, which contained a condition precedent, *i.e.*, "upon future recoupment of the Securities."[22] Thus, the exclusivity rights included in paragraph 7 were conditioned on the issuance of "Securities" in the first place.[23] Upon Pullman's successful arrangement of "Securities," the exclusivity rights under paragraph 7 sprung into effect.[24]

In violation of Pullman's exclusive rights under paragraph 7, the Isley Defendants breached the Engagement Letters. FAC [Exs. A1-A7 at ¶¶ 2, 7] [Engagement Letters]. The first breach under the Engagement Letters occurred in 2017 when the Isley Defendants negotiated an agreement to sell valuable exclusive musical assets to EMI Music Publishing, Ltd.  FAC at ¶ 2. The second breach occurred in 2018 when the Isley Defendants sold valuable music assets to Reservoir Media Management, Inc.[25] *Id.* at ¶ 3. For each independent breach, Pullman is entitled to substantial damages, in an amount no less than 10% of the value of the contemplated sale and/or sale, representing Pullman's contractual fee for a sale of such magnitude, as well as liquidated damages in the amount of $250,000, and contractual costs, legal fees, expenses, and interest from the date of the breach.[26]

## LEGAL STANDARD OF REVIEW ON A MOTION TO DISMISS CLAIMS ON THE GROUND THAT THE STATUTE OF LIMITATIONS HAS EXPIRED

"At the motion to dismiss stage, dismissal of a complaint on the grounds that the statute of limitations has expired is appropriate **only if the complaint clearly shows the claim is out of time**." *Wai Chu*, 2020 WL 1330662 at *8 (emphasis added) (internal quotations and citations omitted). It must be "clear on the face of the complaint that the statute of limitation has run."

---

[22] *Id.* [Exs. A1-A7 at ¶ 7] [Engagement Letters].
[23] *Id.* [Exs. A1-A7 at ¶¶ 3(a), 5] [Engagement Letters].
[24] *Id.*
[25] Since then, the Isley Defendants strung along Pullman into an agreement in a mediation that the Isley Defendants broke. *See* FAC at ¶¶ 72-73.
[26] *See Epstein Decl.* at ¶ 3 [Exs. A1-A7 at ¶¶ 5(c); 12] [Engagement Letters]; FAC at ¶¶ 2-3.

*Mosdos Chofetz Chaim, Inc. v. RBS Citizens, N.A.*, 14 F. Supp. 3d 191, 209 (S.D.N.Y. 2014).  The burden is on the defendants to establish the expiration of the statute of limitations.  *Id.*

In the instant case, it is undisputed that the Engagement Letters are governed by New York law.  *See* FAC at ¶¶ 28-29, *Epstein Decl.* at ¶ 3 [Exs. A1-A7 at ¶ 12] [Engagement Letters][27]; *Motion to Dismiss* at § IV.  Pullman's claims sound in breach of contract. *See* FAC at ¶¶ 105-165. Under New York law, the statute of limitations for a claim sounding in breach of contract is six (6) years.  N.Y. CPLR § 213.

## LEGAL ARGUMENT

"Under New York law, a breach of contract claim requires proof of (1) an agreement, (2) adequate performance by the plaintiff, (3) breach by the defendant, and (4) damages." *Fischer & Mandell, LLP v. Citibank, N.A.,* 632 F.3d 793, 799 (2d Cir. 2011).   As set forth more fully below, the Isley Defendants cannot come close to satisfying the legal threshold for dismissal of the FAC because Pullman has fulfilled all his obligations under the Engagement Letters and the FAC is timely. *See e.g.*, *Wai Chu*, 2020 WL 1330662 at *8.

I.   **The Isley Defendants Cannot Meet Their Burden on a Dismissal Motion to Demonstrate that the Statute of Limitations for Breach of Contract has Expired**

The dismissal of a complaint on the grounds that the statute of limitations has expired "is appropriate only if the complaint clearly shows the claim is out of time." *Id.* at *8 (internal

---

[27] Each of the Engagement Letters provides as follows:

> In the event that any legal proceeding shall be instituted under or in connection with this Engagement Letter, the federal and state courts located in New York, New York, shall have full jurisdiction over…[the] parties with regard thereto, and litigation shall be commenced solely in said courts.

*Epstein Decl.* at ¶ 3 [Exs. A1-A7 at ¶ 12] [Engagement Letters]. Each of the Engagement Letters provides that the Engagement Letters shall be interpreted under and governed by the laws of the State of New York.  *Id.*

quotations and citations omitted).  The untimeliness of Plaintiff's claims must be "apparent on the face of [the] complaint." *Levy v. BASF Metals Ltd.*, 2017 WL 2533501, at *4 (S.D.N.Y. 2017), *aff'd*, 917 F.3d 106 (2d Cir. 2019).  The Second Circuit has made it abundantly clear that the Fed.R.Civ.P. 12(b)(6) dismissal of a breach-of-contract claim is proper only if the contract at issue is "unambiguous" in the defendant's favor. *See Orlander v. Staples, Inc.,* 802 F.3d 289, 294-295 (2d Cir. 2015).[28]

A contract is "unambiguous" in the defendant's favor where the defendant's proffered interpretation of the contract is so in keeping with the contract's "definite and precise" language, *Orlander*, 802 F.3d at 294, that no "reasonably intelligent person," *Eternity Global*, 375 F.3d at 173,  could conclude that the plaintiff's proffered interpretation of the contract is "plausible," *id*. at 181, much less correct. This is not the case here. As set forth more fully below, the Engagement Letters have not expired and, to the extent there is any ambiguity, dismissal of the FAC is not warranted on a dismissal motion. *Wai Chu*, 2020 WL 1330662 at *8; *BASF Metals Ltd.*, 2017 WL 2533501 at *4; *Mosdos Chofetz Chaim, Inc.*, 14 F. Supp. 3d at 209; *Orlander*, 802 F.3d at 294; *Eternity Global*, 375 F.3d at 173.

## II.    Paragraph 7 of the Engagement Letters has not Expired

Paragraph 7 is clear, in that:

> 7. <u>Refinancing or **Asset Sale(s)**</u>.  Pullman is granted the exclusive right, at its sole discretion, to refinance any future transaction(s) or **asset sale(s)** for owner upon future recoupment of the Securities.  Such refinancing or **asset sale** shall be at a minimum transaction size of the initial transaction contemplated by this agreement. Such refinancing will be on the same terms and conditions outlined herein.  **This clause shall be interpreted to include all future financings during the greater of owner's life or two future financing periods in addition to the initial financing contemplated by this agreement**.

*Epstein Decl.* at ¶ 3 (emphasis added) [Exs. A1-A7 at ¶ 7] [Engagement Letters].

---

[28] *See also, Advanced Mktg. Grp., Inc. v. Bus. Payment Sys*., 300 F. App'x 48, 49 (2d Cir. 2008); *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co*., 375 F.3d 168, 176-86 (2d Cir. 2004).

The Engagement Letters include two termination dates, one of which remains in full force and effect.  The first termination date contained in paragraph 1 is occasioned by Pullman's failure to arrange a securitization by the contractually prescribed period demarcated as the termination of Ron Isley's bankruptcy proceeding.[29]  The second termination date is based on Pullman's achievement of the condition precedent contained in paragraph 7 to successfully arrange a securitization. Thus, the Isley Defendants urge on the Court an incorrect termination date for Pullman's exclusive rights arising under paragraph 7.  *Motion to Dismiss* at § IV(B)(1).

Paragraph 7 of the Engagement Letters provides that Pullman's exclusive rights with respect to refinancings/asset sales continued for the original plus the greater of the life of any "Owner"[30] under the Engagement Letters or two "future financing periods," or, at least, through 2061. FAC at ¶¶ 41, 108 fn. 15. Thus, the Isley Defendants' argument that the Engagement Letters have expired in total renders the entirety of paragraph "of no effect." *State St. Glob. Advisors Tr. Co. v. Visbal,* 431 F. Supp. 3d 322, 357 (S.D.N.Y. 2020).

### 1.  The Term Financings in Paragraph 7 Includes Asset Sales

It is well-accepted that courts should construe contracts according to the parties' "intent" as derived from the contract's terms.  *In re Lehman Bros. Inc*., 478 B.R. 570, 585 (S.D.N.Y. 2012). Thus, the starting point for the construal of a contract is the contract's own words. *Id*.  Paragraph 7 states, in relevant part that:

> This clause shall be interpreted to include all future **financings** during the greater of owner's life or two future **financing** periods in addition to the initial **financing** contemplated by this agreement.

*Epstein Decl.* at ¶ 3 (emphasis added) [Exs. A1-A7 at ¶ 1] [Engagement Letters]. The word "financing" is not defined in the Engagement Letters.

---

[29] *Epstein Decl.* at ¶ 3 [Exs. A1-A7 at ¶ 1] [Engagement Letters].
[30] *Id*. [Exs. A1-A7 at ¶ 3] [Engagement Letters].

Where, as here, a word in a contract is undefined courts "construe[s] words of ordinary import with their usual and commonly understood meaning, and in that connection ha[s] regarded dictionary definitions as useful guideposts in determining the meaning of a word." *United States v. Smith*, 985 F. Supp. 2d 547, 570 (S.D.N.Y. 2014) (citations and internal quotations omitted), *aff'd sub nom. United States v. Halloran*, 664 F. App'x 23 (2d Cir. 2016). Black's Law Dictionary defines "financing" as follows:

1. The act or process of raising or providing funds.
2. Funds that are raised or provided.

*Financing,* Black's Law  Dictionary (11th ed. 2019), *available at* Westlaw (emphasis added).[31] The term "financing" is inherently broadly defined.  *Id*.

Thus, the issue evolves to whether the definition of "financing" in paragraph 7 includes a "sale," which is also undefined in paragraph 7.  Black's Law Dictionary defines "sale" as "[t]he transfer of property or title for a price." *Sale*, Black's Law Dictionary (10th ed. 2014), *available at* Westlaw (emphasis added).  *In re Cooper*, 592 B.R. 469, 480 (S.D.N.Y. 2018), *appeal dismissed* (Mar. 1, 2019) (relying on Black's Law Dictionary's definition of sale).[32] Merriam-Webster defines "sale" as "the transfer of ownership of and title to property from one person to another for a price." Sale, Merriam-Webster Dictionary (11th ed. 2011) (emphasis added).[33] *In re Cooper*, 592 B.R. at 480 (relying on Merriam-Webster definition of sale).[34]

Applying well-recognized principles of contractual interpretation that accord words their ordinary and plain meaning, a "sale" clearly falls under the definition of "financing" based on the plain meaning of each term, *i.e.*, a sale provides funds.  *Smith*, 985 F. Supp. 2d at 570.  No other

---

[31] *Epstein Decl.* at ¶ 4. [Ex. B] [Black's Law Dictionary Definition of "Financing"].
[32] *Epstein Decl.* at ¶ 5. [Ex. C] [Black's Law Dictionary Definition of "Sale"].
[33] *Id*. at ¶ 6. [Ex. D] [Merriam-Webster Dictionary Definition of "Sale"].
[34] In the instant case, it is undisputed that the Reservoir Asset Sale constituted an asset sale. *See Motion to Dismiss* at § IV(B)(1).

conclusion is reasonable. *Innophos, Inc. v. Rhodia, S.A.,* 38 A.D.3d 368, 374–75 (1st Dept. 2007), *aff'd*, 10 N.Y.3d 25 (2008) (counseling against interpreting a contract so as not to produce unreasonable results).   Accordingly, the Isley Defendants' argument that the last sentence in paragraph 7 does not apply to asset sales must fail on a dismissal motion.   *Motion to Dismiss* at § IV(B)(2).

### a. The Term "Financings" is Inherently Broad and Includes Both Debt and Equity

According to financial definitions of "financing," paragraph 7's use of the term "financing" is also inherently broad.   *Supra*. at § II(1). There are two main types of financing available for companies: debt and equity.[35] Debt is a loan that must be paid back often with interest, but it is typically cheaper than raising capital because of tax deduction considerations.[36] Equity does not need to be paid back, but it relinquishes ownership stakes to the shareholder. Both debt and equity have their advantages and disadvantages.[37]

### 2. The Only Logical Interpretation of Paragraph 7 is that the Term Financings Includes Asset Sales

Paragraph 7 is a short paragraph.   It is comprised of four (4) sentences and ninety-three (93) words.   Of those ninety-three (93) words, the words "asset sale(s)" are included in the title of the paragraph as well as twice in the body of the paragraph, for a total of **three (3) times**. Applying well-recognized principles of contractual interpretation that require that a provision should be read "as a harmonious whole,"[38] the word "financings" in the last sentence clearly includes "asset sales", which have not expired.

---

[35]FAC at ¶ 44; *see also*, https://www.investopedia.com/terms/f/financing.asp.
[36] *Id*.
[37] *Id*.
[38] *Smith*, 985 F. Supp. 2d at 570.

### III.     Paragraph 7 has not Expired Based on Controlling Principles of Contract Interpretation

The Isley Defendants' isolation of the last sentence in paragraph 7[39] from the rest of paragraph 7 (and the rest of the agreement) is inconsistent with well-established principles of contract construction, which require that all provisions of a contract be read together "as a harmonious whole." *Kinek v. Paramount Commc'ns, Inc.*, 22 F.3d 503, 509 (2d Cir. 1994) (internal citations and quotations omitted).[40]  Based on this principle of contract interpretation, the text and context of the Engagement Letters show that Pullman has exclusive rights, pursuant to paragraph 7, that remain in full force and effect.  *Id.*

#### 1.  Paragraph 7 did not Expire in 2007 Upon the Expiration of Ron Isley's Bankruptcy Proceeding

The term of Pullman's original financing securitization for the Isley Defendants under the Engagement Letters was twenty (20) years, commencing in 2001. FAC at ¶¶ 41, 108 fn. 15. Considering that paragraph 7 specifically conditioned Pullman's exclusive rights "**upon future recoupment of the Securities**", which was not contractually scheduled to occur for twenty (20) years, the only logical interpretation of paragraph 7 of the Engagement Letters is that it did not expire on the expiration of Ron Isley's federal bankruptcy proceeding.  *Epstein Decl.* at ¶ 3 (emphasis added) [Exs. A1-A7 at ¶ 7] [Engagement Letters].   No other conclusion is logical. *Encyclopedia Brown Prods. v. Home Box Office, Inc.*, 1998 WL 734355, at *9 (S.D.N.Y. 1998) (crediting plaintiff's "logical interpretation" of contract-at-issue).

---

[39] *Motion to Dismiss* at § IV(B)(1).
[40] *See* Restatement (Second) of Contracts § 202, cmt. d (1981) ("Meaning is inevitably dependent on context. A word changes meaning when it becomes part of a sentence, the sentence when it becomes part of a paragraph. A longer writing similarly affects the paragraph…and the circumstances affect the whole.").

### 2. Paragraph 7's Inclusion of the Word "Clause" Further Demonstrates that Paragraph 7 did not Expire in 2007

Courts must construe "the entire contract" with particular words or phrases "considered, not as if isolated from the context, but in the light of the obligation as a whole and the intention of the parties as manifested thereby." *Kass v. Kass*, 91 N.Y.2d 554, 566 (1998) (quotation omitted). Paragraph 7 states, in relevant part that:

> This **clause** shall be interpreted to include all future financings during the greater of owner's life or two future financing periods in addition to the initial financing contemplated by this agreement.

*Epstein Decl.* at ¶ 3 (emphasis added) [Exs. A1-A7 at ¶ 7] [Engagement Letters]. Black's Law Dictionary defines "clause" as "[a] distinct section or provision or legal document or instrument." *Clause*, Black's Law Dictionary (11th ed. 2019).[41] Applying well-recognized principles of contractual interpretation that accord words their ordinary and plain meaning,[42] the word "clause" clearly refers to the entirety of the paragraph.  No other conclusion is reasonable. *Innophos, Inc.,* 38 A.D.3d at 374–75, *aff'd*, 10 N.Y.3d 25 (2008) (counseling against interpreting a contract so as not to produce unreasonable results).

### a. The Isley Defendants' Interpretation of Paragraph 7 Violates a Basic Cannon of Contract Interpretation, *Noscitur a Sociis*

The Isley Defendants construal of the Engagement Letters are further undermined by a basic cannon of contractual interpretation, *noscitur a sociis*.

The cannon of construction known as *noscitur a sociis* is the meaning of a word or phrase is "known from its associates" or "determined by the company it keeps." *242–44 E. 77th St., LLC v. Greater N.Y. Mut. Ins. Co.,* 31 A.D.3d 100, 103–104 (1st Dept. 2006) [internal quotation marks and citation omitted]).  Thus, the phrases "financing" and "asset sales" must be interpreted

---

[41] *Epstein Decl.* at ¶ 7. [Ex. E] [Black's Law Dictionary Definition of "Clause"].
[42] *Smith*, 985 F. Supp. 2d at 570.

considering other references in the Engagement Letters. *Innophos, Inc.,* 38 A.D.3d at 374–75, *aff'd*, 10 N.Y.3d 25 (2008); *Partner Canada Biomedical Int'l, Inc. v. Amgen, Inc.*, 2018 WL 3462516, at *2 (S.D.N.Y. 2018).  The Engagement Letters include the words "asset sale" in several paragraphs, for a total of six (6) times[43], three (3) of which appear in paragraph 7 alone. Each reference supports the construal of the word "financing" in paragraph 7 to include "asset sales."

The first place that the words "asset sales" are used is in paragraph 3, titled "Pullman's Services."[44] That section clearly includes that Pullman's services encompasses "asset sales" separate and apart from a securitization. *Id.* The second place that the words "asset sale" are used is in paragraph 5, titled "Compensation to Pullman." *Id.* [Exs. A1-A7 at ¶ 5] [Engagement Letters]. That paragraph specifically provides, in relevant part, that:

(a)     As compensation for Pullman's performance of the Services, Owner shall pay to Pullman:

\*\*\*

(ii)     A fee equal to ten percent (10%) of the aggregate commitment amount of a Warehouse Loan or asset sale, or

(iii)     A fee equal to ten percent (10%) of the aggregate principal amount of investment-grade Securities or proceeds from the asset sale(s) payable at the time the Securities or assets are sold.

*Id*. Thus, considering the above, it is clear that "asset sales" refer to the sale of the Isley Defendants' musical assets. *Encyclopedia Brown Prods.*, 1998 WL 734355 at *9  (crediting "logical interpretation" of contract-at-issue).

Turning to Pullman's exclusive rights to arrange an "asset sale," there are two places in paragraph 7 that show that this provision remains in full force and effect. The first is in the first sentence that provides:

---

[43] *Epstein Decl.* at ¶ 3 [Exs. A1-A7 at ¶¶ 3(a), 5(ii), 5(iii), and 7] [Engagement Letters].
[44] *Id*. [Exs. A1-A7 at ¶ 3] [Engagement Letters].

> 7. <u>Refinancing or Asset Sale(s)</u>.  Pullman is granted the exclusive right, at its sole discretion, to refinance any future transaction(s) or asset sale(s) for owner **upon future recoupment of the Securities**.

*Epstein Decl.* at ¶ 3 [Exs. A1-A7 at ¶ 7] [Engagement Letters].   Since Pullman successfully arranged "Securities," the condition precedent in the above-referenced sentence sprung Pullman's "exclusive rights" to arrange "asset sales."  *Id.* [Exs. A1-A7 at ¶¶ 3(a), 5] [Engagement Letters].

The second place that shows that Pullman's exclusive rights have not expired is in the last sentence in paragraph 7, which provides that:

> This clause shall be interpreted to include all future financings during the greater of owner's life or two future financing periods in addition to the initial financing contemplated by this agreement.

*Id.* [Exs. A1-A7 at ¶ 7] [Engagement Letters].   Thus, the cannon of construction *noscitur a sociis* shows that the word financing in paragraph 7 includes asset sales. *Innophos, Inc.,* 38 A.D.3d at 374–75, *aff'd*, 10 N.Y.3d 25 (2008).

### IV.   The Isley Defendants Mischaracterize Pullman's Argument Concerning the Length of Time of the Exclusivity Period Included in Paragraph 7

In § IV(B)(3) of the Motion to Dismiss, the Isley Defendants inexplicably attribute a legal theory to Pullman that is not included in the FAC, in that Pullman claims the exclusivity rights under the Engagement Letters endure in "perpetuity." *Motion to Dismiss* at p. 10.  This is false. Nowhere in the FAC does Pullman use word "perpetuity," let alone allege that the exclusivity rights contained in paragraph 7 endure in "perpetuity."

On the contrary, the FAC clearly sets forth the period for Pullman's exclusivity rights. The term of Pullman's original financing securitization for the Isley Defendants under the Engagement Letters was twenty (20) years, commencing in 2001.  FAC at ¶¶ 41, 108 fn. 15. Thus, Pullman's exclusive rights with respect to refinancings/asset sales continued for the original plus the greater

of the life of any "Owner"[45] under the Engagement Letters or two "future financing periods," or, at least, through 2061. FAC at ¶ 41. This is not in "perpetuity." *Motion to Dismiss* at § IV(B)(3).

1. **The Isley Defendants' Wrongfully Insinuate that Pullman did not Earn the Exclusivity Rights Contained in Paragraph 7**

The Isley Defendants argument that Pullman did not arrange the EMI Transaction and the Reservoir Transaction is a red herring.

The exclusive rights with respect to future asset sale(s) and refinancing(s) were an essential component of Pullman's compensation under the Engagement Letters. FAC at ¶¶ 42, 111. Pullman specifically bargained for – and earned -- valuable exclusivity rights to arrange asset sales of the Isley Defendant's musical assets. *Id.* at ¶ 5. Pullman received the 10% fee set forth in the Engagement Letters, plus, *inter alia*, the "exclusive right, at [Pullman's] sole discretion, to refinance any future transaction(s) **or asset sales(s) for [the Isley Defendants]** upon future recoupment of the Securities…on the same terms and conditions outlined herein."[46]

Had Pullman not arranged the issuance of "Securities" within the contractually prescribed period, Pullman would not have been entitled to any compensation under paragraph 5.[47] Nor would Pullman have been entitled to the exclusivity rights contained in paragraph 7, which contained a condition precedent, *i.e.*, "upon future recoupment of the Securities."[48] Having successfully arranged the "Securities," Pullman's exclusivity rights under paragraph 7 sprung into effect.[49] Therefore, Pullman earned the exclusivity rights under paragraph 7.

---

[45] *Epstein Decl.* at ¶ 3 [Exs. A1-A7 at ¶ 7] [Engagement Letters].
[46] *Epstein Decl.* at ¶ 3 (emphasis added) [Exs. A1-A7 at ¶¶ 5-7] [Engagement Letters].
[47] *Id.*
[48] *Id.* [Exs. A1-A7 at ¶ 7] [Engagement Letters].
[49] *Id.*

## 2. Pullman Satisfied the Condition Precedent that Triggered his Rights Under Paragraph 7 of the Engagement Letters

A condition precedent is "an act or event…[which] must occur before a duty to perform a promise in the agreement arises." *Oppenheimer & Co. v. Oppenheim, Appel, Dixon & Co.*, 86 N.Y.2d 685, 690 (1995). Conditions can be express or implied. *Id*. "Express conditions are those agreed to and imposed by the parties themselves." *Oppenheimer & Co.*, 86 N.Y.2d at 690 . The Engagement Letters contain a condition precedent that conditions Pullman's rights under paragraph 7 to the achievement of the issuance of "Securities" for the Isley Defendants. This is the case here.

A plain reading of the contract[50], shows that Pullman's rights under paragraph 7 sprung into effect upon the recoupment of the "Securities." *Epstein Decl*. at ¶ 3 [Exs. A1-A7 at ¶ 3(a)] [Engagement Letters]. The Engagement Letters state:

> 7. <u>Refinancing or Asset Sale(s)</u>. Pullman is granted the exclusive right, at its sole discretion, to refinance any future transaction(s) or asset sale(s) for owner upon future recoupment of the Securities…

*Id*. at ¶ 3 [Exs. A1-A7 at ¶ 7] [Engagement Letters]. Pullman fulfilled the condition precedent in that the Securities were issued and recouped. FAC at ¶ 57. Having triggered the condition precedent,[51] the correct measure for the expiry of Pullman's exclusive rights with respect to refinancing/asset sales that continued for the original plus the greater of the life of any "Owner" under the Engagement Letters or two "future financing periods," or, at least, through 2061.[52]

---

[50] *Smith*, 985 F. Supp. 2d at 570

[51] Paragraph 7 states in relevant part that:

> This clause shall be interpreted to include all future financings **during the greater of owner's life or two future financing periods in addition to the initial financing contemplated by this agreement**.

Epstein Decl. at ¶ 3 (emphasis added) [Exs. A1-A7 at ¶ 7] [Engagement Letters].

[52] The term of Pullman's original financing securitization for the Isley Defendants under the Engagement Letters was twenty (20) years, commencing in 2001. Thus, Pullman's exclusive rights with respect to refinancing/asset sales

## V.    The Isley Defendants Rely on Inapposite Authority to Show that Pullman's FAC is out of Time

All the cases that the Isley Defendants rely on are easily factually and legal distinguishable from the instant case.  The Isley Defendants principal reliance on this Court's decision in *Int'l Techs. Mktg., Inc. v. Verint Sys., Ltd.*[53] is legally and factually flawed because a side-by-side comparison of the respective agreements at issue clearly shows that the underlying contracts are fundamentally different. This is clear.

The operative agreement in *International Techs.* (the "International Techs. Agreement")[54] in paragraph 8, entitled "Term", stated, in relevant part, as follows:

> This agreement shall be effective from the date hereof and shall continue in effect for a period of 12 months thereafter…

*Epstein Decl.* at ¶ 8. [Ex. F at ¶ 8] [International Techs. Agreement]. Subsequently, the International Techs. Agreement had been amended to include a 1-page amendment (the "International Techs. Amendment")[55] that provided, in relevant part, as follows:

> Except as specifically included herein, all terms and conditions of the [International Techs. Agreement] will continue to apply to between the parties.

*Epstein Decl.* at ¶ 9. [Ex. G at ¶ 8] [International Techs. Amendment]. The above-referenced paragraph is fundamentally different than the one at issue here because paragraph 7 has a clause that specifically extends the termination date of the contract based on a condition precedent. paragraph 7 provides, in relevant part:

> 7. <u>Refinancing or Asset Sale(s)</u>…Pullman is granted the exclusive right, at its sole discretion, to refinance any future transaction(s) or asset sale(s) for owner **upon future recoupment of the Securities**.

---

continued for the original plus the greater of the life of any "Owner" under the Engagement Letters or two "future financing periods," or, at least, through 2061. Ronald and Rudolph are both still alive. *See id.*; *see also* FAC at ¶ 41.

[53] 157 F. Supp. 3d 352, 363 (S.D.N.Y. 2016) (hereafter, "*International Techs.*").

[54] *Epstein Decl.* at ¶ 8. [Ex. F] [International Techs. Agreement].

[55] *Epstein Decl.* at ¶ 9. [Ex. G] [International Techs. Amendment].

*Epstein Decl*. at ¶ 3 (emphasis added) [Exs. A1-A7 at ¶ 7] [Engagement Letters]. The contracts in *International Techs*. contained no such clause as the one contained in paragraph 7. This is a crucial and fundamental difference. Indeed, this Court, in *International Techs*., held that the statute of limitations on the contract had expired because the plaintiff had no alternative explanation for another expiration period. 157 F. Supp. 3d 352, 363 (S.D.N.Y. 2016). That is not the case here. *See* §§ I-V, *supra*. Accordingly, the Isley Defendants reliance on *International Techs*. is misplaced.

### 1.   The Remainder of the Cases the Isley Defendants Rely on are Also Inapposite

The underlying contract in *Kropschot Fin. Servs., Inc. v. Balboa Capital Corp.* is fundamentally different than the one at issue here. 2012 WL 1870697, at *5 (S.D.N.Y. 2012). There, the court dismissed the breach of contract claims on the ground of statute of limitations solely on the basis that the contract clearly required an "mutual *written* agreement" for an extension. *Id*. (emphasis in original). That is not the case here. Accordingly, the Isley Defendants reliance on *Kropschot Fin. Servs., Inc.* is factually inapposite.

In *Diversified Media Brokerage Partners v. Upscale Commc'ns, Inc.*, the court dismissed the breach of contract claim because it contained "nothing about renewals or extensions." 2010 WL 5068936, at *1 (E.D.N.Y. 2010). This is not the case here given that paragraph 7 of the Engagement Letters contains an extension clause. Accordingly, the Isley Defendants' reliance on *Diversified Media Brokerage Partners* is factually inapposite.

Tellingly, the only other two cases relied on by the Isley Defendants, *Raymond Weil, S.A. v. Theron* and *Sevel Argentina, S.A. v. Gen. Motors Corp.*, are also factually misplaced and procedurally inapposite, because the cases were decided on motions for summary judgment under Fed.R.Civ.P. 56. *Raymond Weil, S.A. v. Theron*, 585 F. Supp. 2d 473, 477 (S.D.N.Y. 2008); *Sevel Argentina, S.A. v. Gen. Motors Corp.*, 46 F. Supp. 2d 261, 271 (S.D.N.Y. 1999).

**VI.     The Isley Defendants' Argument that the Engagement Letters Violate New York Law's Clear Statement Rule Presents a Question of Fact that Precludes Summary Dismissal Under Fed.R.Civ.P. 12(b)(6)**

The law is clear. "[W]hen the language of a contract is ambiguous, its construction **presents a question of fact**,' which of course precludes summary dismissal" on a dismissal motion under Fed.R.Civ.P. 12(b)(6).   *Crowley v. VisionMaker, LLC*, 512 F. Supp. 2d 144, 152 (S.D.N.Y. 2007) (emphasis added); *accord, e.g., Psenicska v. Twentieth Century Fox Film Corp.,* 2008 WL 4185752 at *4 (S.D.N.Y. 2008) ("Where there are alternative, reasonable interpretations of a contract term rendering it ambiguous, the issue should be submitted to the trier of fact and is not suitable for disposition on a motion to dismiss."); *Wurtsbaugh v. Banc of Am. Sec. LLC,* 2006 WL 1683416 at *5 (S.D.N.Y. 2006) (same); *see also, e.g., Eternity Global*, 375 F.3d at 178.

On a motion to dismiss, "a contract is ambiguous if it is reasonably susceptible to more than one meaning." *Maniolos v. United States*, 741 F. Supp. 2d 555, 567 (S.D.N.Y. 2010), *aff'd,* 469 F. App'x 56 (2d Cir. 2012). The Court "should resolve any contractual ambiguities in favor of the plaintiff" on a motion to dismiss. *Subaru Distrib. Corp. v. Subaru of Am., Inc.,* 425 F.3d 119, 122 (2d Cir. 2005); *accord, e.g., Gerritsen v. Glob Trading, Inc.,* 2009 WL 262057 at *4 (E.D.N.Y. 2009) ("Where, as here, a court is determining whether a plaintiff has adequately stated a cause of action for breach of contract, all contractual ambiguities should be resolved in favor of the plaintiff.").  But this is not the legal standard urged on the Court by the Isley Defendants for dismissal under Fed.R.Civ.P. 12(b)(6).

The Isley Defendants ask this Court to rule as a matter of law that the Engagement Letters violate the clear statement rule. This is procedurally improper on a dismissal motion under Fed.R.Civ.P. 12(b)(6).  *Infra*. at § VII.  As set forth more fully below, the Engagement Letters satisfy New York law's clear statement rule as recognized in *Dominick & Dickerman LLC v.*

*Deutsche Oel & Gas AG*.[56]  To the extent there is any ambiguity, dismissal is not warranted under

Fed.R.Civ.P. 12(b)(6).  *Infra*. at § VII.

### VII.   The Engagement Letters are Drafted in Accordance With New York's Clear Statement Rule

Under New York law, a contract giving rise to an exclusive right to sell must "clearly and

expressly" "exclude the owner from independently negotiating a sale." *Deutsche Oel & Gas AG*,

756 F. App'x at 61 (*citing Morpheus Capital Advisors LLC v. UBS AG*, 23 N.Y.3d 528 (2014))

(internal quotation marks omitted). "[A]n exclusive right to sell is only created with an unequivocal

expression of intent by its own terms or by necessary implication from its terms." *Id*.  Paragraph

7 provides, in relevant part:

> Refinancing or Asset Sale(s).  **Pullman is granted the exclusive right, at its sole discretion**, to refinance any future transaction(s) or asset sale(s) for owner upon future recoupment of the Securities…**Such refinancing will be on the same terms and conditions outlined herein**.

*Epstein Decl*. at ¶ 3 (emphasis added) [Exs. A1-A7 at ¶ 7] [Engagement Letters].  The first place

where the Engagement Letters satisfy the "clear statement rule" is in the first sentence that provides

that Pullman "**sole discretion**" to refinance any future transaction(s) or asset sale(s).  *Id*. (emphasis

added).  The second place where there the Engagement Letters satisfy the clear statement rule is

in the third sentence, which provides "**Such refinancing will be on the same terms and

conditions outlined herein**."  *Id*. (emphasis added). As paragraph 7 provides that "the same terms

and conditions outlined herein" govern, the terms and conditions contained in paragraph 2 of the

Engagement Letters apply to paragraph 7.  Paragraph 2 provides, in relevant part that:

> "During the Engagement Period, **neither Owner nor anyone acting on its behalf shall, other than with or through Pullman, undertake any activities with regard to Transactions**."

---

[56] 756 F. App'x 58, 61 (2d Cir. 2018) (summary order).

Epstein Decl. at ¶ 3 (emphasis added) [Exs. A1-A7 at ¶ 2] [Engagement Letters]. The above-emphasized language in the first and third sentences satisfy the clear statement rule because each of those sentences explicitly exclude the owner from independent negotiation of a sale. *Id*.; *Deutsche Oel & Gas AG*, 756 F. App'x at 61.

The Engagement Letters also satisfy the clear statement rule by necessary implication of its terms. *Id.* Paragraph 7 provides "**Pullman is granted the exclusive right, at its sole discretion**, to refinance any future transaction(s) or asset sale(s)." Epstein Decl. at ¶ 3 (emphasis added) [Exs. A1-A7 at ¶ 2] [Engagement Letters]. By its very terms (and by implication), paragraph 7 provides Pullman – and Pullman only – the "**sole discretion**" to negotiate a sale. *Id.*

Thus, the Engagement Letters satisfy the "clear statement rule" in paragraph 2 and two separate places in paragraph 7 by unequivocal expression of intent by its own terms and by necessary implication from its terms. *Deutsche Oel & Gas AG*, 756 F. App'x at 61.

### 1. *Dominick* is Factually Distinguishable and Inapposite

The Isley Defendants principal reliance on *Dominick & Dickerman LLC v. Deutsche*[57] is legally and factually flawed because a side-by-side comparison of the respective agreements at issue clearly shows that the underlying contracts are fundamentally different. This is clear

Presumably because the underlying contracts at issue here and in *Dominick* are fundamentally different, the Isley Defendants' three-page analysis of *Dominick* did not annex the underlying contract in *Dominick*. The critical exclusivity provision in *Dominick* is found in paragraph 5, entitled "Term", provides in relevant part: "Dominick shall be DOGAG's exclusive advisor on all Funding transaction in the United States." *Epstein Decl.* at ¶ 10. [Ex. H] [Dominick

---

[57] 756 F. App'x 58 at 61   (summary order).

Agreement].   The above-referenced paragraph is critically different than the one at issue here because the Engagement Letters contain two separate exclusivity provisions, *to wit*:

Paragraph 2 provides, in relevant part that:

"During the Engagement Period, **neither Owner nor anyone acting on its behalf shall, other than with or through Pullman, undertake any activities with regard to Transactions**."

Epstein Decl. at ¶ 3 (emphasis added) [Exs. A1-A7 at ¶ 2] [Engagement Letters].

. . .

Paragraph 7 provides, in relevant part, as follows:

Refinancing or Asset Sale(s).  **Pullman is granted the exclusive right, at its sole discretion**, to refinance any future transaction(s) or asset sale(s) for owner upon future recoupment of the Securities. . . **Such refinancing will be on the same terms and conditions outlined herein**.

*Epstein Decl*. at ¶ 3 (emphasis added) [Exs. A1-A7 at ¶ 7] [Engagement Letters].  The contract in *Dominick* contained no such clauses as the ones contained in paragraph 2 and 7.  Accordingly, the Isley Defendants' reliance on *Dominick* is factually misplaced.

## 2.  Pullman is Contractually Entitled to Fees on Asset Sales to Reservoir and EMI

Contrary to the Isley Defendants' Motion to Dismiss at IV(C)(3), Pullman is contractually entitled to fees by the very terms of the Engagement Letters. One of the "terms and conditions" referenced in paragraph 7 of the Engagement Letters is Paragraph 5(c)(iii), which entitles Pullman "to its fee in full [*i.e*., 10%]" and liquidated damages in the amount of $250,000 in the event that a transaction "does not occur because of [the Isley Defendants'] failure or refusal to perform its obligations under this Engagement Letter**.**"[58]

---

[58] *See Epstein Decl.* at ¶ 3 [Exs. A1-A7 at ¶¶ 5(c); 12] [Engagement Letters]; FAC at ¶¶ 2-3.

## VIII.   Pullman's Causes of Action are Well Pled

The FAC asserts six causes of action: claims against the Isley Defendants for breach of contract (First, Second and Sixth Causes of Action, FAC ¶¶ 105-121, ¶¶157-165), foreclosure of contractual liens (Fifth Cause of Action, FAC ¶¶ 138-142), and attorney's fees and costs (Third Cause of Action, FAC ¶¶ 122-124); and a claim against Reservoir, Isley Brothers, L.L.C. and Isley Brothers Royalty Venture I SPC for tortious interference with contract (Fourth Cause of Action, FAC ¶¶ 125-137).

As tacitly acknowledged by the Isley Defendants, Pullman's causes of action for foreclosure of contractual liens (Fifth Cause of Action), attorney's fees and costs (Third Cause of Action), and tortious interference with contract (Fourth Cause of Action), are all well pled as the Isley Defendants only argument for dismissal is that these "derivative" claims fail because the Engagement Letters have expired. *Motion to Dismiss* at § IV(D). As set forth more fully above, paragraph 7 has not expired. *Supra* at §§ II-III. Thus, should the Court find favorably for Pullman, all causes of action in the FAC should survive given that the Isley Defendants' do not challenge the sufficiency of the pleading of each cause of action.[59]

## <u>CONCLUSION</u>

For the reasons stated above, the Isley Defendants' Motion to Dismiss should be denied in its entirety.

---

[59] In the alternative, should the Court not find favorably for Pullman, the Court should respectfully allow Pullman to re-plead. *Cruz v. TD Bank, N.A.*, 742 F.3d 520, 523 (2d Cir. 2013) ("it is the usual practice upon granting a motion to dismiss to allow leave to replead").

Dated: New York, New York
         December 9, 2020

                                    Respectfully Submitted,

                                    LEVIN EPSTEIN & ASSOCIATES, P.C.

                                    _/s Joshua Levin-Epstein, Esq._
                                    Joshua Levin-Epstein, Esq.
                                    Jason Mizrahi, Esq.
                                    420 Lexington Avenue, Suite 2525
                                    New York, New York 10170
                                    Tel No.: (212) 792-0046
                                    *Attorneys for Plaintiff*